Eddie Mitchell TASBY, et al., Plaintiffs,

v.

Dr. Linus WRIGHT, General Superintendent, Dallas Independent School District, et al., Defendants.

Civ. A. No. 3–4211–H.

United States District Court,
N. D. Texas,
Dallas Division.

Aug. 3, 1981.

Edward B. Cloutman, III, Mullinax, Wells, Baab, Cloutman & Chapman, Patrick A. White, Dallas Legal Services Foundation, Inc., Dallas, Tex., for plaintiffs.

Mark Martin and Robert H. Thomas, Strasburger & Price, Dallas, Tex., for DISD, Wright, et al.

Thomas I. Atkins, Gen. Counsel, NAACP Special Contribution Fund, New York City, Ernest Lemuel Haywood, Mahomes, Biscoe & Haywood, Dallas, Tex., for NAACP, intervenor.

James A. Donohoe, Gardere & Wynne, Dallas, Tex., for Brinegar, et al., intervenor.

Robert W. Blumenthal and John Martin, Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., for Curry, et al., intervenors.

H. Ron White, H. Ron White & Associates, Dallas, Tex., for Dallas Alliance, amicus curiae.

E. Brice Cunningham, Dallas, Tex., for Cunningham and Dockery, intervenors.

Joan T. Winn, Dallas, Tex., for Black Coalition to Maximize Ed., intervenor.

## TABLE OF CONTENTS

I. History of the Case 686

II. The Parties: Who's Still Here 689

686

III. Demography and Geography: The city, the
 school district, and the students 690
 A. The City of Dallas 690
 B. Scholastic Enrollment 692
 C. Subdistrict Organization 695
 D. Summary 699

IV. Relevant Cases and Principles 701

V. The Constitutional Violation 705

VI. Constitutional Adequacy of the Existing Plan 707

VII. Kindergarten-Third Grade Schools 713
 A. Demographics of the K-3 Schools 714
 B. Time and Distance Study, K-3 Grades 724
 C. Impact of Busing on K-3 Education 730
 D. Opposition of Minority Parents to K-3 Busing 732

VIII. High Schools 733

IX. Fourth through Eighth Grade Schools 736

X. East Oak Cliff 739
 A. Background of the East Oak Cliff Subdistrict 740
 B. Implementation of the 1976 Court Order 741
 C. Feasibility of Transportation to Desegregate
 East Oak Cliff 743

XI. Magnet High Schools 744

XII. Majority-to-Minority Transfers 748

XIII. Remedy 749

OPINION OF THE COURT

SANDERS, District Judge.

■ Today the Court decides that vestiges of state-imposed racial segregation remain in the Dallas Independent School District (DISD). The Court holds that additional systemwide transportation is not a feasible remedy for the existing constitutional violation. The Court believes, however, that effective remedies can be fashioned and directs the parties to prepare and file desegregation plans for the Court's consideration.

I. *History of the Case*

This case is before the Court on remand from U.S. Court of Appeals for the Fifth Circuit. *Tasby v. Estes*, 572 F.2d 1010 (1978), *reh. en banc denied*, 575 F.2d 300 (1978); *cert. dismissed, Estes v. Metropolitan Branches of Dallas NAACP, et al.*, 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980). The Circuit has directed this Court to make specific findings regarding the feasibility of using the desegregation techniques approved in *Swann v. Charlotte-Mecklenburg Board of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (*Swann*), to reduce the number of one-race schools in the Dallas Independent School District.

This case was originally filed in October 1970, Plaintiffs seeking the development of a comprehensive desegregation plan for DISD. The case was tried in July 1971, *Tasby v. Estes*, 342 F.Supp. 945, *aff'd in part, rev'd in part, and remanded with directions, Tasby v. Estes*, 517 F.2d 92 (5th Cir. 1975); tried again in 1976, *Tasby v. Estes*, 412 F.Supp. 1192; and remanded again in 1978, *Tasby v. Estes*, 572 F.2d 1010 (5th Cir.), with directions to make "findings to justify the maintenance of any one-race schools that may be a part of" a new student assignment plan. 572 F.2d at 1018.

The DISD was no stranger to desegregation litigation when this action was initiated, having been involved in several similar lawsuits[1] since the 1955 U.S. Supreme Court decision in *Brown II. Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). A "stair-step" (one grade per year) plan for desegregation was ordered by the federal court in 1960. Implementation began at the first grade level in the 1961–62 school year, and thereafter, the DISD converted from dual attendance zones to single zones on a grade-a-year basis until 1965, when the Fifth Circuit ordered the process accelerated to include all six elementary grades as well as the twelfth grade. Dual zones were eliminated for junior high schools in 1966 and for the remaining grades ten and eleven in 1967. The "stair-step" plan merely called for the elimination of racial criteria from the school system's admission policies. The courts did not direct DISD (and DISD did not volunteer) to take affirmative action to eradicate the vestiges of the former statutory segregated system. So, while it can fairly be said that DISD, like many another school district, moved with maximum deliberation and minimum speed to carry out the 1955 desegregation mandate of the U.S. Supreme Court, it should also be said that the federal court moved at the same pace; DISD did what the Court ordered—no more, no less.[2]

Since the filing of *Tasby v. Estes* ten years ago, a number of complex issues have been raised and resolved in this Court and the appellate courts.

(1) Elements of the former dual system were found to remain, in violation of the Constitution, as evidenced chiefly by the number of segregated schools present in 1971. 342 F.Supp. at 947.

(2) The Court was unable to find that *de jure* segregation had been practiced against hispanic students; nevertheless, it determined that any remedy or plan ultimately adopted would be tri-ethnic in scope and treat hispanics as a distinct ethnic minority group for purposes of student assignment. 342 F.Supp. at 948; *aff'd*, 517 F.2d at 106–07.

(3) The issues relating to metropolitan, interdistrict violation and remedy were separately litigated. Plaintiffs failed to make the showing of "significant segregative effect" required under *Milliken I*,[3] with respect to the suburban Highland Park I.S.D., thereby foreclosing the possibility of multi-district remedy. 412 F.Supp. at 1188–91; *aff'd*, 572 F.2d at 1016. Plaintiffs voluntarily dismissed their complaints against six other suburban school districts.

In 1976 this Court (Taylor, J.) after considering desegregation plans submitted by

---

1. *See, e. g., Bell v. Rippy*, 133 F.Supp. 811 (N.D.Tex.1955); *Borders v. Rippy*, 184 F.Supp. 402 (N.D.Tex.1960); *Boson v. Rippy*, 285 F.2d 43 (5th Cir. 1960); *Britton v. Folsom*, 348 F.2d 158 (5th Cir. 1965); *Britton v. Folsom*, 350 F.2d 1022 (5th Cir. 1965).

2. *See Taylor v. Ouachita Parish Bd.*, 648 F.2d 959, 968 n.10 (5th Cir. 1981) ("... How, the parish asks, can it be violating the Constitution in implementing a court-ordered plan of desegregation? We simply note that conscientious adherence to the command [to eradicate vestiges of segregated schools] may require more of the school board than simply vigorous adherence to the often narrow results of the ponderous litigation machinery.") *See also, Tasby v. Estes*, 342 F.Supp. at 947.

3. *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*).

DISD, Plaintiffs, a court-appointed expert and others, adopted the plan submitted by *amicus curiae*, the Dallas Alliance. The Alliance is a community service organization consisting of seventy-seven correspondent organizations in the Dallas area and having a forty member Board of Trustees, which seeks to assist in focusing attention on and devising solutions for a wide range of current issues facing the city. The Alliance plan had been prepared by its tri-ethnic twenty-one member Educational Task Force after an intensive four-month study.

The essential features of the Alliance plan may be summarized in the following fashion. The school district has been carved into six subdistricts, four of which [4] are geographically structured in such a way that their enrollments reflect the same racial composition as the overall DISD, plus or minus five percent. The remaining two subdistricts [5] were exempt from the racial composition requirement.

Within each of the subdistricts, students in grades kindergarten through three (K–3) were assigned according to then existing assignment patterns, with special emphasis placed on compensatory education involving individualized, diagnostic-prescriptive methods of instruction. In grades 4–8, satellite zoning and transportation techniques were used to establish desegregated schools located around the center of each subdistrict. In grades 9–12, magnet schools and majority-to-minority transfer options were the principal tools of desegregation, leaving students who declined to opt for one of these programs attending the high school in their regular neighborhood attendance zone. Exceptions to the general student assignment principles were made for students who resided in areas which were considered integrated by residential housing patterns (the "naturally integrated areas"), and for students in the East Oak Cliff and Seagoville subdistricts. Other provisions of the desegregation plan concerned special instructional programs, transfer options, discipline policy, facilities construction and improvement, faculty assignment and training, and accountability.

After the case was returned to this Court by the Supreme Court in 1980, the parties negotiated unsuccessfully in an effort to reach an agreement on a desegregation plan. Time and distance studies were ordered by Judge Taylor and trial on the issues raised in the Circuit's mandate was set for March 16, 1981. On March 13 Intervenor NAACP by motion requested Judge Taylor to recuse himself; Judge Taylor did so and on March 20, 1981, this case was assigned to the undersigned Judge for trial. Trial commenced April 27 and concluded May 22, 1981.

In remanding this case, the Fifth Circuit expressed concern about the number of one-race schools under the 1976 Plan—specifically, K–3 schools, high schools, and schools in the East Oak Cliff Subdistrict. The Circuit stated:

> We cannot properly review any student assignment plan that leaves many schools in a system one race without specific findings by the district court as to the feasibility of [*Swann* desegregation] techniques.

572 F.2d at 1014. This Court is also directed by the Circuit "to reevaluate the effectiveness of the magnet school concept", 572 F.2d at 1015, and "to consider assigning anglo students to the [Nolan Estes Educational Plaza [6]] complex" located in East Oak Cliff. 572 F.2d at 1017.

---

**4.** Northwest, Northeast, Southwest and Southeast.

**5.** The East Oak Cliff subdistrict is predominantly black; the rural Seagoville subdistrict is predominantly anglo, but its total enrollment represents a very small proportion of the DISD student population.

**6.** In its 1978 Opinion, the Fifth Circuit approved the school district's acquisition of the former A. Harris Shopping Center for conversion into a multi-school complex. 572 F.2d at 1016–18. Referred to in that opinion as the "shopping center site", the facility was renamed the Nolan Estes Educational Plaza upon completion of its renovation.

## II. *The Parties: Who's Still Here*

As is quite often the case with protracted litigation,[7] the cast of characters appearing before the Court has changed noticeably since 1976, and in some respects has changed radically since these proceedings were initiated in 1971. Intervenors new and old have come and gone. Out of the fourteen or so parties who remain of record in this litigation, eight participated in the month-long hearing just concluded. Evidence was introduced at the hearing on behalf of the Plaintiffs Tasby, et al., representing a class of black and hispanic students; the Defendants, Superintendent Linus Wright and the individual members of the Board of Trustees of DISD [8]; the Curry intervenors, representing a group of far North Dallas parents and students; the Brinegar intervenors, representing a group of people who reside in portions of East Dallas that are multi-racial and multi-ethnic as a result of residential housing patterns; the NAACP intervenors, representing a class of black students; the Cunningham intervenors, representing two black students; and the Black Coalition to Maximize Education ("Black Coalition"), a newcomer among the intervenors, representing a class of black parents with children in DISD whose interests and positions on the issues in this case were found to differ from those of the other parties. The Educational Task Force of the Dallas Alliance, continuing in its capacity as *amicus curiae*, did not call witnesses or put on evidence of its own, but did participate by questioning the witnesses called by the other parties, in an effort to lend further assistance to the Court.[9]

The precise positions of each of the parties on the issues before the Court can be discerned from a reading of the proposed pretrial orders filed by each. Broadly speaking, it can be said that the Defendant DISD, the Brinegar intervenors, the Curry intervenors, and the intervenor Black Coalition have all introduced evidence in an effort to justify, constitutionally, the maintenance of all or most of the provisions of the Court's 1976 Plan. The Plaintiffs Tasby, the intervenor NAACP, and the intervenors Cunningham, on the other hand, have sought to prove that the techniques used in the 1976 Plan are constitutionally inadequate to remedy the vestiges of past segregation and that the DISD has failed to achieve the greatest possible degree of actual school desegregation.

A further comment should be made about the stance taken by the Black Coalition, a party that has only become involved in this litigation in recent months and has, consequently, not been previously identified in the reported opinions of this case. The Black Coalition is a broad-based minority community group composed of parents, patrons and taxpayers with children in the DISD, as well as representatives from a number of civic, political and ecumenical associations in the black community.[10] Organizers of the group sought input from Dallas blacks on the issues pending before this Court by conducting a series of open meetings in the community during 1980. Leave of court was granted for the Black Coalition to intervene in the matter on January 19, 1981, after the Court was satisfied that the viewpoints of its members were not adequately represented by (and were

---

7. *See generally*, C. Dickens, *Bleak House* ch. 1 (London 1853).

8. By Order dated April 22, 1981, Superintendent Wright and the nine current members of the school board were substituted as parties defendant in place of their respective predecessors in office, Dr. Estes, et al.

9. Others remaining of record, who did not play an active role in the latest phase of these proceedings, include the City of Dallas, the Strom intervenors, the Citizens of Oak Cliff, intervenor James T. Maxwell, intervenor Herman

Bond, and the Mexican-American Legal Defense and Educational Fund, Inc.

10. Representative member organizations of the Black Coalition include the Dallas Black Chamber of Commerce, Dallas Council of Black Parents and Citizens, Dallas Black Business and Professional Women, Dallas Committee of 100, Pylon Salesmanship Club, National Council of Negro Women (Dallas Section), Dallas Ministerial Alliance, East Oak Cliff Citizens, and the Dallas Urban League.

often adverse to) the Plaintiffs and intervenor NAACP.

The testimony offered by the large number of witnesses who testified in behalf of the Black Coalition has convinced the Court that there is considerable difference of opinion among sizeable segments of the minority citizenry of Dallas over the type of relief that should be ordered in this case. The Court is in no position, based on the testimony offered thus far, to determine which of the parties speaks for the greater number of Dallas blacks and hispanics. It is doubtful that such a thing can be accurately measured or surveyed, but even if it were capable of proof, this is a finding that need not be made. What is clear from the testimony is that no one party to this suit can lay claim any longer to speaking on behalf of the entire minority population as a sacrosanct "class". As one noted legal scholar has put it:

> Basic principles of equity require courts to develop greater sensitivity to the growing disagreement in black communities over the nature of school relief. Existing class action rules provide ample authority for broadening representation in school cases to reflect the fact that views in the black community are no longer monolithic . . . . [I]t is incumbent on the courts to ensure the fairness of proceedings that will bind absent class members.[11]

By its intervention in this lawsuit, the Black Coalition merely gives formal recognition to the same undercurrents of tension and disunity among blacks that were experienced over the lengthy course of desegregation litigation in such large cities as Atlanta, Detroit, Nashville and Boston.[12] Although the multiplicity of minority viewpoints is not a situation unique to Dallas, the Court is not aware of any other case where intervenor status has been taken for the purpose of advancing the divergent positions on the record.

The Black Coalition represents a substantial body of blacks who are opposed to any escalation in the use of racial balance remedies to cure the effects of school segregation. The Coalition prefers remedies designed to improve educational quality and to eliminate the disparity in academic achievement that can be attributed to past segregation, as alternatives to remedies that require pupil reassignments to noncontiguous attendance zones and mandatory transportation.

## III. Demography and Geography: The city, the school district, and the students

### A. The City of Dallas

The starting point for evaluating any desegregation plan is determining the numbers and whereabouts of the school-age children affected. In the forty years following the start of the Second World War, Dallas has undergone profound changes in demography. The Dallas experience is prototypical of the rapid urbanization that has occurred during the last several decades in numerous boom towns throughout the "Sunbelt". To a great extent Dallas has become a new city, largely suburban in its development pattern. Since 1940 the physical area embraced by the corporate boundaries of Dallas has quadrupled to include well over 400 square miles and the population has nearly tripled.

To simply recite the current statistics without some indication of the historical trends that have contributed to their existence would present a very incomplete picture of the enormous task facing this equity court as it strives to devise a remedy that will retain vitality in subsequent school years. Substantial changes in the size, location, socio-economic status, and ethnic composition of the population of Dallas and DISD have occurred between each stage of

---

11. Bell, *Serving Two Masters: Integration Ideals and Client Interests in School Desegregation Litigation*, 85 Yale L.J. 470, 507–08 (1976).

12. *See, e. g., Calhoun v. Cook*, 522 F.2d 717, 718 (5th Cir. 1975); *Kelley v. Metropolitan Cty. Bd. of Educ. (Nashville)*, 492 F.Supp. 167, 184–85 (M.D.Tenn.1980); *see also*, Bell, *supra* note 11, at 470–72.

this litigation. The changes have been so substantial that the Court is convinced an element of clairvoyance must necessarily be involved in the formulation of a proper decree.

By way of background then, the Court offers the following sketch of the physical and social geography of Dallas. The Trinity River flowing from northwest to southeast bisects the city. On the north bank, at the city's core, lies the central business district and beyond it the residential areas of near and far North Dallas, South Dallas and East Dallas; south of the river lie the residential areas of West Dallas and Oak Cliff. The city spans over twenty-five miles from its northernmost point to its southernmost and is twenty miles across at its widest. Further expansion in the territory of the city has been curtailed by the corporate boundaries of the suburban cities that now ring the Dallas city limits.[13]

In 1940 there were slightly less than 300,000 citizens of Dallas, of whom slightly over 50,000 (or 17%) were black.[14] By 1970 the total population of the city of Dallas had risen to more than 840,000, of whom roughly 25% were black. While census tallies for 1980 are only preliminary at this writing, it appears that the population of Dallas has surpassed 904,000, including more than 250,000 blacks, or 29%. While the population of Dallas increased only 7% in the last decade, the number of people living in the surrounding suburbs rose 58%, from 576,000 in 1970 to 912,000 in 1980. The people who live in the suburbs now outnumber those who live in the city of Dallas. This suburban population boom is expected to continue unhampered throughout the next decade.[15]

In the city of Dallas proper, the major spurts of growth occurred in the early 1950's and again in the early 1960's. The newcomers tended to settle in neighborhoods, initially, along racial lines.

1. *Blacks.* In 1940 as many as three-quarters of the 50,000 blacks in Dallas lived in two areas of the city: just north of the central business district and several miles to the southeast of the central business district, though still north of the Trinity River. While there was considerable territorial annexation occurring to the north and south of the center of town, this pattern of racial location remained constant until the early 1950's. During the fifties Dallas doubled in size and population. Large numbers of blacks moved into the area known as South Dallas, between the central business district and the Trinity. South Dallas was an older area of town that was being abandoned as whites moved into the newly built subdivisions of North Dallas.

The West Dallas area between W. Commerce Street and the Trinity River was annexed to the city in 1957, adding several hispanic neighborhoods, a few whites, and a substantial number of blacks to the population. At the time of its annexation, less than 11% of the housing in this area passed code and there were only two miles of paved streets, only one 60-year-old school building, no parks, sewers or storm drains.

In the area now known as East Oak Cliff (bounded by Interstate 35 on the west, the Trinity River on the north, and Interstate 45 on the east), the 1950's saw the construction of 65% of the present housing in a series of subdivision developments. Initially, blacks resided in only two areas of Oak Cliff—in far northeast Oak Cliff along the south shore of the Trinity (directly opposite South Dallas), and in the far southeast corner of Oak Cliff near the site to which Bishop College had moved from Marshall,

---

13. The following suburban cities encircle Dallas, beginning at the extreme southern edge of the city and moving clockwise around the city limits: Hutchins, Lancaster, DeSoto, Duncanville, Cedar Hill, Grand Prairie, Arlington, Irving, Farmers Branch, Carrollton, Addison, Plano, Richardson, Garland, Mesquite, Balch Springs and Seagoville.

14. See Brief of Amicus Curiae The Dallas Alliance, Appendix B: Population by Race by Census Tract, *Estes v. Metropolitan Branches of Dallas NAACP*, 442 U.S. 938, 99 S.Ct. 2876, 61 L.Ed.2d 308 (1979).

15. *See, e. g., Suburbs Now Total More Than Dallas*, Dallas Times Herald, April 26, 1981, § 1, at 1, col. 5.

Texas. While most of the rest of East Oak Cliff had been originally marketed to whites, during a three-year period in the 1960's the area changed from an almost entirely white residential area to a primarily black area. The average occupancy of these new homes by their original white owners was 2.3 years. This sudden racial crossover, taking place in a newly developed part of the city, with new streets, schools and commercial centers, was virtually unprecedented in this or any other city of its size.

2. *Whites.* Residential location of whites during this same period followed a different pattern, spreading to the outer fringes of the city limits—to the far north and northeast, the far east (Pleasant Grove), and in Oak Cliff, to the far southwest. The more affluent whites concentrated in the new (post-1950's) subdivisions of far North Dallas, north of the island cities of Highland Park and University Park. Additionally, large numbers of whites participated in the tremendous expansion of outlying suburban cities that was beginning to take place.

3. *Hispanics.*[16] Unavailability of separate census information makes it difficult to trace the movement of hispanics in Dallas through the same time periods. Aside from the West Dallas neighborhoods that were annexed in 1957, most of the hispanic population residing in Dallas in the 1940's and 1950's was concentrated in a community just north of the central business district. Most of the hispanic population presently residing in Dallas has come to the city in the late 1960's and 1970's. They live primarily in a wide belt that stretches from West Dallas eastward across the Trinity, through the area between the central business district and the Park Cities, and well into near East Dallas. There is also a sizeable hispanic population residing in Oak Cliff, in a wide corridor along the west side of Interstate 35E.

Presently, the demographic composition of Dallas is impacted by certain related factors, which may come to bear on the task ultimately before this Court. The overall expansion in territory and population has been halted by the presence of the suburban ring. Further increases in population will be accommodated only by increased density of housing units or the construction of multi-family, apartment complexes. Recent years have seen a revitalization and expansion of the central business district; many new skyscrapers have been built or are under construction and specific plans for still others have been announced. As the population of Dallas and its suburbs increases, the number of automobiles on its already busy thoroughfares rises proportionally. Traffic congestion along the arteries and freeways leading to and from downtown in all directions is at its worst in the morning and afternoon rush hours, and will get far worse. There are no currently planned projects to relieve the freeway congestion in the foreseeable future, and any such projects, if ever approved, would take years to implement.

B. *Scholastic Enrollment*

Although the city of Dallas and the DISD include largely the same territory, their boundaries are not entirely coterminous. The school district is smaller than the city, covering approximately 351 square miles. The outer boundary of the DISD is fixed by the presence of a ring of suburban independent school districts which serve the surrounding suburban cities described above.[17] The smaller territory of the school district can be partly attributed to the fact that a portion of the northeast corner of the city of Dallas (north of Northwest Highway) lies within the boundaries of the Richardson I.S.D. rather than DISD; this is a predomi-

16. For statistical purposes, hispanics were broken out for separate treatment only fairly recently. Prior to the 1968–69 school year, all non-black ·DISD students were classified as whites; prior to the 1970 U.S. Census, all non-black residents were classified as whites. In this opinion, the anglo group is defined negatively, and will generally refer to persons or students who are neither black nor hispanic.

17. The political boundary of DISD is depicted on DISD Exhibit 4.

nantly white residential area. The DISD is further geographically distinguished from the city of Dallas by reason of the annexation into DISD of the former Seagoville School District in 1965. Seagoville is a sparsely populated, separately incorporated rural area which is located nearly 18 miles southeast of downtown Dallas. On a diagonal line from the northernmost point of the district near the Dallas County line to the southeast corner of the district in Seagoville there is a distance of over 35 miles. The total number of persons residing within the DISD boundaries (as distinguished from the figures for scholastic enrollment) can be approximated by cumulating the statistics from each of the U.S. Government census tracts that are also located within DISD.[18] In 1970, there were 801,211 people residing in the area served by DISD. By 1980, that figure had increased only slightly to 808,-714, which is about 100,000 fewer persons than live within the city of Dallas.

While the total population statistics have levelled off over the last ten years, the same cannot be said for the number of scholastics enrolled in DISD schools. Throughout the course of this litigation DISD has maintained the position of the eighth largest city school system in the nation. At present it remains among the ten largest, notwithstanding the remarkable decline in enrollment and dramatic changes in racial composition of the district since 1970.

At the time this suit was brought, total enrollment for the 1970–71 school year was 163,353, exclusive of some 1400 kindergarten students.[19] By the end of the 1980–81 school year, enrollment had dropped to 128,-658, including kindergarten students,[20] representing an overall decline in excess of 21%.

This steady decline over the decade was produced by a combination of extremely volatile decreases and increases occurring simultaneously in the respective numbers of anglos and minorities attending DISD schools.

 i. In 1970–71, the total enrollment was 58.2% anglo (95,012 students), 33.4% black (54,612 students) and 8.4% hispanic (13,729 students). By 1981, anglo enrollment had dropped by 60%, from 95,012 students to 37,989.

 ii. Black enrollment rose to a peak of 65,541 in the 1977 school year and has since declined slightly to 63,827, for an overall increase since 1970 of 16.9%.

 iii. Hispanic enrollment has ballooned in the last decade, jumping 82.2% from 13,729 students to 25,010.

Thus, at present the ethnic composition of the district is 29.53% anglo, 49.61% black, and 19.44% hispanic.[21] In a period of ten short years the DISD has undergone a transformation from a student population of 163,000 that was nearly 60% anglo to a district of 128,000 students that has a combined black and hispanic enrollment of nearly 70%.

The dramatic changes in the racial composition of the DISD enrollment since 1970 are not characteristic of similar changes in the makeup of the population residing in the area served by DISD during the same period. While the school district lost 21% of its enrollment, the general population in the district remained fairly constant, showing a .93% increase. Black residents increased from 198,409 to 246,132 between the 1970 and 1980 censuses, a percentage rise of 24% since 1970 vis-a-vis a 16.9% increase in school enrollment. But, where black students comprise 49.6% of the DISD enrollment, blacks only represent 30.43% of the 1980 population. Similarly, hispanic residents increased from 51,061 to 109,697 between the 1970 and 1980 censuses, a percentage rise of 114.83% since 1970, compared to an increase in hispanic enrollment

---

18. These statistics are compiled for census years 1970 and 1980 on a district-wide and sub-district basis in DISD Exhibit 60.

19. DISD Exhibit 2.

20. Curry Intervenors Exhibit 1 at 338.

21. *Id.* American Indian and Asian students make up the remaining .35% and 1.077% of the total enrollment, respectively. Their numbers and proportion will continue to increase.

of 82.2%.[22] Hispanics now constitute 13.56% of the population and 19.44% of the DISD enrollment.

The parallel between population and enrollment trends breaks down, however, when the anglos are taken into consideration. Census figures reveal that the number of anglo residents within the district boundaries dropped from 551,741 in 1970 to 452,885 in 1980.[23] This decline of 17.91% in the anglo population was far less drastic than the 60% reduction in anglo enrollment for the same period. And, although anglo students comprise only 29.53% of the DISD enrollment, anglos still make up 56% of the population residing within the district. Thus, while the rise in hispanic enrollment seems to reflect a similar surge in the numbers of hispanic residents, the sharp drop in anglo enrollment is not indicative of a concomitant decline in anglo population and the percentage of blacks in the schools is substantially greater than the percentage of blacks in the population.

By contrast to the steady decrease in DISD enrollment since 1970, enrollment in the numerous suburban independent school districts surrounding DISD has increased steadily over the last ten years. Since the 1971–72 school year, total suburban enrollment has risen 24.2% while DISD enrollment decreased by 18.7%. In terms of numbers of students (i. e., arithmetic changes), suburban enrollment has increased across the board for blacks, anglos and hispanics. In fact, DISD is the only school district in the Dallas metropolitan area that has sustained a significant decline in anglo enrollment since 1970. The ethnic composition of the combined suburban school districts at the present time is 7% black, 5.9% hispanic, and 85.3% anglo.[24]

It is possible, using a variety of accepted statistical approaches, to predict with rea-

22. Derived from DISD Exhibit 60.

23. Census figures for anglo population include Asians, American Indians, and other ethnicities besides blacks or hispanics.

24. DISD Exhibit 17A at 15–16. The following table depicts the 1980 enrollment and ethnic composition for the major suburban school districts surrounding DISD:

| District | Blacks | Hispanics | Whites |
|---|---|---|---|
| Arlington | 1,266 | 1,324 | 29,889 |
| Carrollton-Farmers Branch | 184 | 1,060 | 10,734 |
| Cedar·Hill | 54 | 121 | 1,642 |
| Commerce | 302 | 31 | 1,117 |
| Denton | 903 | 512 | 6,799 |
| DeSoto | 132 | 126 | 3,796 |
| Duncanville | 228 | 291 | 7,616 |
| Garland | 2,263 | 2,293 | 25,237 |
| Grand Prairie | 1,052 | 2,956 | 9,963 |
| Grapevine | 41 | 118 | 3,790 |
| Highland Park | 3 | 30· | 4,528 |
| Hurst-Euless-Bedford | 179 | 420 | 15,169 |
| Irving | 524 | 1,828 | 18,582 |
| Lancaster | 236 | 202 | 2,556 |
| Lewisville | 264 | 477 | 10,049 |
| Mesquite | 104 | 1,082 | 17,287 |

sonable accuracy the size and ethnic composition of DISD enrollment for each of the next five school years.[25] These projections assume a continuation of present student assignment patterns and they indicate that total enrollment is expected to continue to decrease from the present 128,658 to 122,218 by the 1985–86 school year. The same trends that were observed in recent years in the enrollment patterns of each of the major ethnic groups of students are expected to continue as well:

i. Hispanic enrollment is again expected to rise substantially from the present 25,010 students (19.44% of total district enrollment) to 32,773 students (26.8%) in 1985–86.

ii. Black enrollment is projected to decline slightly from the present 63,827 students (49.61%) to 59,482 students (48.7%) in 1985–86.

iii. The projections also foreshadow a continuation of the sharp decline in anglo enrollment from the present 37,989 students (29.53%) to 27,707 students (22.7%) in 1985–86.

These figures portend the loss of another 29.1% of the present anglo enrollment and the increase of the hispanic enrollment by 32.8% in just four years' time. Most of this loss will occur in the earlier grades.

C. *Subdistrict Organization*

Due to the geographic layout of the district and the low population density of Dallas as a whole, the DISD embraces a great number of students who are dispersed throughout a sprawling urban area. For purposes of devising an effective desegregation plan, as well as overall administrative efficiency, it was recommended by Plaintiffs and certain other parties submitting proposed desegregation plans at the 1976 hearings that DISD be subdivided into smaller, more manageable units. Other large city school districts, such as Boston and Detroit, have also found it expedient to create a subdistrict structure.

Judge Taylor's 1976 Order divided DISD into six geographic subdistricts, each containing elementary, middle and high schools. The subdistrict concept was devised to provide parents and students a sense of community participation and local control over their schools, which the Supreme Court has recognized as essential both to the maintenance of concern and support for public schools and to the quality of the educational process. *See Milliken I,* 418 U.S. at 742, 94 S.Ct. at 3126. The Court finds that, after five school years of operation under this structure, the subdistrict concept has proved to be a useful tool, both for the day-to-day administration of the public schools and for the desegregation of the district, and concludes that there is insufficient evidence of any benefit to be obtained by displacing this organizational structure at this time.

| District | Blacks | Hispanics | Whites |
|----------|--------|-----------|--------|
| Plano | 692 | 538 | 21,670 |
| Richardson | 1,977 | 611 | 33,462 |
| Wilmer-Hutchins | 4,111 | 290 | 416 |

Source: DISD Exhibit 17A at 149-57.

---

**25.** DISD Exhibit 17A at 48–69. Estimates, based on historical enrollment data for school years 1971–80, for the grade-one enrollment in 1980 were made by three different methods. The estimates were then compared to the actual enrollment for that year and the accuracy of each method of projection was measured by calculating the percentage error. The methods with the lowest percentage error for each ethnic group at each grade level in each administrative subdistrict were combined to arrive at the overall projections for subsequent years.

As originally designed in 1976 and implemented today, the six geographic subdistricts used for purposes of student assignments are the Northeast, Northwest, Southeast, East Oak Cliff, Southwest and Seagoville subdistricts.[26] The Northeast subdistrict includes the central business district and much of South Dallas and extends to the northeast along East Grand Avenue and Garland Road through the Munger Place neighborhood, East Dallas, Lakewood, and the area east of White Rock Lake to the DISD boundary line. The Northwest subdistrict begins just north of the central business district and includes near North Dallas, West Dallas (along the south bank of the Trinity River), the Arlington Park industrial area, the Love Field area, and the residential subdivisions of far North Dallas that lie between the Park Cities and the DISD boundary on the west and north. The Southwest subdistrict takes in what is essentially the western half of Oak Cliff, or that quadrant defined by I–30 on the north, I–35E on the east, and the DISD boundary line on the south and west. The East Oak Cliff subdistrict is circumscribed by I–35E on the west, the Trinity River on the north, I-45 on the east, and the DISD boundary line to the south. The Southeast subdistrict begins at the far southeast end of South Dallas, along Hatcher Street, and continues to the eastern boundary of DISD and to the southeast along the C. F. Hawn Freeway, through the Pleasant Grove area, to the subdistrict boundary at Jordan Valley Road. To the west of the Southeast subdistrict lies a large triangular region of undeveloped flood plain along the Trinity River, further separating Southeast from East Oak Cliff. The Seagoville subdistrict lies contiguous to the southeast boundary of the Southeast subdistrict and extends along the C. F. Hawn Freeway to the rural town of Seagoville, some 18 miles from downtown Dallas. This somewhat remote subdistrict takes in the area that was served by the old Seagoville I.S.D., prior to its merger into DISD in 1965.

The subdistrict boundaries were not drawn with an eye towards dividing the DISD into six territories that would be roughly equal in physical dimensions. While the Northeast, Southwest and Southeast subdistricts are more or less the same size, one subdistrict is considerably larger and two subdistricts are considerably smaller than the rest. The East Oak Cliff subdistrict is the smallest of the six, covering only about 21 square miles, but this subdistrict enjoys a greater population density than other areas of the district. The largest subdistrict, the Northwest subdistrict, spans approximately 90 square miles, with a lower population density than is found in other parts of the district.

Instead of trying to create six areas of equal dimensions, the subdistricts were carved in such a way as to cause the ethnic composition of as many of the individual subdistricts as possible to mirror the racial makeup of the DISD as a whole. When the district court issued its memorandum opinion in March 1976, the DISD was 41.1% anglo, 44.5% black, 13.4% hispanic, and 1% other. *Tasby v. Estes*, 412 F.Supp. at 1208, Appendix A. Accordingly, the Final Order entered April 7, 1976, called for the creation of four subdistricts each having approximately the same racial makeup, plus or minus five percent, as the entire DISD— these were the Northeast, Northwest, Southwest and Southeast subdistricts. Because of their geographical isolation from other parts of the city, two of the subdistricts created—Seagoville and East Oak Cliff—were allowed to deviate substantially from the ethnic ratio of the entire school district.

As could be expected from the previous discussion of the recent trends in districtwide enrollment patterns, the decline in student population and changes in ethnic composition can also be detected within each of the subdistricts to a greater or lesser degree, depending on the unique demographic circumstances inherent to each. The following table demonstrates the nu-

---

26. The precise boundary lines for the six subdistricts are depicted on DISD Exhibit 5, and described more fully in the Court's April 17, 1976, Final Order (as amended).

merical breakdown of enrollment by race for all grades in each of the six subdistricts for the years 1971,[27] 1976,[28] and 1981.[29] Additionally, the table includes projections for the ethnic composition of each subdistrict for the school year 1985–86.[30]

### K-12 Enrollment by Subdistrict: 1971-1985

| | Total | Anglo | Black | Hispanic |
|---|---|---|---|---|
| **I. NORTHEAST** | | | | |
| 1971 | 32,088 | 21,687 | 7,967 | 2,259 |
| 1976 | 28,893 | 15,120 | 10,188 | 3,194 |
| 1981 | 25,445 | 10,843 | 9,707 | 4,277 |
| (1985-86) | 23,303 | 8,196 | 8,257 | 6,072 |
| **II. NORTHWEST** | | | | |
| 1971 | 42,634 | 23,641 | 12,094 | 6,647 |
| 1976 | 31,598 | 13,502 | 10,548 | 6,991 |
| 1981 | 25,525 | 8,715 | 8,612 | 7,519 |
| (1985-86) | 23,413 | 5,852 | 7,878 | 8,754 |
| **III. SOUTHWEST** | | | | |
| 1971 | 28,455 | 21,508 | 2,584 | 3,992 |
| 1976 | 28,184 | 11,081 | 9,429 | 7,255 |
| 1981 | 28,071 | 6,943 | 11,142 | 9,611 |
| (1985-86) | 33,863 | 4,715 | 14,560 | 14,166 |
| **IV. SOUTHEAST** | | | | |
| 1971 | 29,009 | 18,455 | 9,089 | 1,398 |
| 1976 | 21,328 | 10,998 | 8,467 | 1,769 |
| 1981 | 18,525 | 8,314 | 8,054 | 2,059 |
| (1985-86) | 20,218 | 8,713 | 8,460 | 2,939 |
| **V. EAST OAK CLIFF** | | | | |
| 1971 | 26,407 | 343 | 25,315 | 732 |
| 1976 | 27,028 | 349 | 26,223 | 439 |
| 1981 | 25,153 | 227 | 24,017 | 898 |
| (1985-86) | 21,421 | 233 | 20,327 | 842 |

**27.** Statistics for 1971 derived from DISD Exhibit 17A, Tables 3, 5, 7, 9, and 11. Although the present subdistricts did not exist at the time, their enrollments can be approximated by calculating the 1971–72 school year statistics for the various schools that were later assigned to each subdistrict.

**28.** Statistics for 1976 derived from DISD Report to the Court, December 15, 1976, Appendix A, Volume I. These totals include data from the Special Magnet and Metropolitan High Schools that are located within the boundaries of each of the subdistricts.

**29.** Statistics for 1981 are derived from Curry Intervenors Exhibit 1 (April 15, 1981 Report to the Court). These figures exclude the enrollment data for the special Magnet and Metropolitan High Schools, which attract students on a district-wide basis. The breakdown for the 3300 students in these programs as of March 9, 1981, was 815 anglos (24.7%), 1,951 blacks (59.12%), and 503 hispanics (15.24%).

**30.** DISD Exhibit 17A, Tables 22–26.

## K-12 Enrollment by Subdistrict: 1971-1985

| | | Total | Anglo | Black | Hispanic |
|---|---|---|---|---|---|
| VI. | SEAGOVILLE | | | | |
| | 1971 | Data Not Provided | | | |
| | 1976 | 2,307 | 1,862 | 373 | 127 |
| | 1981 | 2,629 | 2,132 | 344 | 143 |
| | (1985-86) | No Projections Made | | | |

The numbers speak for themselves. The Court would simply add this gloss to highlight certain recurring themes.

Between 1971 and 1981 total enrollment has declined in every major subdistrict.[31] In the three large subdistricts north of the Trinity River there has been a dramatic drop in scholastics: Northwest has lost 40.12% of its students, Northeast has lost 20.70% of its students, and Southeast has lost 36.14% of its students. The two subdistricts south of the Trinity River have remained fairly constant in total enrollment: East Oak Cliff fell only slightly, from 26,407 to 25,153; and Southwest was virtually unchanged, from 28,455 in 1971 to 28,184 in 1976 to 28,071 in 1981.

Contrasted against this backdrop of steady decline in overall enrollment, the several ethnic components within each subdistrict have exhibited even wider fluctuations over the same ten year period:

i. Hispanic enrollment has risen in every subdistrict. In particular, those three subdistricts through which the wide belt of hispanic residents[32] passes have experienced a phenomenal surge in hispanic students: in Northeast, there was an 89.33% increase between 1971 and 1981; in Northwest, the already sizeable hispanic student body in 1971 swelled another 13.11% by 1981; and in Southwest, hispanic enrollment soared by 140.75%.

ii. Black enrollment during the same decade remained fairly constant, in contrast to the other ethnic groups, rising slightly in Northeast and dropping slightly in Southeast, East Oak Cliff and Seagoville. In Northwest, however, there was a more substantial decline of 28.79%, while in Southwest, black enrollment leaped 334%, from 2,584 to 11,142.

iii. There has been a precipitous loss of anglos in every major subdistrict, particularly in those located north of the Trinity River. In Northeast, the anglo enrollment was cut in half by 1981 (10,844 fewer students); in Northwest, it declined 63.14% (14,926 fewer students); in Southeast, it dropped 54.94% (10,141 fewer students). On the other shore of the river, Southwest experienced a 67.71% loss of anglos (14,565 fewer students). In terms of percentages, anglos now comprise 42.60% of total Northeast enrollment (down from 67.6% in 1971), 42.73% of all Northwest scholastics (down from 55.5% in 1971), 44.88% of all Southeast scholastics (down from 63.6%), and 24.73% of all Southwest scholastics (down from 75.6% in 1971).[33]

31. Seagoville actually experienced a slight increase in total enrollment, but as of 1981 its 2,629 students still represent only 2% of the total DISD enrollment.

32. See text accompanying n.16, *supra*.

33. The present percentage ethnic breakdown of the subdistricts is as follows:

Oddly enough, this precipitous decline in anglo scholastic enrollment over the last decade is not mirrored by a similar trend among the general population residing within corresponding subdistrict boundaries. Using census information, the population statistics for each of the subdistricts in DISD can be accurately approximated for the years 1970 and 1980.[34] Anglo enrollment in Southwest dropped 67.71% in the last decade, while the anglo[35] population residing in Southwest declined only 40%. Even starker was the difference between enrollment and population residing in Northeast, where anglo scholastics decreased 50% while anglo residents decreased only 19%.[36] Without a doubt, the greatest disparity between enrollment and population statistics occurs in Northwest, where most of the affluent white suburban developments in the city of Dallas are to be found. There, the anglo exodus from the public schools measured 63.14% while the anglo population residing in the subdistrict actually increased by 4,449 people.[37]

Census figures reveal that the hispanic and black enrollment trends in each of the subdistricts more closely resemble the fluctuations in the ethnic residential patterns of the subdistricts during this period.

Finally, the projections for scholastic enrollment patterns in each of the subdistricts over the next five years indicate that many of the observed trends will continue unabated.

i. Between now and the 1985–86 school year, hispanic students are expected to increase by 42% in Northeast, by 47% in Southwest, and by 42.7% in Southeast.

ii. Black enrollment will remain fairly constant in most districts, but will drop 15% in East Oak Cliff and increase 30.67% in Southwest by 1985–86.

iii. Anglo enrollment is expected to decline another 24.41% in Northeast, 32% in Southwest, and 32.85% in Northwest.

### D. *Summary*

In the interest of presenting the most complete and accurate picture of the demographic and geographic landscape of DISD, past, present, and future, the Court has laboriously examined each "tree", branch by branch. Now to step back and look at the forest.

The single most compelling characteristic of the DISD for purposes of designing an effective desegregation plan is the hard fact that DISD is and probably will remain a district composed of a majority of minority students. Together, the blacks and hispanics comprised 42% of the student body in 1970; today they account for almost 70%

```
I. Northeast 42.60% Anglo 38.13% Black 16.80% Hispanic
II. Northwest 34.14% 33.74% 29.46%
III. Southwest 24.73% 39.69% 34.24%
IV. East Oak Cliff .90% 95.48% 3.57%
V. Southeast 44.88% 43.48% 11.11%
VI. Seagoville 81.10% 13.08% 5.44%
```

**34.** See DISD Exhibit 60.

**35.** As used in these census statistics, the term "anglo" includes other ethnic groups such as Asians and American Indians, besides non-hispanic whites.

**36.** Similarly, in Southeast the anglo enrollment dropped 55% while the corresponding decline in anglo residents was only 17%.

**37.** It is apparent that the more affluent anglos are departing the public schools leaving to the less affluent the burden of school desegregation. This consequence has serious negative implications for the future of public education, in addition to seeming unfair. However, it has not been accorded legal or equitable significance by the courts. *But see Kelley v. Metropolitan Cty. Bd. of Educ.*, 492 F.Supp. at 191–92.

and, by 1985, their numbers will exceed 77% of the total enrollment. The dwindling anglo enrollment will continue to dwindle, as every year a greater number and percentage of anglo students are graduated from the system than enter the kindergarten and elementary grades. This anglo decline does not reflect a comparable outmigration of anglo residents from DISD, particularly in the northeast and northwest corners of the district. Suburban enrollment is overwhelmingly anglo and increasing in number every year. Regardless of whether or not these occurrences are related to one another or were in some way caused by these proceedings, they are in themselves "interesting statistics." [38]

While the Court places emphasis on the demographic feature of declining anglo enrollment in shaping a remedy for this case, it should not be assumed that the Court lends its imprimatur to the theories of "white flight" or "white avoidance" advanced by some of the parties to this suit, most notably the Curry Intervenors. This oft-sung refrain—that any new measures designed to increase the amount of desegregation will cause white flight and "resegregation" in the schools—has fallen on deaf ears in virtually every court where it has been uttered. *See, e. g., United States v. Scotland Neck Cty. Bd. of Educ.*, 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972); *United States v. DeSoto Parish School Bd.*, 574 F.2d 804 (5th Cir.), *cert. denied*, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978).[39] Moreover, as was ably demonstrated by counsel for Plaintiffs, it is impossible to say that school desegregation is the only impetus for the outmigration of school-aged whites from the system. In some cases, such outmigration may in fact be an unfortunate response to student assignment patterns imposed by the school board or the court on unwilling individuals. However, such factors as job relocations, housing costs and availability, or the inmigration of singles or families without school-aged children might also be causes of declining white enrollment. It is likely that all of these factors contribute to the phenomenon. The Court, therefore, cannot stay its hand out of fear of "white flight". That does not mean that the Court must ignore the unpleasant realities of population changes as it devises a plan that will redress the vestiges of a past wrong and promote greater, lasting desegregation. *Stout v. Jefferson County Bd. of Educ.*, 537 F.2d 800, 802 (5th Cir. 1976). Thus, the trends and projections of ever declining anglo enrollment in a heavily minority district, juxtaposed against the continued existence of a majority anglo resident population within the district and the ever-increasing anglo enrollment in suburban school districts, are conditions which must be factored into the final calculus.[40]

A second characteristic, every bit as critical as the enrollment trends and projections, is the unusual physical size of the district and the manner in which the several ethnic populations are dispersed throughout it—*i. e.*, DISD's "social." geography. There are generally three types of housing patterns: neighborhoods that are primarily anglo, neighborhoods that are primarily minority, and neighborhoods that are residentially integrated, with shifting ethnic populations. Throughout most of the district, there is great physical separation of the

---

**38.** Testimony of Dr. William Webster.

**39.** "From the inception of school desegregation litigation, accommodation of opposition to desegregation by failing to implement a constitutionally necessary plan has been impermissible." *Morgan v. Kerrigan*, 530 F.2d 401, 420 (1st Cir. 1976), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1977). *But see Parent Assoc. v. Ambach*, 598 F.2d 705, 720 (2d Cir. 1979) ("The exodus of white children from the public schools would disadvantage the entire minority community ...").

**40.** The testimony of Dr. Yvonne Ewell, Associate Superintendent in charge of the EOC Subdistrict, was impressive in this regard. "... I think the exodus of white persons and many middle class blacks portends, to my mind, serious concern about the survival of the country.... And I believe Dallas, Texas, is probably the only major city of the top ten that has enough anglos left to begin to see if we can really provide a pluralistic education."

races.[41] In many large cities, the ethnic map of the city would resemble a doughnut, with white residents forming a ring around a black inner-city core. In such instances, dividing the district into pie-shaped wedges will accomplish considerable racial mixing on a smaller scale.[42] Dallas, however, resembles a pie in which one whole "wedge" is made up of black residents, from the center of the district all the way to its outermost boundary. The predominantly black areas in East Oak Cliff are separated from the white neighborhoods, primarily in far north Dallas and northeast Dallas, first, by the Trinity River and its bottomlands, then, by the central business district with its congested traffic, then, by a buffer zone of integrated housing overlayed by a wide arc of hispanic residents, and finally, by the separate "Park Cities" in North Dallas and by White Rock Lake in northeast Dallas. The problem is further exacerbated by population density, which is extremely high in South Dallas and Oak Cliff (where most blacks live) and much lower in far north and northeast Dallas (where most anglos live).[43]

These, then, are the unique features in the light of which any desegregation plan must be evaluated.

## IV. *Relevant Cases and Principles*

During the years since this litigation began, the higher federal courts have decided many significant cases. The principles announced in these cases guide this Court. Accordingly, the Court now turns to an examination of some of those cases and the facts out of which they originated.

*Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), cited by the Fifth Circuit in remanding this case (572 F.2d at

1014, 1015), involved a metropolitan school system with 84,000 students (71% white and 29% black), and is chiefly noted for its approval of mandatory cross-district transportation to achieve desegregation. Chief Justice Burger, for a unanimous court, found that the school board "had totally defaulted in its acknowledged duty to come forward with an acceptable plan . . .," 402 U.S. at 24, 91 S.Ct. at 1280, and held that busing a substantial number of students was an acceptable method of achieving desegregation. The Court also noted that the existence of some one-race schools "is not in and of itself the mark of a system that still practices segregation by law." *Id.* at 26, 91 S.Ct. at 1281.

*Swann* was preceded by unanimous Supreme Court decisions in *Green v. New Kent County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and *Davis v. Board of School Commissioners of Mobile County*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). In *Green* the school system had only two schools and 1300 pupils —740 black and 550 white. There were no attendance zones; each school served the entire county. At issue was "a freedom of choice" plan, which the Court struck down as ineffective because it was not achieving desegregation. In *Davis*, the school district had 91 schools and 73,500 pupils, divided 58% white and 42% black, with 22,000 pupils already being transported for purposes not related to desegregation. The Supreme Court held, 402 U.S. at 37, 91 S.Ct. at 1292, that ". . . the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation."

---

**41.** This racial separation is doubtless due to complex socio-economic factors, which are beyond the writ of this or any other court.

**42.** *E. g.,* the Charlotte-Mecklenberg school system. *See Swann,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554.

**43.** Overall, the population density of Dallas is below average, a product of the large area it covers. By contrast to DISD with its 128,000

students scattered over 351 square miles, the Boston school district served 90,000 students who were concentrated in a total area of 43 square miles (Testimony of Dr. Robert C. Wood, former Superintendent of Boston schools). This interplay between numbers of students and their geographic density will doubtless impact on the feasibility of *Swann* techniques in the Dallas schools.

In 1973 the Court addressed school desegregation in a case from Denver, Colorado, *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). Denver had 119 schools and approximately 97,-000 pupils, divided 66% anglo, 14% black, and 20% hispanic. In that case the Supreme Court originated the well known *Keyes* presumption:

> . . . intentionally segregative school board actions in a meaningful portion of a school system, . . . creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions.

413 U.S. at 208, 93 S.Ct. at 2697. *Keyes* also stated another important, if lesser known, principle:

> In *Swann*, we suggested that at some point in time the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of *de jure* segregation warranting judicial intervention. (Citations omitted). We made it clear, however, that a connection between past segregative acts and present segregation may be present even when not apparent and that close examination is required before concluding that the connection does not exist.

*Id.* at 211, 93 S.Ct. at 2698–99.

In 1974 and again in 1977 the Supreme Court considered school desegregation in Detroit. *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*); *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II*). The Detroit school system had approximately 257,000 students, of whom 71.5% were black. *Milliken I* chiefly concerned an interdistrict remedy ordered by the District Court, which the Supreme Court invalidated. *Milliken II* approved the use of remedial education programs as a method of eliminating the effects of prior segregation in a large urban district with a large minority student population, and also held, *inter alia*, that the purpose of a desegregation decree is "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." 433 U.S. at 280, 97 S.Ct. at 2757. The Court further noted that an order requiring a "particular degree of racial balance" is "infirm as a matter of law", *Id.* n.14, and approved the District Court's plan "to prevent the disruption, by massive pupil reassignment, of racially mixed schools in stable neighborhoods", 433 U.S. at 288 n.19, 97 S.Ct. at 2761 n.19.

The Supreme Court has twice dealt with school desegregation in Dayton, Ohio. *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) (*Dayton I*); *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (*Dayton II*). The Dayton schools had about 54,000 students, 43% of whom were black. Dayton had 69 schools, including 21 one-race black schools and 28 one-race white. *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) was handed down the same day as *Dayton II*. The Columbus, Ohio, school system had 96,-000 students, 32% of whom were black, with 172 schools, half of which were one-race schools. *Columbus* and *Dayton II* strongly reaffirmed the *Keyes* presumption and the continuing affirmative duty of the school board to establish a racially nondiscriminatory system. Chief Justice Burger, concurring in *Columbus* criticized the "unknown and unforeseeable affirmative duty to desegregate for the past 25 years", *Id.* at 469, 99 S.Ct. at 2952; Justice Rehnquist, dissenting, said that the Court was making the *Keyes* presumption "essentially . . . irrebuttable", *Id.* at 508, 99 S.Ct. at 2962.

For over a generation, in scores of opinions, the Fifth Circuit has consistently required of school systems the "maximum desegregation practically achievable." *See, e. g., United States v. Seminole County School District*, 553 F.2d 992, 995 (5th Cir.

1977). The Circuit has been unwavering in its commitment to school desegregation; in recent years its resolve has, if anything, become more firm.

In *Carr v. Montgomery County Board*, 377 F.Supp. 1123 (M.D.Ala.1974), *aff'd* 511 F.2d 1374 (5th Cir.), *cert. denied* 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975), Chief Judge (now Circuit Judge) Frank Johnson, holding that the Montgomery County, Alabama, school system had a satisfactory desegregation program, made several cogent observations particularly relevant to the case at bar:

> Thus, it appears that a balance must be reached, one unquestionably subtle in its implications: while school system segregation must be actively disestablished, racial quotas for student population are not to be instituted.

*Id.* at 1133.

> This Court desires to emphasize that the remaining predominantly black schools in this school system under the board's plan cannot be effectively desegregated in a practical and workable manner. . . . As this Court has observed time and time again in school desegregation cases, racial quotas and busing to achieve racial quotas are not required by the law.

*Id.* at 1135.

> . . . every formerly all-white school in the Montgomery school system will . . . be substantially desegregated.

*Id.* at 1139.

*Calhoun v. Cook*, 522 F.2d 717 (5th Cir. 1975), *affirming* 332 F.Supp. 804 (N.D.Ga. 1971) concerned the Atlanta, Georgia, school system. Atlanta had a student population 85% black and 15% white, a dramatic change since 1958 (70% white, 30% black). In 1975, after trying for years to effect desegregation, Atlanta had 92 one-race black schools out of 148. The school district had "substantially met" its goal of 30% black enrollment in every white school. The Fifth Circuit held that "based on live, present reality" the Atlanta school system was "free of racial discrimination." 522 F.2d at 720. The Circuit stressed that the school board was controlled by blacks and

that blacks were in the majority in the school administration. The Circuit also noted that the busing of blacks to white schools was opposed by a large group of black parents, and that time and distance studies showed that busing was impracticable as a desegregation remedy.

In *Lemon v. Bossier Parish School Board*, 566 F.2d 985 (5th Cir. 1978), however, the Circuit refused to rule out busing as a remedy where there were three virtually all-white schools within two miles of an all-black school.

*U.S. v. DeSoto Parish School Board*, 574 F.2d 804 (5th Cir.), *cert. denied*, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978) concerned a rural school district with a student population 60% black and 40% white and no concentrated residential segregation. The district had 11 schools; several of the five black schools were in close proximity to several of the six predominately white schools. The Fifth Circuit ruled that white flight was not a valid argument against busing but said:

> This is not to say that a school board or Court must ignore a likely danger of an exodus of white students from a school system. '[I]n choosing between various *permissible* plans a chancellor may . . . elect one calculated to minimize white boycotts. . . . He may not refuse to adopt a permissible plan and elect or confect one which preserves a dual system because of such fears.' *Stout v. Jefferson County Bd. of Educ.*, 1976, 5th Cir., 537 F.2d 800, 802.

*Id.* at 816.

This Court has also reviewed *U.S. v. Valdosta Board of Educ.*, 576 F.2d 37, 39 (5th Cir.) *cert. denied*, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978) and *Lee v. Tuscaloosa Schools*, 576 F.2d 39, 41 (5th Cir. 1978) which emphasize that "a systemwide racial balance" is not the goal of desegregation; the goal is "to cure the continuing effects of the dual school system." One-race schools, however, are subject to close scrutiny. *Anderson v. Dougherty County Board of Education*, 609 F.2d 225 (5th Cir. 1980).

In *U.S. v. Texas Education Agency (Lubbock I.S.D.)*, 600 F.2d 518 (5th Cir. 1979), the Fifth Circuit remanded the Lubbock school case for additional findings of fact. In Lubbock there were 32,000 students, divided 59% white, 27% Mexican-American, and 13% black. The Circuit held, in effect, that the District Court's findings did not overcome the *Keyes* presumption:

> The district court's task on remand is to determine how much 'incremental segregative effect' the School Board's [past] intentional discriminatory acts had on the residential distribution of the Lubbock school population as presently constituted, when that distribution is compared to what it would have been in the absence of such intentional segregative acts.

600 F.2d at 527.

> ... the School Board continues to bear the burden to show that its intentional [past] segregative acts did not contribute to the current segregation of those schools.

*Id.* at 528.

*Lee v. Macon County*, 616 F.2d 805 (5th Cir. 1980) involved a district which, like DISD, has long been entangled in desegregation litigation. Ruling that the district court's reasons for retaining one-race elementary schools were "legally insufficient" the Circuit held:

> Unlike the *Carr* court's conclusion that logistical difficulties prevented dismantling every one-race school, the present district court's conclusion implies that the racial imbalance in Tuscaloosa's elementary schools results not from *de jure* segregation but rather from demographic changes occurring since [the first attempt to desegregate].... Not until all vestiges of the dual system are eradicated can demographic changes constitute legal cause for racial imbalance in the schools.

*Id.* at 809.

The Circuit also ruled in *Macon County* that opposition to busing by experienced educators of both races was not decisive on the issue. However, the Circuit did note:

> Focusing on the target of a unitary system rather than a systemwide racial balance, the court may devise a constitutional plan that temporarily or permanently leaves one or more racially identifiable elementary schools, or that omits some of the earlier grades from the busing program.

600 F.2d at 812.

*See, also, Flax v. Potts*, 464 F.2d 865, 868 (5th Cir.), *cert. denied*, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972); *Lee v. Lee County Board*, 639 F.2d 1243, 1247 n.4 (5th Cir. 1981).

More recently in *Valley v. Rapides Parish School Board*, 646 F.2d 925 (5th Cir. 1981) and *U.S. v. Texas Education Agency (South Park I.S.D.)*, 647 F.2d 504 (5th Cir. 1981), the Fifth Circuit has emphasized the continuing affirmative duty to eliminate all vestiges of previous state-imposed segregation, at the same time stressing that the school system must be viewed as a whole and not school-by-school.

From these and other representative cases, several of which are cited later in this opinion, this Court gleans the following principles relevant to the case *sub judice*:

■ 1. Since *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (*Brown II*) in 1955, every school district which operated a *de jure* racially segregated system has been under an "affirmative duty to take whatever steps might be necessary" to eliminate all the vestiges of past school segregation. *Green, supra*, 391 U.S. at 437–38, 88 S.Ct. at 1693–94.

■ 2. The *Keyes* presumption (that past segregative actions in a "meaningful portion" of a school system are presumed to be the cause of current segregated schools, absent "countervailing evidence"), as strengthened in 1979 in *Dayton II* and *Columbus*, may be irrebuttable. Demographic changes are insufficient to rebut the *Keyes* presumption. *See, e. g., Lee v. Macon County, supra.*

But the *Keyes* presumption pertains to liability, not to remedy, or feasibility of remedy, which is the principal task before this Court.

3. There is a presumption against the continued existence of one-race minority schools; they will be tolerated only after "close scrutiny" by the courts. But racial quotas and racial balance in individual schools are neither a goal nor a requirement; in fact, they are disapproved. The school district must be viewed as a whole and not school-by-school; a constitutional plan may leave some racially identifiable schools if further desegregation is not feasible.

4. A school desegregation plan should be flexible and sensitive as well as effective and must take into account the "practicalities of the situation" in the particular district. The goal is to make whole the victims of past unlawful discriminatory practices. The fact that minority students in significant numbers are enrolled in most or all of the previously predominantly anglo schools is a measure of desegregation.

5. Good faith conduct on the part of the school authorities is "a vital element for appropriate consideration" in school desegregation litigation. *Carr v. Montgomery County Bd.*, 377 F.Supp. at 1126.

6. Naturally desegregated schools should not be disturbed—that is, need not be included in a desegregation remedy.

7. The exodus of anglos from the public schools is recognized as a problem but not as a reason for inaction. However, the court may fashion a constitutional desegregation plan that is the least likely to cause loss of Anglo students.

8. In this case a substantial number of minority parents are represented by Intervenor Black Coalition. These citizens advance a remedial program of their own to achieve desegregation; they oppose the remedies sought by Plaintiff and Intervenor NAACP. This situation, *viz.*, disagreement in the minority community over the nature of desegregation remedies, while not unique (*see Calhoun v. Cook, supra*) has not been addressed by the higher federal courts. *See* Bell, *supra* note 11.

9. In only a few instances have the higher federal courts addressed school desegregation in large urban areas. In both Detroit and Atlanta the courts recognized that a large number of one-race minority schools would continue to exist in heavily minority school districts.

## V. The Constitutional Violation

The basic rule which governs federal courts' remedial powers in eliminating *de jure* school segregation is that "[i]n fashioning and effectuating the desegregation decrees, the courts will be guided by equitable principles." *Brown II*, 349 U.S. at 300, 75 S.Ct. at 756. The task, as defined in *Swann* and refined in *Milliken I*, is to correct by a balancing of the individual and collective interests "the condition that offends the Constitution". *Swann*, 402 U.S. at 16, 91 S.Ct. at 1276; *Milliken I*, 418 U.S. at 738, 94 S.Ct. at 3124. The touchstone of these "equitable principles" is that federal remedial power may be exercised "only on the basis of a constitutional violation" and "[a]s with any equity case, the nature of the violation determines the scope of the remedy". *Id.* See also *Estes v. Metropolitan Branches of Dallas NAACP*, 444 U.S. 437, 444, 100 S.Ct. 716, 719, 62 L.Ed.2d 626 (1980) (Powell, J., dissenting from dismissal of cert.). Once invoked, however, "the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies". *Swann, supra,* at 15.

The original constitutional violation was the maintenance of a segregated school system and failure to disestablish it after *Brown II* in 1955. Dual attendance zones for all schools had been discontinued in DISD by fall, 1967; there have been no racially discriminatory student assignments since then, a period of 14 years. Teacher assignments based on racial composition of schools had been discontinued by 1971; teacher assignments since then have been generally in accord with this Court's requirements.[44] Existing predominantly an-

---

44. Plaintiffs and NAACP assert that DISD is not in compliance with *Singleton v. Jackson*

*Municipal Separate Sch. Dist.*, 419 F.2d 1211 (5th Cir. 1969). The Court regards this as a

glo and minority schools (including any one-race schools) are not the result of any present discriminatory DISD policies.

In 1971 Judge Taylor determined that vestiges of the segregated system remained in DISD. *Tasby v. Estes*, 342 F.Supp. at 947 (1971). A similar finding of system-wide vestiges of segregation was the basis for the systemwide remedy ordered by Judge Taylor in 1976. *Tasby v. Estes*, 412 F.Supp. 1192, 1197. Also, in 1976 Judge Taylor determined that "DISD has acted in good faith since this Court's order in 1971 . . .", 412 F.Supp. at 1207. These findings are the "law of the case" and will not be reexamined. *U.S. v. Texas Education Agency (South Park I.S.D.)*, 647 F.2d 504, at 506 (5th Cir. 1981).

■ The Court finds that DISD has continued since 1976 to act in good faith. Though good faith is important, it is not decisive. The central question is whether vestiges of previous segregation remain today—that is, whether DISD has now fully discharged its "affirmative duty to take whatever steps might be necessary", *Green v. County School Board*, 391 U.S. at 437–38, 88 S.Ct. at 1693–94, to eliminate all vestiges of the former *de jure* segregated system. This question has to be considered and answered in the light of the *Keyes* presumption, *viz.*, that current segregated schools are the result of past segregation policies. The Court is of the opinion that *Keyes* mandates a finding that vestiges of the previous segregated system remain today, even though diminished and attenuated by the very passage of time and by the absence

since 1971 of any intentional discriminatory motives or conduct (other than as presumed by *Keyes*).

In 1970–71 minorities comprised about 41% of DISD pupils; in March 1981, they comprised approximately 70%. In 1970–71 anglos comprised about 59% of DISD students; in March 1981 they were less than 30%. During the ten-year period one-race anglo schools have practically disappeared, decreasing from 69 to 2, while the number of one-race minority schools has risen, as might be expected in view of the enrollment figures.

DISD vigorously asserts that nearly all of the current predominantly minority schools are due to the increase in minority student population, or to residential patterns and developments which have occurred completely unrelated to any acts or omissions of DISD.[45] This argument may well be true with respect to many of those schools but the Court could not conclusively so find without additional evidence. *Smiley v. Vollert*, 453 F.Supp. 463, 480 (S.D.Tex.1978). Indeed, it is doubtful that such evidence is obtainable:

> . . . [W]e cannot say with assurance where people would have lived, where schools would have been located, and how much integration would have obtained absent the long standing constitutional violation—indeed, no court will ever be able to do so in any school case . . . .

*U.S. v. Columbus (Miss.) School District*, 558 F.2d 228, 231 n.11 (5th Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 728, 54 L.Ed.2d 757 (1978).

---

matter of enforcement of its 1976 Order, which need not be addressed here.

Testimony established, and the Court finds, (a) that DISD has stressed the need for greater minority representation in its top administrative staff; two of the five associate superintendents are black and four of the ten assistant superintendents are black or hispanic; (b) the district is having difficulty in recruiting hispanic teachers, because of competition for such teachers due to bilingual education needs throughout Texas; and (c) DISD has recently adopted an affirmative action program to further increase minority representation at all administrative and teaching levels.

**45.** *But see, Lee v. Macon County*, 616 F.2d 805, 810 (5th Cir. 1980) ("Not until all vestiges of the dual system are eradicated can demographic changes constitute legal cause for racial imbalance in the schools.") While demographic changes will not avert a finding of constitutional violation, *Lee v. Macon County* does not preclude the Court from considering demographic changes, once a violation has been found, as it fashions a remedy that will accomplish the greatest degree of desegregation, "taking into account the practicalities of the situation." *Davis v. Bd. of School Commissioners*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971).

It is also true, with respect to the few remaining predominantly anglo schools and with respect to many of the predominantly minority schools (the four crossover[46] high schools—Adamson, Carter, North Dallas, and South Oak Cliff; most of the predominantly minority schools in the Southwest subdistrict; many of the predominantly minority schools in the Northwest, Northeast, and Southeast subdistricts; and at least a few of the schools in the East Oak Cliff subdistrict) that there is considerable basis for the Court to infer that the relationship between past segregative acts and present segregation has "become so attenuated as to be incapable of supporting a finding of *de jure* segregation warranting judicial intervention." *Keyes*, 413 U.S. at 211, 93 S.Ct. at 2699. But the Court has been unable to discern from the decisions of the higher federal courts any guidelines by which to determine when such an "attenuated" status has been reached. In any event, in view of the remedy being prescribed, there is no reason to pioneer in the field.

█ The Court is persuaded that it is neither practical nor possible to undertake the Sisyphean task of determining which schools are "vestiges" of past segregation and which are not. In any case, the Court must view the school system as a whole. *Swann, supra*, 402 U.S. at 25, 91 S.Ct. at 1280; *Carr, supra*, 377 F.Supp. at 1137–38. So viewing, the Court is of the opinion that vestiges of past segregation continue to exist in DISD, evidenced by some of the predominantly minority schools, the specific number and exact identity of which the Court cannot determine and further evidenced, to an unascertainable extent, by the lower achievement of minority students as compared to anglo students, as reflected by objective testing.

46. *See* text accompanying note 110, *infra*.

47. See testimony of Dr. Gordon Foster (characterizing any school having less than 90% concentration of anglos and minorities as "multi-ethnic"); see also *Tasby, supra*, 572 F.2d 1010, 1012 n.3.

## VI. *Constitutional Adequacy of the Existing Plan*

This Court has the unique perspective of sitting in review on a plan devised five years ago and measuring its continuing vitality under the applicable constitutional standards and in light of the variations in demography and enrollment that have transpired during the intervening five years. Those features of the 1976 plan which the Court herein finds to be either ineffective or constitutionally infirm will be addressed at a subsequent hearing upon remedial proposals to be submitted by the parties.

The Circuit was alarmed by the number of one-race schools existing in 1976 and has asked this Court to determine whether specific findings can be made to justify any one-race schools which presently remain in DISD. "One-race schools", a term of art adopted by many courts in evaluating racial imbalance, is used here to describe any school that has a student body with approximately 90% or more of the students being either of the anglo or combined minority races.[47] Although aware of the admonition of the Circuit that this 90% figure is not a "magic level below which a school [will] no longer be categorized as 'one-race,'" 517 F.2d at 104, the Court provides the following discussion of one-race schools in response to the Circuit's use of the 90% standard as its rule of thumb throughout the 1978 opinion. By looking at one-race schools simply as one measure for evaluating the degree of racial imbalance remaining in the system, the Court does not adopt the 90% standard as the talisman for the achievement of an acceptable degree of desegregation in a given school.

There are at present 79 one-race schools in the DISD, of which two are over 90% anglo and 77 are over 90% minority schools, out of a total of 255 school centers.[48] In

48. Cunningham Intervenor's Exhibit 30.

One source of much heated debate during the trial was whether the DISD's enrollment pattern should be evaluated on the basis of "campuses" or "schools". The dispute arises because of the manner in which the 1976 order

1966–67 after the "stair-step plan" to eliminate the statutory dual structure was fully implemented, there were 147 one-race schools, of which 114 were one-race white and 33 were one-race black.[49] Over 77% of all black pupils attended these 33 all-black schools, while 90% of the anglo and hispanic students attended the 114 all-white schools. By the end of the 1970–71 school year, the number of one-race anglo schools had dropped from 114 to 70 and there were 49 combined minority one-race schools, of which 40 were all-black, for a total of 119 one-race schools.[50] The 49 one-race minority schools enrolled 91% of all black pupils, with only 3% of the blacks in the district attending schools in which the majority of the students were white or anglo. In the first semester following the implementation of the 1976 desegregation plan, the total number of one-race schools had declined from 119 to 77. The number of one-race anglo schools dropped from 70 to 11, while the one-race minority schools rose from 49 to 66.[51] For purposes of comparing likes with likes,[52] the Court notes that there are today 59 one-race campuses out of a total 176 campuses in DISD, vis-a-vis 66 one-race campuses in 1976. Of the 59 current one-race campuses, there are two one-race anglo campuses and 57 combined minority cam-

creates standardized grade configurations at the K–3, 4–8 and 9–12 levels. A single school building, or "campus", may house two discrete "schools" or school centers—one for grades K–3 and one for grades 4–6. Prior to 1976 these two school centers would have been treated as a single K–6 elementary school. The DISD is concerned that, since the prior decisions in this case have measured one-race schools on the basis of school buildings (campuses), the use of school *centers* as the measure of one-race schools in this opinion would grossly overinflate the number of such schools in 1981 when compared to previous years. Specifically, they fear that an increase in the number of one-race schools between 1976 and 1981 would be caused by the arbitrary division of each former K–6 and K–8 campus unit into several smaller administrative units and would not necessarily represent any increase in racial imbalances. For example, the J. N. Ervin campus, housing students in grades K–8, would have been listed as one one-race school in 1976, but would account for as many as three one-race schools today, without any change in its overall racial composition.

Plaintiffs, on the other hand, argue that using "campuses" as the basic unit of calculation would undercount the number of one-race schools in the district. They point to several specific instances in which a one-race anglo K–3 school center is housed in the same building with a much larger 4–6 center, which has been desegregated by busing. When enrollment figures for the K–3 and 4–6 centers are combined, there are sufficient numbers of minorities in grades 4–6 to bring the overall *campus* enrollment below the percentage necessary to constitute a one-race, or predominantly one-race (*see* text accompanying note 57, *infra*) school, even though the classrooms at the lower grade level remain essentially segregated.

Both parties are correct in their observations. The primary vice of using the school centers standard appears to be the potential for confusion that exists when numbers for 1981 are contrasted with numbers for years prior to 1976 when there was no campus/school center distinction. When numbers for 1981 are viewed in isolation there is no real danger of overinflation; the increased number of one-race school centers is offset by a corresponding increase in the total number of school centers, eliminating any distortion created by the division of the elementary schools into smaller administrative units. Consequently, the Court adopts the school center as the unit of measure in tabulating the number of one-race schools in the district in 1981, with the understanding that these numbers are not directly comparable to the numbers of one-race schools in prior years. Although feeling slightly apologetic that desegregation litigation has progressed to the point, some 25 years after *Brown II*, that it becomes necessary to define the word "school" as a term of art, the Court nevertheless wishes to avoid any unnecessary confusion: as used in the context of the current desegregation plan, the word "school" refers to school centers and not school buildings or campuses. The significance of the disparity between the numbers of one-race schools and one-race campuses will be further explained in the discussion of K–3 schools below. (*See* text accompanying note 75, *infra*).

49. Hispanic enrollment was not separately tabulated in 1966–67, and hispanics were counted as "whites." Therefore, these figures may tend to overstate the number of one-race anglo schools and understate the number of one-race minority schools. See Defendants' Answers to Interrogatories (first set), Appendix 4.

50. *Tasby, supra*, 342 F.Supp. at 947.

51. Derived from December 15, 1976, Report to the Court, Appendix A, Vol. 1.

52. *See* discussion at note 48, *supra*.

puses (some 20 of which house more than one school center).[53]

Overall, the DISD has virtually eliminated one-race anglo schools. The 114 all-white schools that were present in 1966, when there was extensive racial segregation throughout the district, have been reduced to two.[54] The number of minority one-race schools has gradually risen during the course of this litigation, ranging from 49 in 1970 to 66 in 1976 to 77 at present.[55] The percentage of black students attending one-race minority schools has declined from 91.7% in 1970–71 to 67.6% in 1975–76 to 59.4% in 1980–81.[56] Obviously, the progress that has been achieved in this regard is the result both of the efforts of the district to eradicate the vestiges of the former dual system, and of the declining anglo enrollment throughout the period. The gradual increase in the number of one-race minority schools since 1970 appears to be fairly closely tied to the rise in combined black and hispanic percentage enrollment from 42% to almost 70%, in view of the absence of any intentionally discriminatory action on the part of the school district since this litigation was begun.

An analysis of 90% "one-race schools" is by no means the only method of evaluating the degree of racial imbalance within a school system. Since as early as 1976, the DISD has also been analyzing enrollment trends with a measuring stick that is calibrated on a 75%/25% ratio.[57] Throughout trial the parties have used the phrases "predominantly anglo schools" and "predominantly minority schools" to refer to schools which have an enrollment of either anglo or combined black and hispanic students in excess of 75%. When the same historical enrollment data for each school in the district is viewed from the vantage point of this 75%/25% window, the results are less favorable. As of March 9, 1981, there are 142 "predominantly one-race schools" out of 255 school centers—of these, 116 are predominantly minority schools.[58] The number of predominantly anglo schools has declined from 47 in 1976 to 26 at present, and it will continue to decline. None of the remaining predominantly anglo schools are located south or west of the Trinity River. The

---

53. Figures for 1981 are taken from DISD Exhibit 46B; figures for 1976 may be found at 572 F.2d 1010, 1012.

54. The future status of these two schools will be considered at a subsequent hearing; *see* "Remedy", *infra*.

55. From 1976 to present, the number of one-race minority schools has increased from 25.8% of the total number of school centers (66 out of 255 schools) to 30.2% (77 out of 255 schools). While these figures are depressing, Dallas compares quite favorably among the rest of the 20 largest urban school districts in the country. On the average, 60% of the school populations in these 20 districts are minority-group students, and 90% of them attend schools that are predominantly nonwhite. *See* Bell, *supra* note 11, at 478 n.23. By way of specific example, DISD's one-race minority schools are both fewer in number than those of Atlanta and Houston (77, vis-a-vis 92 and 101, respectively) and represent a smaller proportion of all schools than in those two unitary systems (30.2% vis-a-vis 62% and 42%, respectively). *See Calhoun v. Cook*, 522 F.2d 717 (5th Cir.) *reh. denied*, 525 F.2d 1203 (1975) (Atlanta system declared unitary notwithstanding fact that further integration was theoretically possible); *Ross v. Houston I.S.D.*, No.

10,444 (S.D.Tex. June 17, 1981) (order declaring unitary status).

56. At the same time, the number of blacks attending schools which were 50% or more white rose from 3% of total black enrollment in 1970–71 to 10% of the black enrollment in 1980–81. *See* 342 F.Supp. at 947 and Curry Exhibit 1. The significance of this increase can only be measured when read in the perspective of the declining anglo enrollment over the same period. In 1971, 114 out of 176 school campuses had 50% or more anglos (70 of these were 90% or more anglo), but by 1981 there were only 49 out of 255 school centers that had 50% or more anglo students.

57. *See Tasby, supra*, 412 F.Supp. at 1199 n.14. This standard was borrowed by the District Court in 1976 for its definition of the naturally integrated areas, and was adopted by Justice Powell, in his dissent from the dismissal of certiorari, as the measure of a racially identifiable school in DISD. *See Estes, supra*, 444 U.S. at 442, 100 S.Ct. at 718.

58. Curry Exhibit 1; Cunningham Intervenors Exhibit 31. Of the 176 school *campuses*, 19 have more than 75% anglo students and 83 have more than 75% minority students. DISD Exhibit 46A.

number of predominantly minority schools has risen from 89 in 1976[59] to 116 today, and may very well continue to increase regardless of what action this Court takes.

■ The Court is keenly aware that there is no absolute numerical standard below which a school district may with impunity cease its efforts to maximize desegregation. The higher federal courts have been understandably reluctant to chisel into stone any universal standard or percentage ratio that would define a safe harbour for school districts of every shape and size across the country; the Supreme Court has declined to fashion, as a matter of substantive constitutional right, a concept of "unitariness" that requires any particular degree of racial balance or mixing. Rather, a school system will be declared unitary only when the system as a whole, based on the six traditional facets or indicia,[60] has been desegregated. With respect to the facet of student assignment, the Supreme Court and this Circuit have frequently reiterated that the system *as a whole* is examined for purposes of determining whether the assignment policies are truly nondiscriminatory and desegregative; the racial balance of individual schools is not looked to for that purpose. *Swann, supra,* 402 U.S. at 25, 91 S.Ct. at 1280; *Carr, supra,* 377 F.Supp. at 1138. In short, while precise racial or ethnic balance in each school is not required, and while there may be schools of one race that will pass the close scrutiny required by *Swann,* it is the school system as a whole that must be converted to unitary status on a tri-ethnic basis. *Swann, supra.*

The command of *Swann* is simple in its statement: the district court must make every effort to achieve "the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools." 402 U.S. at 26, 91 S.Ct. at 1281. But that is not the same

as saying that the elimination of one-race schools fulfills the Court's duty to achieve the maximum degree of desegregation possible in the system, as a whole, given the facts and circumstances unique to each case.[61] Ultimately, it becomes incumbent on the Court to determine, based on all the realities of the particular district before it, at what point the schools in that system can be said to have achieved a desegregated status. That is to say, in order to determine whether the district has achieved "the maximum degree of desegregation possible," taking into account the practicalities of the situation, the Court must first decide, looking at the district as a whole, what will be accepted as the minimum definition of a desegregated setting. It must then set about examining those schools which fail to satisfy this threshold test to see whether or not they can similarly be converted to a desegregated status or whether or not their continued existence is constitutionally permissible.

The threshold step of prescribing the measure of desegregation constitutionally required is fraught with a unique set of difficulties in the context of a heavily minority urban school system. Federal judges in Detroit, Atlanta, Richmond and Washington, D. C., have had occasion to travel down this road in the past; judges in Cleveland, St. Louis and elsewhere must address the problem contemporaneously with this Court. In Detroit, on remand after *Milliken II,* the district court candidly observed that:

Limitations [in the scope of the remedy] may be imposed by the desegregation area. For example, the black proportion of the population can be so great that racial balance will inevitably result in majority black schools. In such an area, only two alternatives are available: *The desegregation area must be enlarged or*

---

**59.** Derived from December 15, 1976, Report to the Court, Appendix A, Vol. I.

**60.** These indicia are generally accepted to be student assignments, racial composition of faculty and staff, transportation, extracurricular activities, and facilities. *Green, supra,* 391 U.S.

at 435, 88 S.Ct. at 1692; *Swann, supra,* 402 U.S. at 18, 91 S.Ct. at 1277.

**61.** This is precisely the point made by the Fifth Circuit in its footnote caveat at 572 F.2d 1010, 1012 n.3.

*flexibility must be permitted in defining a desegregated setting.*

*Bradley v. Milliken*, 402 F.Supp. 1096, 1131 (E.D.Mich.1975), *remanded*, 540 F.2d 229 (6th Cir. 1976) (emphasis added). Like Detroit, if DISD's school population were more evenly divided between anglos and minorities or if the "desegregation area" were enlarged to take in the outlying suburban school districts with their overwhelming anglo enrollment, it would be possible to diminish the inevitable limitations on the task of eliminating racially identifiable schools in the district. But the statistics previously discussed portend that lesser rather than greater equalization is destined to occur in DISD, and the possibility of expanding the desegregation area through interdistrict relief has already been foreclosed in this case, 572 F.2d 1010, 1015, given the vigorous showing of interdistrict violation that is required by *Milliken I*. Once the city school district has been "sealed off" from the suburbs, the Court can only work with what it has before it; the definition of a desegregated setting will be shaped accordingly.

The parties approach the issue of the measurement of desegregation from different worlds. The school district emphasizes the degree to which one-race (90%) schools have been eliminated in DISD and urges (as it has in one way or another since this litigation began) the Court to concentrate on the presence or absence of one-race schools as the measure of a desegregated school system. Plaintiffs, on the other hand, would conclude that a school district is desegregated only when the racial composition of its schools mirrors the system-wide racial ratio within 10% in either direction.[62] The Court agrees with Plaintiffs that it would be unreasonable to use a 90% yard-stick to measure desegregation in a district that has become minority anglo. But Plaintiffs' approach is just as unacceptable. Under the numerical tolerances advanced by Plaintiffs' expert witness, Dr. Gordon Foster, any school with a present anglo enrollment greater than 40% would be out of balance with the system; given the projected enrollment for 1985, such a sliding-scale measurement would label a school with an enrollment of only one-third anglo as "racially identifiable" as anglo.[63] In converting DISD into a school system without white schools and black or brown schools, but just schools,[64] the Court cannot in all conscience call a school a "white" school when only 40% or 50% or even 60% of its student body is anglo. The target of school desegregation cases from *Brown I* to the present has been the elimination of the dual school system, not the imposition of strict racial balance throughout the system. *Swann, supra*, 402 U.S. at 22, 91 S.Ct. at 1279.

After careful consideration of the relevant authorities as applied to the realities of this case, the Court concludes that a proper definition of a desegregated setting for a school within DISD should include, at a minimum, those schools which have achieved a racial mix of 75%–25%, anglos to minorities or minorities to anglos. This mathematical ratio is merely a necessary starting point in the process of shaping a remedy and is not intended as a rigid racial balance requirement. This standard is appropriate for a number of reasons.

In 1976 this Court described the naturally integrated areas of the district as those schools in which the racial makeup of the

62. See Plaintiffs Exhibit 41.

63. Dr. Foster's use of sliding tolerances was similarly rejected by then District Judge Frank M. Johnson in the Montgomery, Alabama, desegregation case as being "highly artificial," unnecessarily disruptive, an impingement on the educational processes of the system, and premised on a misunderstanding of the commands of *Swann. Carr, supra*, 377 F.Supp. at 1140–1141. The weakness of Dr. Foster's sliding scale approach can be further demonstrated, as follows. Given sufficient longterm fluctuations in district-wide demographics, it would be possible for a particular school to be classified as "racially identifiable" in 1970, desegregated in 1975, racially identifiable again in 1980, and desegregated again in 1985, *all* without that school ever experiencing any change in the ethnic makeup of its own student body.

64. *Green, supra*, 391 U.S. at 442, 88 S.Ct. at 1696.

student population reflects naturally integrated housing patterns; those schools which met the standard of having not more than 75% anglos or more than 75% combined minorities were identified as naturally desegregated. These schools were allowed to retain their existing student assignment patterns, since no vestiges of the former dual system remained in these areas, and since there would be no educational or other benefit in disturbing the trend towards residential integration. *Tasby, supra*, 412 F.Supp. at 1199, 1206. This approach was not disturbed by the Circuit in its remand opinion.

At various times throughout the litigation parties on both sides have taken the position that having no more than 70% to 75% of any one race in a given school will constitute a multi-ethnic, desegregated environment. That is presently the position taken by the Black Coalition and apparently by the Cunningham intervenors. Proposed plans submitted by the Plaintiffs in 1976 generally treated schools as desegregated when no race exceeded 70%; but in several instances listed among the category of desegregated schools (which were left alone in Plaintiffs' plan) were schools with as many as 73% of a given race. As noted above, DISD has been computing statistical data for each school on a 75%–25% ratio for a number of years. The record is replete with references to this standard and conclusions based on this standard [65]; it is not just a number the Court has arbitrarily plucked from the sky.

Moreover, there is a basis for this standard in experience and common sense, as borne out by the pertinent social science literature. Research by various experts indicates that for effective participation and healthy interpersonal interaction among students, an ethnic or racial group in the numerical minority should ordinarily comprise at least 20% of the student body.[66] Twenty-five percent gives a group a "presence" in a school and is a sufficient number to form an effective bloc. Also, when historical trends are examined it appears that once a school, which had previously been virtually all-anglo, attains a 25% minority representation, it is very likely that this percentage representation will increase, rather than stay constant or decrease.[67]

Other courts have adopted plans which considered a school desegregated when it fell within this 20% to 30% range. For example, in cases involving heavily minority school districts, the federal court's principal objective in Atlanta was to achieve at least a 30% black enrollment in every majority white school in the system; in Detroit, the court's guidelines provided that no school should have a black student population less than 30%.[68] All things considered, the Court believes that a school having no more than 75% anglo or minority enrollment provides a desegregated education and has shorn itself of any vestigial badge or characteristic of a dual system that it once may have had by virtue of student assignments. In making this finding, the Court reaffirms the previous conclusion of Judge Taylor that it would be unwise to disturb assignment patterns which effectively desegregate such schools. Equity does not require the disruption of racially mixed schools in stable neighborhoods which have already

**65.** Testimony at the trial supports the reasonableness of this basis for measurement. Plaintiff Sam Tasby testified that, in his opinion, a school with at least 25% minority enrollment would be considered integrated. Superintendent Linus Wright testified that, in his opinion, a school is racially identifiable if its enrollment exceeds 75% for any one race or ethnic group.

**66.** *See, generally*, 7 Clearinghouse for Civ. Rights Research 3 (Spring 1979); Willie, *Racial Balance or Quality Education?*, 84 Sch.Rev. 313, 319 (1976). *See also* Epps, *The Impact of School Desegregation on Aspirations, Self-Con-*

*cepts and Other Aspects of Personality*, 39 Law & Contemp. Problems 300 (Spring 1975).

**67.** *E. g.*, Thomas Jefferson High School, Kimball High School, Woodrow Wilson High School, Caillet Elementary, Jackson Elementary, etc.

**68.** By contrast, the court in Nashville required a minimum presence of only 15% of whichever race was in the minority in a given school, as a reasonable attempt to provide an intercultural, pluralistic experience. *Kelley. supra*, 492 F.Supp. at 193.

undergone residential and educational change. *See Milliken II*, 433 U.S. at 288, n.19, 97 S.Ct. at 2761 n.19.

Once the desegregated schools are removed from consideration, the remaining schools that are all or predominantly of one-race must be subjected to close scrutiny. This Court will scrutinize the remaining one-race schools in DISD, but proposes to go a step further and subject all *predominantly* one-race schools (schools which are not desegregated) to the same close scrutiny.[69]

The examination of the 142 remaining predominantly one-race (75% +) schools out of 255 school centers will proceed in the following fashion:

i. Grades K-3 83 predominantly one-race
 schools (19 anglo/64 combined
 minorities);

ii. Grades 9-12 13 predominantly one-race schools
 (4 anglo/9 combined minorities);

iii. Grades 4-6 38 predominantly one-race schools
 (2 anglo/36 combined minorities), and

 Grades 7-8 8 predominantly one-race schools
 (1 anglo/7 combined minorities).

Additionally, the Court will review the justification for the East Oak Cliff subdistrict, and consider the effectiveness of the magnet school program and majority-to-minority transfer option as tools for further desegregation.

## VII. *Kindergarten-Third Grade Schools*

The Court's 1976 desegregation plan left neighborhood school attendance areas intact for students enrolled in kindergarten through third grades (K–3). The decision to exclude these students from any desegregation assignment plan accounts for over half of the predominantly one-race schools in the Dallas system in 1976 and in 1981. The Fifth Circuit directed this Court on remand to assess the feasibility of the *Swann* desegregation techniques of pairing, clustering, or the use of transportation to eliminate one-race schools. *Tasby v. Estes*, 572 F.2d at 1014.

The directive of the Fifth Circuit reflects a longstanding reluctance to approve desegregation plans which exclude certain grades unless sufficient findings have been made "to ascertain whether the plan reaches the maximum desegregation permitted by local conditions." *Lee v. Macon County Board of Education*, 616 F.2d at 808–09; *see also Mills v. Polk County Board of Public Instruction*, 575 F.2d 1146 (5th Cir. 1978); *Haycraft v. Bd. of Educ. of Jefferson County, Kentucky*, 585 F.2d 803 (6th Cir. 1978), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1979); *Arvizu v. Waco I.S.D.*, 495 F.2d 499 (5th Cir. 1974); *Flax v. Potts*, 464 F.2d 865 (5th Cir.), *cert. denied*, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972). The courts have also recognized, however, that a constitutional plan may be devised which "temporarily or permanently leaves one or more racially identifiable elementary schools, or that omits some of the earlier grades from the busing program." *Lee v. Macon County, supra*, at 812. *See also United States v. Board of Education of Valdosta, Georgia*, 576 F.2d 37 (5th Cir.), *cert. denied*, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978); *Thompson v. School Board of City of Newport News, Virginia*, 498 F.2d 195 (4th Cir. 1974); *Lockett v. Board of Education of Muscogee County*, 447 F.2d 472 (5th Cir. 1971).

The ultimate objective of any remedy designed by the Court is "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken I*, 418 U.S. at 746, 94 S.Ct. at 3128. At the same time, however, the Court must weigh the vindication of constitutional entitlements against the practical limitations on the use of remedial tools. As the Supreme Court has repeatedly emphasized, "[t]here are undoubted practical as well as legal limits to the remedial powers of federal courts in school desegregation cases." *Id.* at 763, 94

**69.** It is purely a question of semantics whether the Court expands the definition of "one-race schools" to include schools 75% or more of one race (as some parties have recommended) or whether it retains the traditional definition of one-race schools and coins a new phrase, "predominantly one-race" schools, to describe such schools over 75%; the same schools will be scrutinized regardless of the appellation.

S.Ct. at 3136 (White, J., dissenting). The Court's lodestar in its attempt to discern these limits must be that its purpose is "to desegregate an *educational* system in which the races have been kept apart, without, at the same time, losing sight of the central *educational* function of the schools." *Id.* at 764, 94 S.Ct. at 3137 (emphasis in original).

■ In recent years, the transportation of students has become the major technique adopted by courts to eliminate unconstitutionally segregated schools. · To this end, this Court has examined, and reexamined, the demographics of the Dallas school system, the time and distance studies, the opposition of many minority K–3 parents to busing, and the potential impact of busing on the health and education of K–3 students, and finds that the remaining predominantly minority K–3 schools in the DISD cannot be effectively desegregated in a practical and workable manner through the use of transportation.

## A. *Demographics of the K–3 Schools*

### 1. *K–3 Enrollment Trends, 1971–1981*

Analysis of the racial composition and enrollment trends of the K–3 schools over the last ten years is a necessary predicate to a determination of the feasibility of *Swann* techniques to desegregate these schools. Enrollment in K–3 grades was 42,008 in 1971–72 and 43,532 at March 1981.[70] These total figures mask, however, the actual changes in the racial composition of this group over the ten-year period.

Anglo K–3 enrollment has shown a continuing decline at all four grade levels in every year since 1973–74 and has decreased from 19,363 or 46.1% of K–3 students in 1971–72 to 11,842 or 27.2% in 1981. The most precipitous annual declines occurred after the 1971–72 school year (11.8%), and again in 1974–75 (8.6%), 1976–77 (7.6%) and 1979–80 (9.0%). Anglo K–3 enrollment showed a steep decline in all five subdistricts,[71] ranging from 20% in the Southeast to 57% in both the Northwest and Southwest subdistricts. The Court finds that the trend of diminishing anglo representation in the K–3 student group will continue in the foreseeable future.

Black K–3 enrollment presents a somewhat different picture, having remained rather stable for ten years—17,384 in 1970–71 and 20,471 in 1981. Black students accounted for 41.4% of the K–3 students in 1971–72 and 47% in 1981. Although some growth was documented in earlier years, black K–3 enrollment has trended slightly downward in the last three years with a 4.5% decline in 1980–81. Hispanic K–3 enrollment, on the other hand, has risen consistently since 1971–72 and more than doubled, from 5,006 (11.9%) in 1971–72 to 10,509 (24.1%) in 1981. Hispanics will soon overtake anglos as the second largest group in DISD and this upward progression will continue. American Indians and Asian Americans each have relatively small numbers in the K–3 group representing only 0.4% and 1.18%, respectively.

The marked changes in student population size and ethnic mix in DISD are also clearly discernible in each of the subdistricts created by the 1976 Order. The only significant increase in total K–3 enrollment over the ten year period was reported in the Southwest subdistrict, which had an increase of 5,400 minority K–3s.

---

**70.** The 1971–72 figures reflect only Grades 1–3. In addition, the total number of K–3 students includes 3,195 Special Education students who are reported separately without a grade designation. Since several of the K–3 schools are housed in centers with 4–6 schools, it is possible that some of the special education students are in grades 4–6; thus the total number of K–3 students may be somewhat overstated. The relative proportions of each racial group, however, remain fairly constant.

**71.** Although the subdistrict concept was not in operation in DISD until implementation of the 1976 Court Order, the data on historical enrollments and projections for 1971–72 until 1981 has been compiled for schools within the subdistrict framework.

The K–3 student body in 1981, summarized below, is markedly different from that which faced the Court in either 1971 or 1976.[72]

### Summary of DISD Enrollment
### Grades K-3
### (March 4, 1981)

| GRADE | ANGLO | BLACK | HISPANIC | AM.IND. | ASIAN | TOTALS |
|-------|-------|-------|----------|---------|-------|--------|
| K | 2344 | 4271 | 2423 | 40 | 109 | 9187 |
| 1 | 2922 | 4740 | 2787 | 42 | 141 | 10632 |
| 2 | 2740 | 4835 | 2549 | 51 | 126 | 10301 |
| 3 | 2799 | 4966 | 2276 | 43 | 133 | 10217 |
| | 10805 | 18812 | 10035 | 176 | 509 | 40337 |
| | 26.8% | 46.6% | 24.87% | .4% | 1.3% | |

Special Education

| | 1037 | 1659 | 474 | 18 | 7 | 3195 |
|---|------|------|-----|----|---|------|
| | 11842 | 20471 | 10509 | 194 | 516 | 43532 |
| | 27.2% | 47.0% | 24.1% | .4% | 1.18% | |

With only 11,842 anglo K–3 students remaining, the magnitude of the problem facing this Court in any attempt to desegregate the K–3 schools becomes apparent. Projections for anglo attendance in the K–3 grades for the period 1981–1985, furthermore, portend that the "problem [may] no longer [be] how to achieve integration but how to prevent resegregation." *Calhoun v. Cook*, 332 F.Supp. at 806. By 1985, anglo K–3 enrollment is expected to drop to 7,661 students, and these students will comprise only 19.2% of DISD's K–3 student body. Blacks will comprise 44.1% of the K–3s by 1985, while hispanic enrollment will increase to 34.3%.[73] Projections for K–3 enrollment in the subdistricts show the same overall trends.

Although this projection is itself particularly disturbing for the future of an urban school district within a majority anglo metropolitan area, the fact that the estimate assumes no further disruption in the school system is ground for concern. While it is not possible for the Court to determine the precise nature or causes of the departure of anglo students from DISD, history shows that significant changes in anglo enrollment have accompanied each segment of this litigation. The ultimate number of anglo students in DISD's K–3 classes, therefore, could easily drop below 7,661 if substantial changes, whether perceived or real, take place in the school district.

Any attempt to forecast the K–3 enrollment in DISD or the long term effects of

72. The source of data reflected in this Table is the March 9, 1981, Report submitted to the Court by DISD and admitted into evidence as Cunningham Exhibit 10 and Curry Exhibit 2. Special Education students are included with total K–3 students as discussed in note 70, *supra*, because DISD calculations of enrollments for K–3 schools in elementary centers include such students. *See, e. g.*, DISD Exhibit 46A.

73. Projections on enrollment for 1981–85 are drawn from DISD Exhibit 17A.

any action by this Court must also take into account the high degree of mobility within the district, reaching approximately 30% in grades K–3.[74] Such high mobility itself shows the difficulty of achieving any effective, permanent desegregation by pupil assignment and busing. The fact that families residing in DISD with children in school tend to be highly mobile indicates that the impact of any court ordered busing for desegregation would likely be only transitory.

With these statistics in mind the Court turns now to an examination of predominantly one-race K–3 schools in DISD and the feasibility of desegregating them with the available equitable tools. Pursuant to the plan implemented in 1976, DISD schools were separated into K–3, 4–6, 7–8, and 9–12 grade configurations. Under this designation, there are 126 K–3 schools. Seventy-eight of these K–3 schools are housed with 4–6 elementary schools at the same location (at the J.N. Ervin School, one building houses K–3, 4–6, and 7–8 grades). Obviously, whether these campuses which have both K–3 and other grades at one location are treated as one school or two alters the calculation and number of one-race and predominantly minority and predominantly anglo schools in DISD and makes comparison with 1976 data difficult. Using the separate "school" rather than campus data, of the 126 K–3 schools, 19 are predominantly anglo, 64 are predominantly minority, and 43 are desegregated. Thirty-one percent of the K–3s attend the 43 desegregated K–3 centers; 12% are in predominantly anglo schools; and 57% are in the predominantly minority K–3 centers.[75]

## 2. Predominantly Anglo K–3 Schools

The perception by minority children that they are excluded from a school because of their race may "affect their hearts and minds in a way unlikely ever to be undone," *Brown I*, 347 U.S. 483, at 494, 74 S.Ct. 686, at 691, 98 L.Ed. 873. The continued existence of schools with predominantly anglo enrollment, therefore, is always at the crux of any school desegregation case. Clearly, if further desegregation of minority schools is practicable, the elimination of only identifiably anglo schools is not sufficient. *See, e. g., Bradley v. Milliken*, 620 F.2d 1143, 1151 (6th Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980). *Arthur v. Nyquist*, 473 F.Supp. 830, 836 (W.D.N.Y. 1979). The problem, however, is aggravated in a system like Dallas where, with a 70% and increasing black and hispanic enrollment, it is impossible to avoid having a substantial number of predominantly minority schools and the prospects for any significant desegregation appear bleak. *See, e. g., Lee v. Lee County Bd. of Education*, 639 F.2d 1243, 1259 n.10.

Of the 126 K–3 schools, only two are one-race anglo—Kramer and Lagow—with a total enrollment of 507 in March 1981. Only 19 of the 126 K–3 schools, including Kramer and Lagow, are predominantly anglo.[76] Located primarily in the northern portions of the Northwest and Northeast subdistricts, these schools serve 4,815 K–3 students of whom 83% are anglo, 6% black, 9% hispanic, and 2% American Indian and

---

**74.** The 30% figure is reached by an analysis using "cohort group" figures of numbers of children who were enrolled continuously together between grades 1 through 3 for all races. About 70% of those in the third grade in spring 1980 had been together in the first grade in fall 1977. About 30%, therefore, who were present in the first grade, no longer were enrolled by the third grade. *See* Brinegar Exhibit 18.

**75.** Using figures for K–3 campuses, 50 out of 126 campuses are desegregated, 13 are predominantly anglo and 63 are predominantly minority.

**76.** These 19 K–3 schools are Adams, Blanton, Cabell, Dealey, Gooch, Hexter, Kiest, Kramer, Lagow, Lakewood, Macon, Mosely, Pershing,

Preston Hollow, M. T. Reilly, Reinhardt, Seagoville, Urban Park and Withers. Enrollment history of these schools is shown in Table B. Seven (Adams, Blanton, Lakewood, Pershing, Preston Hollow, Reilly, and Reinhardt) are already below the 75% benchmark if the 4–6 classes are included. Since the K–3 and 4–6 classes are separated, however, the Court treats the seven as separate entities for purposes of this discussion. There is merit, however, in the proposition urged by DISD et al, that the presence of these children in 4–6 creates a desegregated environment in these seven schools.

Asian-American. The relevance of this data, however, must be viewed within the context of the system as a whole. The 4015 anglo students in these 19 schools represent only 34% of the anglo K–3 enrollment in the district and 11% of the total K–3 enrollment; two-thirds (7827) of the anglo K–3 students are in desegregated or predominantly minority schools. In *Alvarado v. El Paso I.S.D.*, 593 F.2d 577 (5th Cir. 1979), by contrast, a plan was approved whereby six out of seven anglo students remained in schools over 90% white.

The geographic concentration of anglo students in DISD schools has also been significantly diluted since 1970–71, when the great majority of the anglo students were concentrated in 69 one-race anglo schools. While these figures are for all grades, the pattern of decreasing concentration of anglo students and increased desegregation is also clearly evident in the K–3 grades. In 1976, there were 38 K–3 schools with 75% or more representation of anglo students; by 1981 that number had decreased to the 19 identified above.

Taking into account enrollment history and trends, it is clear that these predominantly anglo schools will soon be desegregated without the application of any external measures. The steady movement towards more integrated student bodies in formerly anglo schools is highlighted by the five K–3 schools which moved below 75% anglo between November 1980 and the submission of enrollment data by DISD in March 1981. As can be seen in Table A, the decrease in anglo enrollment and the increase in minority enrollment at each of these schools has been in progress for several years.

The remaining 19 predominantly anglo K–3 schools (summarized in Table B) exhibit the same characteristics and enrollment trends as these five. Enrollment at these 19 schools shows a general decline from 1970–81 which will continue. Eight of these schools [77] with 1981 student populations 75–80% anglo will very likely become desegregated within the next year, based upon past enrollment histories and trends of K–3 enrollment district-wide, not to mention the 30% mobility factor. Another six of the 19 predominantly anglo K–3 schools are currently between 80–85% anglo [78]; three are between 85–90% [79]. Again based on enrollment histories and trends, the Court finds that these nine schools will become desegregated within two and not more than three years.

TABLE A

### K-3 SCHOOLS WHICH CHANGED FROM PREDOMINANTLY ANGLO TO DESEGREGATED -- NOV. 1980 - APRIL 1981

| | ANGLO | | BLACK | | HISPANIC | |
|---|---|---|---|---|---|---|
| **DeGolyer** | | | | | | |
| 1973 | 175 | 97.2% | 2 | 1.1% | 1 | .6% |
| 1976 | 141 | 91.56% | 4 | 2.6% | 4 | 2.6% |
| 1981 | 95 | 74.2% | 15 | 11.7% | 17 | 13.3% |
| **Walnut Hill** | | | | | | |
| 1973 | 166 | 91.7% | 0 | 0 | 13 | 7.2% |
| 1976 | 111 | 86.05% | 3 | 2.3% | 14 | 10.9% |
| 1981 | 63 | 68.5% | 19 | 20.7% | 9 | 9.8% |

77. Dealey, Kiest, Macon, Urban Park, Adams, Blanton, Pershing and Reinhardt.

78. Cabell, Gooch, Hexter, Withers, Preston Hollow and Reilly.

79. Mosely, Seagoville and Lakewood.

TABLE ___A___

## K-3 SCHOOLS WHICH CHANGED FROM PREDOMINANTLY ANGLO TO DESEGREGATED -- NOV. 1980 - APRIL 1981

| | | ANGLO | | BLACK | | HISPANIC | |
|---|---|---|---|---|---|---|---|
| Truett | | | | | | | |
| | 1973 | 351 | 93.0% | 1 | .3% | 21 | 5.6% |
| | 1976 | 340 | 87.2% | 17 | 4.4% | 29 | 7.4% |
| | 1981 | 295 | 74.3% | 53 | 13.4% | 37 | 9.3% |
| Casa View | | | | | | | |
| | 1973 | 298 | 94.7% | 0 | 0 | 34 | 10% |
| | 1976 | 282 | 82.7% | 0 | 0 | 49 | 14.4% |
| | 1981 | 224 | 72.3% | 13 | 4.2% | 65 | 21.0% |
| Hawthorne | | | | | | | |
| | 1973 | 180 | 94.7% | 2 | 1% | 6 | 3.2% |
| | 1976 | 150 | 83.3% | 18 | 10% | 10 | 5.6% |
| | 1981 | 115 | 71.9% | 28 | 17.5% | 16 | 10% |

TABLE ___B___

## HISTORICAL ENROLLMENTS OF REMAINING K-3 PREDOMINANTLY ANGLO SCHOOLS

| | ANGLO | | BLACK | | HISPANIC | |
|---|---|---|---|---|---|---|
| CABELL | | | | | | |
| 1973 | 365 | 96.6% | 2 | .5% | 9 | 2.4% |
| 1976 | 236 | 93.3% | 5 | 2.0% | 7 | 2.8% |
| 1981 | 153 | 80.1% | 8 | 4.2% | 23 | 12.0% |
| DEALEY | | | | | | |
| 1973 | 198 | 91.2% | 17 | 7.8% | 1 | .5% |
| 1976 | 119 | 91.0% | 9 | 6.8% | 2 | 1.5% |
| 1981 | 87 | 77.7% | 14 | 12.5% | 6 | 5.4% |
| T. GOOCH | | | | | | |
| 1973 | 252 | 95.8% | 5 | 1.9% | 4 | 1.5% |
| 1976 | 223 | 90.7% | 9 | 3.7% | 7 | 2.9% |
| 1981 | 154 | 82.8% | 17 | 9.1% | 8 | 4.3% |
| V. HEXTER | | | | | | |
| 1973 | 149 | 94.9% | 7 | 4.5% | 1 | .6% |
| 1976 | 170 | 88.5% | 4 | 2.0% | 10 | 5.2% |
| 1981 | 122 | 84.4% | 8 | 5.5% | 11 | 7.6% |
| E.J. KIEST | | | | | | |
| 1973 | 311 | 90.9% | 2 | .6% | 27 | 7.9% |
| 1976 | 272 | 84.0% | 4 | 1.2% | 38 | 11.7% |
| 1981 | 182 | 76.5% | 5 | 2.1% | 32 | 13.5% |
| A. KRAMER | | | | | | |
| 1973 | 144 | 97.3% | 0 | 0 | 1 | 1.3% |
| 1976 | 108 | 92.3% | 4 | 3.4% | 3 | 2.6% |
| 1981 | 70 | 97.2% | 0 | 0 | 1 | 1.4% |
| R. LAGOW | | | | | | |
| 1973 | 370 | 94.4% | 5 | 1.3% | 17 | 4.3% |
| 1976 | 436 | 91.8% | 8 | 1.7% | 31 | 6.5% |
| 1981 | 394 | 90.8% | 10 | 2.3% | 27 | 6.2% |

TABLE B

## HISTORICAL ENROLLMENTS OF REMAINING
## K-3 PREDOMINANTLY ANGLO SCHOOLS

| | ANGLO | | BLACK | | HISPANIC | |
|---|---|---|---|---|---|---|
| **B.H. MACON** | | | | | | |
| 1973 | 233 | 91.7% | 1 | .4% | 15 | 5.9% |
| 1976 | 226 | 86.3% | 2 | .8% | 33 | 12.6% |
| 1981 | 204 | 79.1% | 11 | 4.3% | 41 | 15.9% |
| **N. MOSELEY** | | | | | | |
| 1973 | 299 | 93.0% | 4 | 1.2% | 2 | .6% |
| 1976 | 341 | 96.3% | 1 | .3% | 10 | 2.8% |
| 1981 | 295 | 87.5% | 16 | 4.8% | 26 | 7.7% |
| **SEAGOVILLE** | | | | | | |
| 1973 | 346 | 79.6% | 58 | 7.3% | 44 | 5.5 |
| 1976 | 455 | 82.6% | 61 | 11.1% | 33 | 6.0% |
| 1981 | 579 | 86.4% | 49 | 7.3% | 40 | 6.0% |
| **URBAN PARK** | | | | | | |
| 1973 | 214 | 89.2% | 1 | .4% | 22 | 9.1% |
| 1976 | 175 | 82.6% | 5 | 2.4% | 26 | 12.3% |
| 1981 | 182 | 76.2% | 9 | 3.8% | 43 | 18.0% |
| **H. WITHERS** | | | | | | |
| 1973 | 215 | 98.2% | 0 | 0 | 1 | .4% |
| 1976 | 157 | 94.6% | 4 | 2.4% | 4 | 2.4% |
| 1981 | 90 | 83.3% | 15 | 13.9% | 2 | 1.9% |
| **LAKEWOOD** | | | | | | |
| 1973 | 135 | 95.0% | 0 | 0 | 6 | 4.2% |
| 1976 | 167 | 91.3% | 4 | 2.2% | 7 | 3.8% |
| 1981 | 156 | 86.2% | 10 | 5.5% | 11 | 6.1% |
| **J.Q. ADAMS** | | | | | | |
| 1973 | 361 | 85.5% | 5 | 1.2% | 52 | 12.3% |
| 1976 | 306 | 75.6% | 39 | 9.6% | 59 | 14.6% |
| 1981 | 293 | 76.9% | 37 | 9.7% | 51 | 13.4% |
| **A.W. BLANTON** | | | | | | |
| 1973 | 256 | 96.2% | 1 | .4% | 8 | 3.0% |
| 1976 | 289 | 88.7% | 4 | 1.2% | 33 | 10.1% |
| 1981 | 228 | 79.7% | 26 | 9.0% | 30 | 10.5% |
| **J.J. PERSHING** | | | | | | |
| 1973 | 175 | 87.1% | 13 | 6.5% | 9 | 4.5% |
| 1976 | 122 | 89.1% | 7 | 5.1% | 8 | 5.9% |
| 1981 | 59 | 75.6% | 12 | 15.4% | 5 | 6.4% |
| **PRESTON HOLLOW** | | | | | | |
| 1973 | 158 | 97.5% | 1 | .6% | 2 | 1.2% |
| 1976 | 140 | 92.7% | 5 | 3.3% | 3 | 2.0% |
| 1981 | 123 | 83.7% | 13 | 8.8% | 6 | 4.1% |
| **M. T. REILLY** | | | | | | |
| 1973 | 416 | 95.2% | 2 | .5% | 16 | 3.7% |
| 1976 | 369 | 91.3% | 13 | 3.2% | 18 | 4.5% |
| 1981 | 289 | 83.5% | 18 | 5.2% | 34 | 9.8% |
| **REINHARDT** | | | | | | |
| 1973 | 305 | 93.3% | 0 | 0 | 16 | 4.9% |
| 1976 | 280 | 88.6% | 4 | 1.3% | 29 | 9.2% |
| 1981 | 199 | 76.5% | 20 | 7.7% | 33 | 12.7% |

There remain, then, of the 19, only the two one-race anglo K–3s—Kramer and Lagow. Kramer in far North Dallas has less than 100 students and will likely be consolidated with a nearby school to promote desegregation and to eliminate the inefficiencies associated with such a small school. Lagow, with an enrollment of 431, is situated in a portion of far southeast Dallas near several predominantly minority schools, and, together with Mosely, Macon, Adams, and Blanton, may be a candidate for contiguous pairing, clustering or redrawing of attendance zone lines.

The Court finds that these 19 predominantly anglo K–3 schools account for only 11% of the total K–3 enrollment, and that 17 of them will soon have desegregated student bodies. Some question exists, furthermore, whether all of these schools can be fairly identified as vestiges of the former dual school system. Nine of the schools which are predominantly anglo in 1981 had enrollments over 90% anglo in 1966–67 and thus clearly raise the *Keyes* presumption that they were elements of the previous state-imposed segregation.[80] Whether the racial imbalance of the remaining 10 schools is likewise attributable to statutory segregation and its incremental effect is less clear. All of the predominantly anglo schools are located in areas which were far from the concentrations of minority populations in the 1960s and 1970s, and some only came into existence after the official termination of the dual school system. It could be argued that the "relationship between past segregative acts and present segregation" within the predominantly anglo schools may have become "so attenuated as to be incapable of supporting a finding of *de jure* segregation warranting judicial intervention," *Keyes*, 413 U.S. at 211, 93 S.Ct. at 2699; *Swann*, 402 U.S. at 31–32, 91 S.Ct. at 1283–84—an uncertain path, however, which this Court has decided not to follow.

### 3. *Predominantly Minority K–3 Schools*

The number of predominantly minority K–3 schools in the Dallas system presents a sharp contrast with the practical disappearance of the predominantly anglo K–3 schools. As of March 1981, about one-half of the K–3 schools (64, including 29 separate K–3 campuses and 35 K–3 schools housed with other grades) have predominantly minority enrollments.[81] These 64 K–3 schools are located in every subdistrict: 16 in Northwest, 12 in Northeast, 5 in Southeast, 15 in Southwest, and 16 in East Oak Cliff. The change in the district's K–3 enrollment from 53% combined minority in 1971 to 70.7% in 1981 is inevitably reflected in the increase of predominantly minority schools from 37 in 1970–71, to 49 in 1976 under the new grade configurations, to the 64 identified above.[82] The 25,000 children attending these schools represent about 57% of the K–3 students in Dallas. Given the constant rise in non-anglo school population, projected to reach 81% of the K–3 population by 1985, it is an undeniable and harsh fact that the number of predominantly minority schools is more likely to increase than decrease and that the prospects for meaningful racial integration in K–3 are dismal. *See Lee v. Lee County Board of Education*, 639 F.2d at 1259 n.10; *Calhoun v. Cook, supra; Carr v. Montgomery County Board of Education, supra; Cf. Armour v. Nix*, No. 16708 (N.D.Ga.1979), *affirmed*, 446 U.S. 930, 100 S.Ct. 2146, 64 L.Ed.2d 784 (1980).

At the same time, however, the Court finds that, "considered as a part of a complete system", *Carr*, 377 F.Supp. at 1138, the effect of the K–3 assignments is mitigated somewhat by the desegregated edu-

---

**80.** Cabell, Dealey, Gooch, Hexter, Kramer, Lagow, Macon, Mosely, Urban Park.

**81.** Cunningham Exhibit 31 and DISD Exhibit 46A.

**82.** The 1970–71 data reflects elementary school figures drawn from Defendants' Answers to

Interrogatories (first set), No. 1(d) cited before the Supreme Court in *Estes v. Metropolitan Branches of the Dallas NAACP*, 442 U.S. 938, 99 S.Ct. 2876, 61 L.Ed.2d 308, No. 78–282. The statistical summary filed by DISD in December 1976 provides the number of minority K–3 schools for that year.

cation many of these minority students will receive in grades 4–8 and high school. Approximately 10,000 or 40% of K–3 students in predominantly minority K–3 schools will attend a desegregated 4–6 center under the 1976 assignment plan now in operation.[83] A significant number of these students, in addition, will attend a desegregated high school. Other students in the Southwest and East Oak Cliff schools, where neighborhood assignments are in place, may elect to utilize the majority-to-minority transfer program or to attend a specialized educational program at a 4–6 vanguard, 7–8 academy, or a magnet high school. The overall evaluation of the K–3 predominantly minority schools, therefore, must recognize that a substantial portion of the students in these schools may attend a desegregated school for the majority of their educational career.

The Court further notes that in 18 of the 64 predominantly minority K–3 [84] schools neither black nor hispanic enrollment represents 75% of the student body; it is the combination of the two groups which makes these schools predominantly minority. Even though this somewhat unique situation may not have legal significance, the diversity in enrollment in these 18 schools appears to give their students the benefit of a multi-cultural education which mirrors the realities of our society. Given the trend of rapidly rising hispanic enrollment, which will reach 34.3% of K–3 students within four years and will continue to increase steadily thereafter, the Court finds that there will probably be a constant increase in the number of such multi-cultural schools. This exposure of students to divergent races and cultures alleviates, but does not solve, the vexing problem of so many predominantly minority K–3 schools.

Although the figures paint a bleak picture of racial separation, comparison with other urban areas shows that Dallas is not unique. In Atlanta, for example, "[a] totally segregated system which contained 115,-000 pupils in 1958" had by 1975 "mutated to a substantially segregated system serving only 80,000 students". *Calhoun v. Cook*, 522 F.2d at 718. When the district court concluded in 1971 that "the Atlanta school district was unitary and has purged itself of all vestiges of the formerly state imposed dual school system", *Id.* at 719, ninety-two of that system's 148 schools were over 90% black, revealing, as the Fifth Circuit pointed out "that every judicial design for achieving racial desegregation in this system has failed." *Id.* at 718.

In a Detroit school system over 70% black, the Sixth Circuit recognized "that some one-race schools are unavoidable under a Detroit-only plan." *Bradley v. Milliken*, 620 F.2d at 1151. Although the Sixth Circuit remanded the case for further consideration by the district court because of the total exclusion from a plan of three regions of the system with over 83,000 black students, the Court conceded that "genuine constitutional desegregation may be impossible within the Detroit district . . . ." *Id.* at 1153. *See also Carr*, 377 F.Supp. at 1144 (53.5% of blacks in predominantly minority schools); *Alvarado v. El Paso I.S.D.*, 593 F.2d at 581 (5th Cir. 1979) (50% of Mexican-Americans and 90% of anglo students in one-race schools); *Mapp v. Board of Education*, 525 F.2d 169 (6th Cir. 1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3199, 49 L.Ed.2d 1203 (1976) (2 of 4 high schools left over 90% black).

Elimination or meaningful reduction of predominantly minority schools in a large urban district with an expanding minority enrollment is a quixotic task for which courts and judges are ill-suited. Yet, it is a dilemma which frequently confronts courts attempting to apply equitable principles, developed for school districts of limited size and enrollment, to the complex geography and populations of large urban school districts. The demographic pattern in Dallas has become a familiar one; the school population has become smaller and predominant-

---

**83.** Appendix A, Final Order, April 7, 1976.

**84.** Curry Exhibit 2—March 9, 1981 statistical summary prepared by DISD and filed with the Court.

ly minority as the surrounding predominantly anglo suburban districts have expanded. The Fifth Circuit has recognized that the development of a school desegregation plan in such an urban area entails "special considerations" which might "justify the maintenance of some one-race schools." *Tasby v. Estes,* 572 F.2d at 1013.

This Court finds, based solely on the K–3 demographics, after close scrutiny and careful examination, that there will continue to be a substantial number of predominantly minority K–3 centers in DISD. Beyond the practical limitations which the demographics place on a desegregation remedy, the time and distance studies will also show that great hardships would be inflicted upon both anglo and minority children in any attempt to achieve further desegregation, if possible, through the use of system-wide transportation.

### 4. Desegregated K–3 Schools

As of March 9, 1981, 43 of the district's 126 K–3 schools (50 of 176 campuses) had desegregated student bodies accounting for over 31% of DISD K–3 students.[85] Statistics for these schools reflect that desegregation is occurring naturally in many parts of the school district.[86] Most of the 43 schools have less than 70% of either anglo or minority students, and a significant number have multicultural enrollments (where neither anglo, black or hispanic students represent more than 50%) which parallel the composition of the district itself. In less than one-fourth of these schools does the representation of any one racial group rise as high as 70–75%.

A number of these 43 schools are located in areas which the Court in 1976 found to be naturally integrated through residential housing patterns. Assignments to neighborhood schools were made for students residing in these integrated areas: in East Dallas, within the J. L. Long Junior High School attendance zone and certain adjacent school zones; in the Southwest subdistrict; in Pleasant Grove in the Southeast subdistrict; and in the area of North Dallas encompassed within the Thomas Jefferson High School area. As the Court stated in 1976, "[t]here is no denial of the right of educational opportunity in these areas, and, as all parties recognized, there would be no benefit, educational or otherwise, in disturbing this trend toward residential integration." *Tasby v. Estes,* 412 F.Supp. at 1206. Both plans proposed by the Plaintiffs in 1976 identified certain schools as desegregated and excluded them from the suggested student assignment plan.[87]

Testimony in the 1981 hearing showed the stabilization of desegregated school enrollments in many of the areas termed naturally integrated in 1976 and a continuing trend toward additional racial balance in others. In the Southwest subdistrict, for example, although the minority residential population increased five-fold since 1970 sufficient numbers of anglo students remained to desegregate 13 of the 28 K–3 schools.[88] Only nine schools which had desegregated K–3 enrollments in 1976 had changed into predominantly minority by 1981. This analysis takes on more significance when one considers that, outside of East Oak Cliff, the Southwest subdistrict experienced the largest percentage increase

---

**85.** Cunningham Exhibit 31 and DISD Exhibit 46A.

**86.** Curry Exhibit 2, which is the March 9, 1981, statistical summary prepared by DISD and filed with the Court, indicates that the percentage of the largest racial group, either anglo or minority, in each of the 43 desegregated schools is as follows:

| | |
|---|---|
| 70 – 75% | 10 schools |
| 60 – 70% | 17 schools |
| 50 – 60% | 7 schools |

In nine schools, neither anglos, hispanics, nor blacks individually reach 50% of total school enrollment.

**87.** Plaintiffs' Plan A identified 13 elementary schools as desegregated while under Plan B, 41 K–5 schools were considered desegregated.

**88.** DISD Exhibits 46A and 60; and Cunningham Exhibit 31.

in minority population since the 1975–76 school year.[89]

Other areas of Dallas have also begun to exhibit diverse ethnicity and desegregation in the K–3 schools. Population movements within the last five years within both the Northwest and Southeast subdistricts have resulted in the transition of several former predominantly anglo schools to desegregated status, a trend which will continue across the district (*see* discussion, *supra*). In the Southeast subdistrict the influx of minority population is apparent by tracing the increasing proportion of minority students from schools near the inner city edge of the subdistrict to the schools in the middle and extreme ends of the subdistrict. For example, the minority representation at Ireland elementary school changed from 46% in 1976 to 52% in 1981. In Runyan, on the far edge of the Southeast subdistrict, minority students accounted for only 12.6% in 1976 but were 33% in 1981, while the percentage of anglos dropped from 87% to 67%. In the Northeast subdistrict, the minority representation at Sanger K–3 school moved from 14% in 1976 to 27% in 1981, while at nearby Conner the proportion of minority students grew from 18% to 32% in 1981. These figures document steadily increasing desegregation in areas not included in the 1976 naturally integrated areas.[90] The Court is concerned with the encouragement and preservation of these naturally integrated areas and the stabilization of white enrollment in these schools, since integrated housing patterns are surely the most effective and permanent method of school desegregation.

The Court has determined that the areas identified in 1976 as naturally integrated were in many cases older neighborhoods which were suffering decline and urban blight. There are substantial efforts underway in Dallas to reverse and rehabilitate aging and blighted neighborhoods. The Court finds that the continuation of neighborhood schools in these areas has significantly helped these efforts and has been a material factor in the preservation of racially mixed neighborhoods as reflected in the multi-racial enrollments in these schools. Not surprisingly, growth of black and, more particularly, hispanic population in DISD since 1976 has resulted in some desegregated areas becoming minority dominated. However, maintenance of neighborhood K–3 schools in those areas has contributed to the preservation of their desegregated schools and to discouraging anglo exodus from those schools. Mandatory busing of K–3 children in or out of these schools would disrupt their stability and would be detrimental to desegregation. *Cf. Bradley v. Milliken*, 620 F.2d at 1152; *Stout v. Jefferson County Board of Education*, 537 F.2d at 802.

89. Percentage Change in Enrollment
 1975-76 to 1980-81

| | Black | Anglo | Hispanic |
|---|---|---|---|
| Northwest | -15% | -38% | +22% |
| Northeast | - 4% | -22% | + 6% |
| Southeast | - 2% | -11% | +30% |
| Southwest | +26% | -30% | +44% |
| DISTRICT | + 3% | -26% | +36% |
| Source: DISD Exhibit 17A. | | | |

90. It might be argued that these figures are also proof of a trend toward minority dominance and resegregation. If this argument is valid, it shows how ephemeral any desegregation by pupil reassignment through busing would be. The Court, however, finds that such argument is not valid, particularly if schools in the integrated areas are not disrupted by busing.

B. *Time and Distance Study, K–3 Grades*

 The scope of permissible transportation in a remedial decree has not been rigidly defined but it is clear that valid objections may be raised "when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process." *Swann,* 402 U.S. at 30–31, 91 S.Ct. at 1283. Certainly a major variable in assessing the limits on time of travel is the age of the students involved in the assignment plan. *Id.* The Court finds that the time and distance between the predominantly minority schools and any schools with anglo enrollments sufficient for use in a *Swann* busing plan are too great to justify system-wide busing of the five to eight year old students in grades K–3. The underlying reasons for this finding are spelled out below.

The Court's determination that naturally integrated areas and schools should not be included within any K–3 assignment plan fixes the parameters of possible mandatory busing. As pointed out earlier, the largest number of students in predominantly minority K–3 schools are attending the 16 centers in East Oak Cliff subdistrict, which is bordered to the west by naturally desegregated schools in the Southwest subdistrict and by an expanse of unpopulated area on the east. Almost all of the remaining predominantly minority K–3 schools are located in a wide swath across the middle of DISD from near North Dallas to East Dallas. On both the north and east perimeters the minority schools are separated from schools with predominantly anglo enrollments by schools and areas which have desegregated populations. Only in the Southeast subdistrict are predominantly minority schools found in any degree of proximity to predominantly anglo schools.

Eliminating the currently desegregated K–3 schools from involvement in a student assignment plan leaves only a few elementary schools as possible sources or recipients of students in a busing plan. Even if those schools in far North Dallas which are under the 75% mark but have higher numbers of anglo students were encompassed within a busing program, the times and distances involved appear prohibitive for young K–3 children.

Pursuant to the Fifth Circuit remand, time and distance studies were conducted at randomly selected schools in each of the subdistricts to provide a framework for the assessment of assignment options. Each of the 128 runs to elementary schools in the studies were composed of a morning and afternoon trip between the sending or neighborhood school and the receiving schools for a total of 256 trips. In addition, an estimate of time required for the pick-up or drop-off was made for children who, under state law, are entitled to transportation if they live more than two miles from school.[91] The travel times appear to be representative and even optimistic considering the increasingly heavy traffic in many parts of Dallas.

The initial inquiry raised by time and distance studies is what measure of acceptable time should be used as a standard for K–3 transportation. The amount of time spent on a bus which can be deemed excessive, is, of course, open to varying interpretations. The Plaintiffs urge that the length and duration of bus rides currently provided under the two-mile state law is the appropriate benchmark for measurement. The Court is aware that where transportation facilities are already in place, "a requirement of a moderate increase in transportation is a proper tool in the elimination of the dual system." *Lee v. Macon County Bd. of Educ.,* 448 F.2d 746, 755 (5th Cir. 1971).

At the same time, however, the Court must also take into consideration that in the 1980–81 school year, only 11,886 students in all grades were provided free bus transportation under the two-mile program. (An additional 1724 students in special education programs also received bus services.) Unlike many school districts (*see Swann,*

---

91. The State of Texas provides funds to pay transportation costs for students who live two or more miles from school. *See* Tex.Educ.Code Ann. § 16.51 *et seq.* (Vernon 1972).

402 U.S. at 29, 91 S.Ct. at 1282) in which student assignment and transportation plans have been implemented, voluntary bus transportation has never been "an integral part of the public education system" in Dallas. *Id.* The Dallas situation is different from that which faced the Fifth Circuit in *Lemon v. Bossier Parish School Bd.*, 566 F.2d 985 (5th Cir. 1978) where "three-fourths of all students in the system [were already] bused to school", *Id.* at 988, or in *Lee v. Macon County Bd. of Educ.*, 448 F.2d at 754, where a great number of students had been transported in the past by the county bus system.

The time required for students to reach the neighborhood or sending school and return home must be included in the calculation of time consumed in travel. *Cisneros v. Corpus Christi I.S.D.*, 467 F.2d 142, 153 (5th Cir. 1972) (en banc), *cert. denied*, 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044 (1973). Whether a child walks, is driven in a private car, or is eligible for two-mile transportation, the total time expended before arrival at assigned classes must affect the *Swann* assessment of impact on health and education, particularly in an urban district which stretches over 351 square miles.

Only limited data is available to the Court on the extent of neighborhood routes since not all schools selected for the time and distance studies had large enough attendance zones to require a neighborhood pick-up route. Only 32 of the 128 runs have any data on the time which must be expended to bring children from outside the two-mile zone to the sending school. A summary of these 32 runs, which averages the 64 morning and afternoon trips, is set out below:

### SUMMARY OF TIMES AND DISTANCES FOR NEIGHBORHOOD TWO-MILE PICKUP ROUTES FOR K-3
#### (School-to-school not included)

| TIME | | DISTANCE | |
|---|---|---|---|
| Travel Time | No. of Runs | Miles | No. of Runs |
| 20 - 30 Minutes | 9 | 1 - 5 Miles | 0 |
| 31 - 45 Minutes | 13 | 6 - 10 Miles | 15 |
| 46 - 60 Minutes | 2 | 11 - 15 Miles | 9 |
| 60-plus Minutes | 8 | 15 - 20 Miles | 0 |
| | 32 | 21 - 25 Miles | 1 |
| | | 26 - 30 Miles | 7 |
| | | | 32 |

The Plaintiffs rely on the 8 runs exceeding one hour to support their contention that one hour on a bus is not unreasonable or excessive for K-3 students. The relevance of these runs, however, must be weighed against the fact that all 8 involved *one* elementary school zone, Walnut Hill. By contrast, in *Calhoun v. Cook, supra*, the District Court refused to consider busing as "feasible, reasonable or workable" where the distance would require total times of 40 minutes or more. The Sixth Circuit, in *Brinkman v. Gilligan*, 583 F.2d 243 (1978) *affirmed* in *Dayton II*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979), approved guidelines for elementary students providing that no student should be transported "for a period of time exceeding twenty (20) minutes, or two (2) miles, whichever is shorter." *See also, Brinkman v. Gilligan*, 539 F.2d 1084, 1085 (6th Cir. 1976); *Morgan v. Kerrigan*, 401 F.Supp. 216, 263 (D.Mass. 1975), *aff'd*, 530 F.2d 401, 414 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49

L.Ed.2d 386 (1976), approving the Boston desegregation plan where

> . . . the average distance from home to school will not exceed 2.5 miles, and the longest possible trip will be shorter than 5 miles. Bus travel times will average between 10 and 15 minutes each way, and the longest trip will be less than 25 minutes.

See further, Northcross v. Memphis Bd., 489 F.2d 15 (6th Cir. 1973), cert. denied, 416 U.S. 962, 94 S.Ct. 1982, 40 L.Ed.2d 313 (1974), affirming the District Court's refusal to accept a desegregation plan requiring 46–60 minute trips for elementary students.

▮ The Court finds that it is unreasonable to suggest that trips up to one hour somehow impose no additional burdens on these young children. Such an assertion surely represents far more than the "moderate increase" approved in Lee v. Macon County Bd. of Educ., 448 F.2d at 755. Accordingly, based upon the age of the children involved in grades K–3, the time at which they must be at school (8:00 A.M.), and the ever-increasing traffic in most portions of Dallas, the Court finds that no more than 30 minutes in the aggregate should be spent by these students for transportation purposes. The Court notes that a proposed desegregation plan submitted by the Plaintiffs in 1976 also was based on a 30 minute time limit for transportation.

The summary below of total times and distances travelled in the 128 runs in the study represents the averages for the morning and afternoon trip times for school and, where applicable, includes the neighborhood pickup routes in the averages.[92]

This summary chart brings into sharp focus the problem facing any attempt to transport large numbers of K–3 students. Over two-thirds of the 128 runs (86) require more than thirty minutes, including 40 which entail from 46 minutes to significantly over an hour in transportation time. Only 42 of the bus runs took 30 minutes or less to bring children from the neighborhoods, if necessary, and from the sending school to the receiving school. The total distances which were travelled varied widely from a low of three miles to 47 miles in one pairing. Almost two-thirds of the runs covered more than 15 miles with 51 requiring at least 21 mile trips. Only about one-third of the 128 runs reported less than 15 miles to reach the receiving school.

Study of the average times and distances makes clear that transportation is not feasible to desegregate many of the remaining predominantly one-race K–3 schools because (1) the time involved for transportation out of predominantly anglo areas in North Dallas is excessive due to large neighborhood attendance zones; (2) pairings under 30 minutes between predominantly minority schools and desegregated schools in the Southwest, Southeast and Northeast subdistricts would destroy the naturally integrated student bodies in these areas without significantly increasing desegregation; and (3) the predominantly anglo schools in the Southeast and Northeast subdistricts have insufficient numbers of anglo students to desegregate predominantly minority schools without at the same time becoming predominantly minority themselves.

## SUMMARY OF AVERAGE TOTAL TIME AND DISTANCE STUDIES

| TIME | | DISTANCE | |
|---|---|---|---|
| TRAVEL TIME | NUMBER OF RUNS | MILES | NUMBER OF RUNS |
| 0 - 15 Minutes | 10 | 1 - 5 Miles | 12 |
| 16 - 30 Minutes | 32 | 6 - 10 Miles | 8 |

92. The summary does not, however, include the time spent traveling to school by children within the two-mile limit, which probably ranges from a few minutes for those within two or three blocks of school to 30 minutes and more for those at the outer edge of the two-mile limit.

SUMMARY OF AVERAGE TOTAL TIME AND DISTANCE STUDIES

| TIME | | DISTANCE | |
|---|---|---|---|
| TRAVEL TIME | NUMBER OF RUNS | MILES | NUMBER OF RUNS |
| 31 - 45 Minutes | 46 | 11 - 15 Miles | 27 |
| 46 - 60 Minutes | 16 | 16 - 20 Miles | 30 |
| 61-plus Minutes | 24 | 21 - 25 Miles | 28 |
| | 128 | 26 - 30 Miles | 12 |
| | | 31-plus Miles | 11 |
| | | | 128 |

SUMMARY OF RUNS FROM PREDOMINANTLY ANGLO AREAS TO
PREDOMINANTLY MINORITY AREAS

| TRAVEL TIME | NUMBER OF RUNS | MILES | NUMBER OF RUNS |
|---|---|---|---|
| 0 - 15 Minutes | 5 | 1 - 5 Miles | 5 |
| 16 - 30 Minutes | 6 | 6 - 10 Miles | 3 |
| 31 - 45 Minutes | 17 | 11 - 15 Miles | 8 |
| 46 - 60 Minutes | 12 | 16 - 20 Miles | 11 |
| 61-plus Minutes | 24 | 21 - 25 Miles | 15 |
| | 64 | 26 - 30 Miles | 11 |
| | | 31-plus Miles | 11 |
| | | | 64 |

SUMMARY OF RUNS FROM PREDOMINANTLY MINORITY AREAS
TO PREDOMINANTLY ANGLO AREAS

| TRAVEL TIME | NUMBER OF RUNS | MILES | NUMBER OF RUNS |
|---|---|---|---|
| 0 - 15 Minutes | 5 | 1 - 5 Miles | 7 |
| 16 - 30 Minutes | 26 | 6 - 10 Miles | 5 |
| 31 - 45 Minutes | 29 | 11 - 15 Miles | 19 |
| 46 - 60 Minutes | 4 | 16 - 20 Miles | 19 |
| 61-plus Minutes | 0 | 21 - 25 Miles | 13 |
| | 64 | 26 - 30 Miles | 1 |
| | | 31-plus Miles | 0 |
| | | | 64 |

## 1. Transportation out of predominantly Anglo Schools in North Dallas

It is clear from the summary chart that the major portion (53 of 86) of the runs which required more than thirty minutes to complete involved transportation out of schools in predominantly anglo areas. The attendance zones surrounding these schools are generally larger due both to a more dispersed population and to the need for a wider sweep to deal with reduced anglo K–3 enrollment. Most of these routes, therefore, include the time required to pick up children in their neighborhoods. Half of all the 64 runs from schools in predominantly anglo areas were thus accompanied by such a route. The need for this additional travel also increased the number of miles which children in these areas would have to experience (by 6 to 30 miles). Three-fourths of the runs, for example, would require children to travel at least 16 and up to 31 miles each way.

On the other hand, experimental pairings out of predominantly minority areas were almost evenly divided between runs requiring less than thirty minutes and runs taking more than 30 minutes. Transportation out of the predominantly minority areas, therefore, represented the bulk (31 of 42) of the total runs under thirty minutes. The dense population clusters in the East Oak Cliff area are responsible for these lower times because smaller K–3 attendance zones are possible where no neighborhood pickup routes need be run. None of the pairings from a minority school required such neighborhood travel and the distances involved illustrate the effect since almost half required less than 15 miles.

The time and distance studies run between the sample pairings indicate that any transportation out of the predominantly anglo schools in far North Dallas will involve excessively lengthy bus trips for children in K–3. Most of the zones surrounding these schools are of such size that neighborhood pickup routes would be required and total bus time consequently increased beyond ac-

ceptable limits. In the Kramer attendance area, for example, approximately 25 minutes is needed just to traverse the neighborhood route, without any school-to-school time involved. The attendance zones for schools in areas surrounding Kramer are of generally equal breadth.

The distances involved in the neighborhood routes, furthermore, are substantial, with at least half being over ten miles—before transportation to the receiving school is even begun. It appears obvious that far more than the 30 minutes deemed appropriate by the Court would be required to transport K–3 children from these areas to predominantly minority schools.

## 2. Transportation Involving Desegregated Schools

Pairings between some K–3 schools in the upper and lower quadrants of the Northeast subdistrict and between parts of the East Oak Cliff and Southeast subdistricts may be possible without the need for bus trips exceeding 30 minutes. Other factors than time and distance, however, must enter into the calculation of feasibility of student assignment between these schools. In the first place, since the times for transportation out of predominantly anglo areas are significantly greater than the times required for trips out of areas of minority concentration, most of the runs under thirty minutes would require the one-way transportation of minority students alone. While busing in one direction may not be *per se* unacceptable in the face of other practical limitations, *see, e. g., United States v. Hendry*, 504 F.2d 550 (5th Cir. 1974); *Thompson v. School Bd. of Newport News, Va.*, 465 F.2d 83 (4th Cir. 1972), *cert. denied*, 413 U.S. 920, 93 S.Ct. 3053, 37 L.Ed.2d 1041 (1973); *Mims v. Duval County School Board*, 329 F.Supp. 123 (M.D.Fla.), *aff'd*, 447 F.2d 1330 (5th Cir. 1971), it does raise serious questions about the equitable distribution of desegregation burdens, *see, e. g., Arvizu v. Waco Independent School District*, 495 F.2d 499 (5th Cir. 1974); *Hig-*

*gins v. Board of Educ.*, 508 F.2d 779 (6th Cir. 1974). Testimony developed by the Plaintiffs and Intervenor Black Coalition addressed this problem in detail. This consideration is further highlighted by the fact that almost all of the trips into East Oak Cliff under 30 minutes were run from the bordering Southwest subdistrict, which contains no school with a predominantly anglo student body. Left untouched by the student assignment portions of the 1976 Order, the subdistrict has only desegregated and predominantly minority K–3 schools. With a clear trend of increasing minority concentration, as discussed earlier, the Court finds that transportation of K–3s in or out of the Southwest subdistrict would adversely affect the natural desegregation which characterizes large portions of the subdistrict.

Similarly, the existence of eighteen desegregated schools within the Northeast and Southeast subdistricts also diminishes the number of schools within the thirty minute range which may be used in an assignment plan. Although five of these schools have up to 72% anglo enrollment, in the other 13 schools, anglos represent from 37–69% of the student body.[93] The progression of natural population movements in these areas, furthermore, suggests that many of these schools may lose anglo enrollment and experience increased minority representation over the next five years without any action by this Court. The goal of the Court is to stabilize and encourage the growth of these naturally integrated areas; in any event, they would present only minimal opportunities for desegregating the heavily concentrated minority schools in East Oak Cliff because of the lack of sufficient number of anglo children in these schools. To illustrate: these 18

schools contain 5161 students (3167 anglos, 1885 blacks and hispanics, and 109 Asians and Indians). In order to create student bodies having equal numbers of minority and anglo children, 2582 blacks and hispanics would have to be assigned to these schools. Since the 18 schools already have 1885 blacks and hispanics, however, only 697 additional minority students could be brought in. In just the eight East Oak Cliff schools generally within thirty minutes of the Southeast schools, however, approximately 1100 black children would have to be transported out and replaced by anglos to bring the East Oak Cliff schools under the 75% benchmark.[94] To remove 1100 anglo children from these naturally integrated schools, however, would upset the delicate enrollment balance and shift their student bodies toward predominantly minority. The net result of such action would simply create new predominantly minority schools in different locations without significantly desegregating East Oak Cliff. *Cf. Bradley v. Milliken*, 620 F.2d at 1150.

3. *Transportation from Predominantly Anglo Schools in Northeast and Southeast*

In the remaining 11 schools in the Northeast and Southeast subdistricts which have predominantly anglo enrollments and which are generally within 30 minutes of predominantly minority schools,[95] there are similar restraints on the degree of desegregation which could be effected, even if all these students were involved in a new student assignment plan. As pointed out previously in this opinion, all of these predominantly anglo schools are progressing naturally to desegregated status, a trend this Court is

**93.** The schools included in this analysis are in the Southeast subdistrict (Titche, Anderson, Runyan, San Jacinto, Hawthorne, Dorsey and Ireland) and in the Northeast subdistrict (Casa View, Gill, Sanger, Conner, Truett, Bayles, Silberstein, Lipscomb, Lee, Jackson and Rowe).

**94.** The East Oak Cliff schools included are Darrell, Lisbon, Bryan, Ervin, Miller, Bushman, Pease and Thornton.

**95.** Northeast (Lakewood, Hexter, Reilly, Reinhardt, Kiest, Urban Park) and Southeast (Blanton, Adams, Macon, Lagow and Mosely). *See* discussion, *supra*, demonstrating that these

reluctant to disturb. In addition, the enrollments and capacity of these schools impose certain limitations on the numbers of children from East Oak Cliff or South Dallas which could be accommodated while maintaining racially balanced student bodies.

In the five predominantly anglo schools in Southeast subdistrict (Blanton, Adams, Macon, Lagow and Mosely) that are within reasonable time and distance from East Oak Cliff, enrollment totals 1697 with 275 minority students. Assuming (contrary to the oft repeated catechism that racial balance is not a goal) that the aim of a new desegregation plan should be to bring the racial composition of these schools to no more than 50% minority and 50% anglo, 849 (one-half of 1697) minority students would have to be assigned to these schools. Subtracting the 275 minority students already in these schools, it becomes obvious that only 574 additional minority children could be assigned to these six schools without their exceeding the 50% mark. As discussed earlier, however, to reduce the enrollments of the eight nearest East Oak Cliff schools to 75% black would require busing out at least 1100 black students and busing in 1100 anglos. There are only 1414 anglos in the six Southeast schools; assigning 1100 of them to East Oak Cliff would cause the six Southeast schools to become predominantly minority while doing little to change the existing black concentrations in East Oak Cliff.

Since the preceding analysis also holds true in most respects for pairings between East Oak Cliff schools and schools in the Northeast subdistrict, and between predominantly minority and predominantly anglo schools within the Northeast subdistrict, the Court concludes that *Swann* transportation between these schools would not be feasible. The benefits of such an assignment plan in terms of desegregation would be negligible and would serve only to create additional predominantly minority schools in different locations. There is no conceivable benefit to transporting minority children out of a predominantly minority school if no hope of increased desegregation awaits them at the end of the bus ride. At the same time, however, any opportunities for increased desegregation by redrawing attendance zones, pairing or clustering certain of these schools should, as earlier suggested, be considered in any proposed remedial plan.

### C. Impact of Busing on K–3 Education

Evaluation of the feasibility of system-wide desegregative busing for K–3 students should also take into account any adverse impact on their education. *Swann*, 402 U.S. at 31, 91 S.Ct. at 1283. Testimony at trial established that the Early Childhood Education Centers created to serve grades K through 3 by the 1976 Court Order have improved education in these grades for students of all races. These programs, which feature increased emphasis on individualized instruction, extensive parent, volunteer, and community involvement, continuous progression of students toward mastery of basic skills, careful principal and staff planning, intensified staff development, and a reduced adult/pupil ratio, help to insure that all children in the District receive equal educational opportunity, by providing a curriculum and instructional approach tailored to the needs of the students in each neighborhood school. The effects of these educational techniques can be seen in the steady and significant upward trend in achievement levels in all basic skill areas for second grade students. Percentile rankings in 1980 for students of all races show important gains over 1973 and 1979.[96] In this same vein, Dr. Yvonne Ewell, DISD administrator and a leader in the development of creative educational approaches for minority children, testified that these early years are the most formative in a child's

---

schools will soon drop below 75% anglo enrollment.

**96.** DISD Exhibit 16A.

development and should be preserved for education without the instability and distraction which busing brings.

The Court has also weighed the potential impact of busing on the special programs developed by DISD to address identified learning deficiencies in the K–3 age group. An important special program is the elimination by DISD of "social promotion", *i. e.*, automatic promotion, for K–3 children who have failed to master basic skills for their grade level. Beginning in the 1981 spring semester, DISD identified over 8300 K–3 students (20% of the K–3 population) who were subject to retention. The racial composition of those subject to this retention program roughly parallels the racial composition of the District as a whole.[97] A special tutorial program, which involved one and one-half hours daily instruction after normal school hours, was created for the remainder of the 1981 school year to provide individual attention in an attempt to raise the skills comprehension for approximately 3000 of these students, and will continue. A summer school program has also been scheduled to try to bring many of the "retainees" up to the appropriate grade level. Busing the children involved in these special programs would add still more time to an already lengthened school day and would adversely affect the potential success of this significant educational program.

Specially-developed compensatory programs are also in place in East Oak Cliff and in areas of the district which have large numbers of students with limited English-speaking ability. These programs of educational components were initiated, in part, in response to the 1976 Court Order and seek to eradicate underachievement among minority students and to provide students of all races with a culturally pluralistic perspective. Neighborhood K–3 centers play an important role in the success of these programs, particularly in East Oak Cliff. By disrupting the normal attendance zones for these K–3 schools, desegregative busing would limit the effectiveness of these special programs which are successfully operating to ameliorate the past history of educational disadvantage for minority students.

The Court is also concerned with the probable adverse consequences of mandatory busing of K–3 children who are receiving bilingual education programs.[98] Forty percent (9700) of the 25,000 hispanics in DISD schools need bilingual training; 25% (10,509) of the K–3s are hispanics; the Court finds that at least 4,000, and probably more, of the K–3s need the bilingual education which DISD is now providing in neighborhood K–3 schools. Busing these children out of their neighborhood would disrupt the bilingual education programs, cause some loss of security to children who already tend to be less secure because of the language problems which bilingual education seeks to remedy, and cause a serious loss of parental involvement, which is more important to this K–3 group than any other.

Another fact in the Court's analysis is the recognition that "[a] successful school system demands support from the community—both black and white." *Carr,* 377 F.Supp. at 1127; *see also, Berry v. School District of the City of Benton Harbor,* 515 F.Supp. 344, at 356 (W.D.Mich.1981). From testimony at the trial the Court finds that mandatory busing of K–3s would result in loss of community support for the schools in all segments of the DISD community— black, hispanic and anglo. The Court recognizes, of course, that such loss is not an

---

97. DISD Exhibits 27A, B and C.

98. The required scope of bilingual education program is, or will be, before the Fifth Circuit in litigation out of the Eastern District of Texas. It is not contested that the quality of DISD bilingual education is, in general, quite good. Broadly speaking, the purpose of these programs (with respect to hispanic children) is to provide the children instruction in Spanish in all areas of the curriculum, while they acquire English language skills. With the rapid increase in hispanic enrollment in DISD, a successful program of bilingual education is an extremely important component of equal educational opportunity for these children. *See* testimony of Dr. Angel Gonzales.

excuse for inaction where a constitutional deprivation is involved, but is of the opinion that this is yet another factor to be weighed in choosing between permissible remedies. *Stout v. Jefferson County Bd.*, 537 F.2d at 802. *See also Kelley v. Metropolitan County Bd. of Educ.*, 492 F.Supp. at 191.

Any educational calculus for students in K–3 must include an assessment of the extent of parental participation in their children's schooling. Considered by several educational experts at trial to be the best predictor of academic success and key to motivation of the student, the involvement of parents appears to be closely related to the neighborhood location of the K–3 school. *See Berry, supra* at 357. The extent of such parental participation is greatest during these early years with over 85% of K–3 parents visiting the school on at least one occasion. At a great majority of these schools, however, a much greater showing of parent concern is documented with over 57,000 conferences held in the 126 K–3 schools in 1980–81.[99] Mandatory transportation out of these schools would deter this parental involvement deemed critical for a child's early development by making the assigned schools less accessible than the neighborhood location for working parents and those without private transportation, and by the loss of community ties with the neighborhood school. The Court realizes that loss of parental participation may not be decisive where constitutional rights are concerned, *see Valley v. Rapides Parish*, 646 F.2d 925 (5th Cir. 1981), but the Court is of the opinion that such loss is an equitable factor to be weighed with other factors in this equity proceeding.

In conclusion, therefore, the Court finds no educational advantage to weigh against several educational disadvantages flowing from the mandatory transportation of K–3 students in the Dallas system. While it is clear that it is not the function of this Court to "weigh advantages against disadvantages, for that judicial balancing has already been done," *Lee v. Macon County Bd. of Educ.*, 616 F.2d at 811, when con-

sidered with the practical limitations of time and distance, these educational factors confirm that systemwide busing of K–3 students is not feasible.

### D. *Opposition of Minority Parents to K–3 Busing*

More than twenty-five years after the landmark Supreme Court decision in *Brown v. Board of Education (Brown I)* "most black children attend public schools that are both racially isolated and inferior." D. Bell, *Brown v. Board of Education and the Interest-Convergence Dilemma*, 93 Harv.L.Rev. 518, 520 (1980). Further progress in implementing *Brown* has been rendered almost impossible by "[d]emographic patterns, white flight, and the inability of the courts to effect the necessary degree of social reform...." *Id.* These barriers to desegregated schooling for minority children have occurred most often in the urban areas of both South and North where, as in Dallas, racially isolated neighborhoods make total school desegregation impossible without major commitments to the transportation of students, often over long distances.

The history of school desegregation litigation in Atlanta, Boston, Nashville, and Detroit documents the growing disenchantment of the minority community with traditional racial balance remedies to cure the effects of school segregation. *See* Bell, *supra* note 11, at 480. Minorities have begun to question whether busing is "educationally advantageous, irrelevant, or even *disadvantageous*". *Id.* (Emphasis in original). Dallas school board president Kathlyn Gilliam, one of three minority members, described the perception of busing in the black community in compelling terms:

> I don't think that additional busing is even the issue ... it has never been the issue .... [T]he issue is whether or not we are going to educate the children and youth. I think that the whole question around the whole busing issue just loses sight of why we are here and what the schools are about now. I think it was a

---

**99.** DISD Exhibit 57.

noble idea in 1954 ... but what I envisioned and I'm sure what other black parents envisioned in 1954 just never happened.

The conclusion that racial balance remedies have ill-served minority students is shared by the members of a broad-based coalition group of black and hispanic parents and organizations (Black Coalition) which intervened in this case to oppose the further use of such remedies and to advocate court-ordered programs that focus, instead, on educational improvement.

The Court was impressed with the testimony presented by a number of these parents reflecting that the desegregation experience in Dallas has been both traumatic and unproductive for many black and hispanic children. A variety of reasons underpin these reactions, including hostile school environments and the negative implications of minority neighborhood inferiority (and loss of self esteem by minority children) which transportation into anglo schools implies. In particular, these minority parents expressed strong opposition to the transportation of K–3 children out of their neighborhoods because of the perceived greater need of such young students for a nurturing atmosphere, loss of time for sleep and learning required by transportation, the dissipation of community involvement and support in the neighborhood schools, and young K–3 children being a considerable time and distance from home in the event of sudden illness or other emergency. While the Plaintiffs argue that many of these responses flow from the failure to implement an acceptable desegregation plan with two-way transportation, the Court concludes the thrust of these feelings runs far deeper and raises serious implications about the traditional goals of the school desegregation process.

A large number of these minority parents are actively involved in their neighborhood schools. This involvement and concern with the schooling received by their children has led many to conclude that remedies targeted at the effects of segregated schools exhibited in lower achievement scores and other educational deficiencies are the proper scope of court-ordered relief. The special compensatory programs in place in East Oak Cliff pursuant to the 1976 court order, for example, received unanimous praise for the advances in educational achievement which have been accomplished, the community involvement which they have engendered, and the pride and esteem in both their race and neighborhood which have been created.

■ While the Court recognizes that the proper weight to be afforded these perceptions and concerns of class members and victims of school segregation is unsettled in the case law, the Court believes that the imposition of mandatory transportation on minority parents and children who are opposed to such a remedy is unfair and paternalistic.

Finally, and perhaps thankfully, the Court's task is less complicated because, completely aside from the testimony of these minority parents, considerations of demographics and time and distance independently establish that systemwide mandatory transportation in DISD is both unreasonable and unworkable in grades K–3. Nevertheless, the Court is of the opinion that the vigorous opposition to racial balance remedies expressed by these minority parents, whom the Court finds to be representative of a significant group in the minority community, is yet another factor which weighs in the scales of equity against the feasibility of *Swann* transportation remedies.

## VIII. *High Schools*

In remanding this case the Fifth Circuit stated: "Of particular concern are the high schools that are one race," *Tasby v. Estes*, 572 F.2d at 1014, that is, with "90% or more of the students being either anglo or combined minority races", *Id.* at 1012, n.3. The Circuit noted, *Id.* at 1014, n.14, the existence of four one-race anglo high schools and three one-race minority high schools.

Not surprisingly, the demographics of the DISD high schools have changed somewhat since the 1976 trial which the Circuit was reviewing in 1978. There are no longer any

one-race anglo high schools. An analysis of those demographics is a prerequisite to any fair determination of the feasibility of using *Swann* techniques to further desegregate the high schools.

There are 20 high schools (grades 9–12)[100], with 32,934 students—11,762 anglos, 16,425 blacks, 4,306 hispanics, and 441 Indians and Asians.[101]

Seven of these high schools are desegregated.[102] Their anglo population ranges from a high of 66% at Samuell to a low of 39% at Sunset. The anglo enrollment in these seven schools is decreasing. These desegregated high schools contain 40% (13,129) of the DISD high school population; 53% of the anglos, 26% of the blacks, and 57% of the hispanics attend these schools. In view of the segregated residential patterns in this community, and the continuing increase in minority students together with the continuing decrease in anglo students, these statistics are noteworthy.

The Court finds no problem with respect to the racial composition of these seven high schools and sees no reason to disturb their desegregated status by transportation of students. The Court therefore turns to an examination of the remaining 13 high schools with their 19,805 students.

Nine high schools are predominantly minority (over 75% combined minority) including six which are one-race (over 90%) black.[103] (The six contain 56% of the black high school students.) These nine predominantly minority schools have 13,443 stu-

dents, 41% of the DISD high school enrollment. Seventy percent of the blacks and 34% of the hispanics (and 4% of the anglos) attend these nine schools.

Four high schools are predominantly anglo[104] with 6362 students, including 5087 anglos or 43% of the total anglo enrollment. Based on their enrollment history and trends, three of these—Seagoville, Hillcrest and Adams—will drop below 75% anglo by fall 1982, perhaps earlier. The anglo population of these three schools will continue to shrink. They will continue to become more desegregated, as each year, larger numbers of anglos graduate from the twelfth grades than enter into the ninth grades, and minority enrollment increases.[105]

The other predominantly anglo high school is W. T. White, in far North Dallas, which with 1968 students is 85% anglo. Nothing in its enrollment history indicates that White will be below 75% anglo within two years, although its hispanic population is increasing. The Court will require DISD to propose remedies designed to accelerate desegregation at White.

In general, the demographic characteristics and trends for DISD high schools are similar to those for the district as a whole: the total enrollment has decreased and will continue to decrease; the anglo high school population has shrunk by more than one-half since 1971, and this shrinkage will continue; black enrollment has increased about one-third but henceforth will remain relatively stable; hispanic enrollment has dou-

100. Bryan Adams, Hillcrest, Seagoville, W. T. White, Lincoln, Madison, Pinkston, F. D. Roosevelt, A. Maceo Smith, W. H. Adamson, David Carter, North Dallas, South Oak Cliff, Thomas Jefferson, J. F. Kimball, W. W. Samuell, Skyline, H. G. Spruce, Sunset, Woodrow Wilson. *See* DISD Exhibit 10.

101. Source of the enrollment figures in this section are Curry Exhibit 1, the March 9, 1981, Report to the Court, and DISD Exhibit 10 "High Schools". Primary source of findings about enrollment trends is DISD Exhibit 17A and the testimony of Dr. William Webster.

102. Thomas Jefferson, J. F. Kimball, W. W. Samuell, Skyline, H. G. Spruce, Sunset, Woodrow Wilson.

103. Lincoln, Madison, Roosevelt, Smith, Carter and South Oak Cliff have more than 90% black enrollment. Pinkston has more than 90% combined minority. Adamson and North Dallas have more than 75%, but less than 90%, combined minority. Hispanics comprise a significant portion of the enrollment at these two high schools.

104. Bryan Adams, Hillcrest, Seagoville and W. T. White.

105. These projections are based on the uncontroverted testimony of Dr. William Webster.

bled since 1971, by 1985 will approximate 20% of the DISD high school population, and will continue to rise.

So, within two years or less, there will be one predominantly anglo school (W. T. White, at about 78–80% anglo). Using 75–25 as the benchmark, 82% of the anglo high school pupils, 30% of the blacks, and 64% of the hispanics will attend desegregated schools, and another 4% of the anglos will be in the predominantly minority schools. Put another way, by fall 1983 only 14% of the anglos (those at W. T. White) will remain in a predominantly anglo setting, absent any changes from the present plan and assuming no sharp rise in the anglo exodus.

The Court has also examined the March, 1980 time and distance study for the high schools [106] and has reviewed the testimony regarding that study. The Court begins with the observation and finding that traffic into, and on the periphery of, the downtown area will continue to worsen. That fact relates directly to the feasibility of busing students between high schools on opposite sides of the Trinity River. The Court is of the opinion that, because of Dallas traffic trends, the school-to-school travel times between the DISD high schools, as reflected in the time and distance study, may be low; anyone who drives the streets of Dallas knows that traffic is worse now than it was in March 1980 when the study was made. Further, the time necessary to reach the neighborhood high school, that is, the pickup time for students living more than two miles from their neighborhood high school, should be included in any reasonable computation of student travel time. *See Cisneros*, 467 F.2d at 153; *Swann*, 402 U.S. at 31, 91 S.Ct. at 1283.

With neighborhood pickup time included, the shortest time for transportation re-flected in the time and distance study is 45 minutes one way, from Lincoln to Adams.[107] In most instances transportation times exceed one hour each way. This amount of time spent riding a school bus for desegregation would "significantly impinge on the educational process", *Swann*, 402 U.S. at 30–31, 91 S.Ct. at 1283.[108]

Plaintiffs argue that students living outside the two-mile limit could be excluded from any desegregative busing and only those within two miles included. The Court believes that this is impractical as well as unfair. Such a distinction does not allow for the time spent traveling to school by students within the two-mile zone—walking or bicycling or driving through traffic. In any event, such an exclusion would further reduce the (already small) pool of anglo students available for assignment for desegregation purposes.

The plain fact is that the predominantly minority high schools are so far removed, in time and distance, from the four high schools with a significant number of anglos, that *Swann* transportation techniques are not feasible (*i. .e.*, not "workable", "effective", "realistic", or "reasonable", *Swann*, 402 U.S. at 31, 91 S.Ct. at 1283).[109]

Six of the predominantly minority high schools—Roosevelt, Smith, South Oak Cliff, Carter, Adamson and Pinkston—are separated from the predominantly anglo high schools by the Trinity River. The viaducts across the Trinity are clogged with traffic in the morning, when school opens. The closest of these six to a predominantly anglo school is Pinkston, which is ten miles from Hillcrest and 11 miles from White, by way of traffic arteries which are increasingly heavily travelled. The shortest travel time between Pinkston and either White or Hillcrest approximates one hour each way. The same difficulties obtain with respect to

**106.** DISD Exhibit 18.

**107.** Due to a lengthier neighborhood pickup route, however, the morning trip from Adams to Lincoln would take 60 minutes.

**108.** *See* text accompanying notes 91–92, *supra*.

**109.** A. Maceo Smith, with a 99% minority student body, is a part of the Nolan Estes Educational Plaza. The remand directed this Court "to consider assigning anglo students" to this complex. 572 F.2d at 1017. The closest anglo high school to A. Maceo Smith is Bryan Adams, 21 miles and almost one hour away.

the other predominantly minority high schools—North Dallas, Lincoln, and Madison—on the same side of the Trinity as the predominantly anglo schools. The travel times for each of these to and from W. T. White are far in excess of one hour; between these minority schools and either Hillcrest or Bryan Adams, the travel time approximates or exceeds an hour. Travel time between Seagoville and all the minority high schools is, in general, even greater.

DISD classifies four of the nine predominantly minority high schools [110] as "crossover" schools—because they have "crossed over" from anglo to minority enrollment since dual attendance zones were terminated. DISD asserts that these four schools are not the result of past discriminatory policies and, therefore, should not be considered as vestiges of past discrimination. This argument has been rejected in decisions of the Supreme Court and the Fifth Circuit. See Keyes; Columbus; Dayton II; U.S. v. Texas Education Agency (Lubbock), 600 F.2d at 527; U.S. v. Columbus (Miss.) School District, 558 F.2d at 231, n.11. DISD has not proved that the current predominantly minority status of these schools was not caused by the previous de jure segregation in DISD. The Court doubts that such proof is obtainable. That is why the Keyes presumption (and its progeny) are "essentially . . . irrebuttable", Columbus, 443 U.S. at 508, 99 S.Ct. at 2962 (Rehnquist, J., dissenting).

DISD takes essentially the same position with respect to White, Hillcrest, Adams and Seagoville, arguing that their current predominantly anglo status is not the result of previous school system segregation. This Court cannot so find; the same cases and principles govern. It would be difficult, indeed, to prove that minorities, whether few or many, would not have lived in these areas and attended these schools had there never been school segregation.

In any event, determination of feasibility of Swann remedial techniques is the principal task assigned to this Court by the Fifth Circuit, and cases which focus primarily on the Keyes presumption are not decisive on the issue of remedy.

 To summarize, then, analysis of the time and distance study reveals that it would not be feasible to use Swann mandatory busing techniques to desegregate DISD high schools. When the time and distance study is considered alongside the current racial composition of the high schools, it is even more apparent that desegregative busing in grades 9–12 would be unrealistic and ineffective.

Although considerations of time, distance, and demography preclude the use of Swann techniques of non-contiguous pairing and busing, other permissible techniques approved in Swann might be used to advantage to achieve further desegregation in the high schools. In the remedy section of this opinion, the parties will be directed to submit plans addressing the feasibility of altering contiguous attendance zones in order to achieve a greater degree of desegregation, without upsetting the equilibrium that presently exists in the desegregated high schools, and within the time and distance strictures established herein.

IX. Fourth through Eighth Grade Schools

The Circuit did not specifically request this Court to review the effectiveness of the student assignment plan as it pertains to grades 4–8. None of the parties contested the maintenance of the present techniques for desegregation in these grades, with the exception of the Black Coalition, which argued generally for an end to transportation of minority students out of neighborhood schools. Nevertheless, in order to respond fully to the Circuit's directive to justify any one-race schools that presently remain under the desegregation plan, the Court turns now to a consideration of the schools at the 4–8 grade level.

The 1976 desegregation plan assigned students in grades 4 through 8, who did not live in naturally integrated areas, to 26 intermediate (4–6) and 11 middle (7–8) schools centrally located in the Northwest, Northeast, and Southeast subdistricts.[111]

---

110. Adamson, Carter, North Dallas, and South Oak Cliff.

111. Eleven of the 4–6 centers were in the Northwest subdistrict (Burnet, Caillet, Foster,

*Tasby v. Estes*, 412 F.Supp. at 1214. Neighborhood attendance zones were continued for students in areas determined to be naturally integrated through residential housing patterns, primarily in the Southwest subdistrict, East Dallas, and parts of Pleasant Grove and near North Dallas. The East Oak Cliff and Seagoville schools were not included in the student assignment patterns.

Thirty-six schools in grades 4–6, and seven in grades 7–8, have predominantly minority enrollments as of March 9, 1981, with most of these schools located in the Southwest and East Oak Cliff subdistricts.[112] Only three schools serving students in 4–6 and 7–8 have predominantly anglo student bodies; all are in Seagoville, with a total of 893 anglo students. No time and distance studies were conducted between the 4–6 schools and little testimony focused on either 4–6 or 7–8 grades during the trial. Extrapolating from the time and distance reports for K–3, 7–8 and 9–12, however, the Court finds that the length and duration of bus rides between Southwest and East Oak Cliff, on the one hand, and the three predominantly anglo schools in Seagoville would in general exceed acceptable transportation limits. Equally important, the relatively few anglo students in the three Seagoville schools would have practically no impact on the 34 schools and over 17,000 minority students in these grades in the Southwest and East Oak Cliff subdistricts.

The history and future projections for enrollment in grades 4–8 parallel the pattern of the district as a whole as can be seen in the summary below.[113]

### 4-6 Enrollment

| | Total | Anglo | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|
| 1976 | 30870 | 10909 | 35% | 14874 | 48% | 4844 | 16% | 243 | 1% |
| 1981 | 30452 | 8487 | 28% | 15318 | 50% | 6237 | 20% | 409 | 1% |
| Projected 1985 | 28817 | 6028 | 21% | 14063 | 49% | 8219 | 29% | 507 | 2% |

### 7-8 Enrollment

| | Total | Anglo | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|
| 1976 | 22797 | 8683 | 38% | 10844 | 48% | 3115 | 14% | 155 | 1% |
| 1981 | 18939 | 5380 | 28% | 9780 | 52% | 3536 | 19% | 243 | 1% |
| Projected 1985 | 19057 | 4323 | 23% | 9690 | 51% | 4779 | 25% | 265 | 1% |

Longfellow, Marcus, Hotchkiss, Pershing, Walnut Hill, Preston Hollow, Rogers, Williams); seven in Northeast (Bayles, Conner, Lakewood, Reinhardt, Rose, Sanger, Truett); and eight in the Southeast (Ireland, San Jacinto, Hawthorne, Blanton Adams, Rylie, Burleson, Dorsey). The eleven 7–8 schools were Cary, Marsh, Rusk, Spence, Walker, Gaston, Hill, Long, Hood, Comstock and Florence. *See* Final Order of April 7, 1976, for a listing of the feeder schools for each 4–6 and 7–8 school.

112. Under the "campus" designation, 43 of the 78 *K–6s* have desegregated student bodies while one has a predominantly anglo enrollment and 33 serve predominantly minority stu-dents. In the eight schools with only 4–6 grades, two schools are desegregated, one is predominantly anglo, and five are predominantly minority. "Campus" and "school" data are generally the same for the seventh and eighth grades since most 7–8 schools are on separate campuses from any other grade. Only J. N. Ervin in East Oak Cliff and Kleberg are housed with other grades.

113. The 1976 data and 1985 projections are drawn from DISD Exhibit 17A. Figures on 1981 are compiled from Curry Exhibit 1, the March 9, 1981, statistical summary in the DISD report to the Court.

Although total enrollment has remained stable in grades 4–6, the racial proportions have changed dramatically, with anglo representation dropping to 28% in 1981 and to an anticipated 23% by 1985. While the number of black students has stayed at the same level over the last five years, hispanic students have continued to account for a larger share of the enrollment in these grades with each passing year. This distribution of students is in major part repeated in grades 7–8 although these higher grades show a decided drop-off in the total number of students enrolled.

The 30,452 students in grades 4–6 are in 86 schools across the district with 78 housed on campuses with other grades. (Only eight of these schools serve 4–6 students alone.) As pointed out earlier, twenty-six 4–6 centers were designated under the 1976 plan to receive students from 70 feeder schools in the Northwest, Northeast, and Southeast subdistricts. The remaining 4–6 students attend schools located in naturally integrated areas in these three subdistricts,[114] and in the Southwest, East Oak Cliff and Seagoville subdistricts.

Forty-eight 4–6 schools have desegregated enrollments, as of March 9, 1981, with 16,986 students or 56% of total 4–6 enrollment. Within the grades 4–6, 82% of the anglo children attend desegregated schools along with almost 60% of the hispanic and 41% of the black students. Only the two Seagoville schools remain predominantly anglo.

Within grades 7–8 in DISD, 18,939 students attend 23 schools. Fifteen of these schools are desegregated and have 67% of the DISD 7–8 students. The remaining students attend seven predominantly minority schools [115] (34% of 7–8 enrollment) and one predominantly anglo school (2% of total enrollment) in Seagoville. Tracking the pattern in grades 4–6, six of the seven predominantly minority schools in 7–8 are located in the Southwest and East Oak Cliff subdistricts.

Thus, 38 of the 4–6 schools and eight of the 7–8 schools had predominantly one-race enrollments as of March 9, 1981. Of these 46 schools, one 7–8 school and eight of the 4–6 schools were either desegregated by busing under the 1976 plan or had naturally integrated enrollments at that time, which subsequently shifted to predominantly minority by 1981.[116]

The remaining predominantly minority schools are located in the Southwest subdistrict (twelve 4–6 and two 7–8 schools) [117] and East Oak Cliff (sixteen 4–6 and four 7–8 schools).[118] The only predominantly an-

---

114. The naturally integrated schools were located in the Northwest (Maple Lawn, Field, Knight, Milam, Polk); Northeast (Crockett, S. Jackson, R. Lee, Lipscomb, Roberts, Silberstein, Mt. Auburn); and Southeast (Blair) subdistricts.

115. The seven predominantly minority schools are Holmes, Ervin, Hulcy, Spence, Stockard, Stone and Storey.

116. Hotchkiss and Rogers, included under the 1976 plan as 4–6 receiving schools, changed from desegregated to predominantly minority by 1981. In 1976 Hotchkiss was projected to have 181 anglo students but retained only 75 by 1981. Similarly, Rogers was estimated to have 290 anglos in 1976 but had only 110 in 1981. The six schools which were naturally integrated in 1976 but predominantly minority in 1981

were Maple Lawn, Milam, Crockett, Mount Auburn, Roberts and Knight. Alex Spence, a 7–8 school, had over 75% minority enrollment in 1976.

117. The 4–6 predominantly minority schools in Southwest are Alexander, Bowie, Carpenter, Davis, Hogg, Lanier, Lee, Peeler, Terry, Turner, Webster and Winnetka. Stockard and Hulcy are the two predominantly minority 7–8 schools.

118. In East Oak Cliff, the predominantly minority 4–6 schools are Jackson, Oliver, Patton, Russell, Young, Bryan, Budd, Bushman, Ervin, Harllee, Johnston, Libson, Marsalis, Miller, Mills and Thornton. The four 7–8 schools are Ervin, Stone, Holmes and Storey.

glo schools available for use in any *Swann* transportation program are located in Seagoville (two 4–6 and one 7–8 schools).[119]

With respect to the Southwest subdistrict, most of the 14 predominantly minority schools are located in the deep southern quadrant of the subdistrict. The time and distance to any 4–6 centers in the other three subdistricts, or to Seagoville, is excessive. Transportation out of Carter High School, in the area near many of the predominantly minority 4–6 schools, into Seagoville, for example, would require a bus ride of 74 minutes.[120] Further, the Court has earlier concluded that the neighborhood attendance zones in place in the Southwest have stabilized and encouraged the preservation of many desegregated areas and that they should not be disturbed. The twenty predominantly minority 4–6 and 7–8 schools in East Oak Cliff are subject to the same limitations of feasibility pointed out earlier for the K–3 and 9–12 schools in this subdistrict. Time and distance aside, the major roadblock to any attempt to desegregate these schools and their 10,832 minority students is, again, the lack of anglos—only 893 anglos are in the three predominantly anglo schools in Seagoville.

In sum, analysis of the feasibility of *Swann* techniques to desegregate the predominantly one-race 4–6 and 7–8 schools in Southwest, East Oak Cliff and Seagoville leads to the same conclusion reached for K–3 and 9–12 schools in these subdistricts. It is sufficient to point out, and the Court so finds, that time and distance, the preservation of naturally integrated areas, and the small number and location of anglo students prevent the use of any systemwide transportation plan in these grades in these subdistricts. The Court notes the opposition of many minority parents to existing as well as additional transportation in grades 4–8.

The nine schools which changed from desegregated in 1976 to predominantly minor-

ity by 1981 appear to reflect the changing population and decreased anglo enrollment which characterizes DISD. It may be, however, that some of these schools can be incorporated into the current 4–8 student assignment framework in place in DISD without disturbing the desegregated status of the other 4–6 and 7–8 schools, although the Court recognizes the disquieting strains of *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976) in this situation. The Court concludes that the feasibility of further desegregation in these nine schools should be addressed in the remedial plans required pursuant to this opinion.

## X. *East Oak Cliff*

Stretching from the Trinity River bottom to Interstate Highway 35, the East Oak Cliff subdistrict embraces 27 campuses and over 25,000 students, almost all of whom are black. "[T]he practicalities of time and distance, and the fact that the DISD is minority Anglo", *Tasby v. Estes*, 412 F.Supp. at 1204, underpinned the Court's decision in 1976 to exclude this area from any student assignment plan. The creation of an all-black subdistrict, the concomitant acceptance of a number of one-race schools, and the approved acquisition of the A. Harris Shopping Center for conversion into a probable minority school, however, were found by the Fifth Circuit to rest on an inadequate foundation of specific findings on the feasibility of the *Swann* techniques to desegregate these schools. *Tasby v. Estes*, 572 F.2d at 1014. Earlier in this opinion, the Court concluded, after rigorous examination, that it is not feasible to desegregate K–3, 4–8 and 9–12 schools by systemwide transportation. The same rigorous examination of the East Oak Cliff subdistrict leads inescapably to the same conclusion—*Swann* transportation techniques are not feasible to desegregate the East Oak Cliff schools.

**119.** The Seagoville schools are Kleberg (4–6), Central (4–6) and Seagoville (7–8).

**120.** *See* DISD Exhibit 18.

## A. *Background of the East Oak Cliff Subdistrict*

First experiencing an influx of black population movement in the 1960s, the area now·designated as the East Oak Cliff subdistrict has exhibited an almost totally black enrollment since at least the 1971–72 school year. The total number of students attending the EOC schools has remained rather constant over the last ten years with 27,028 in 1976 and 25,153 reported in March 1981. Over 95% black, these students represent slightly over one-third (37%) of the district's black students although only 19% of the total student enrollment in DISD, and comprise the largest segment of minority children in predominantly one-race schools. The next five years will witness a decline in the subdistrict's enrollment which is anticipated to drop to 21,000 (about one-sixth of DISD enrollment) in all grades while the concentration of blacks will remain above the 90% level.

The subdistrict is comprised of 41 schools on 27 campuses with three high schools [121], one ninth grade center [122], one special school for high school students with adjustment problems [123], four middle schools [124], and fifteen 4–6 centers housed generally with seventeen K–3 centers.[125] A major portion of the area's students (14,846) are in the K–6 grades, with the balance split fairly evenly between high school (4879) and middle school students (5237). The enrollment at each of these 41 schools is almost totally black and they represent over one-third (41 out of 116) of the district's predominantly minority schools. (27 out of 83 campuses.)

Four of the schools [126] in East Oak Cliff are housed in the Nolan Estes Educational Plaza, formerly the A. Harris Shopping Center [127], located on twenty-eight acres of land in the western quadrant of the subdistrict adjacent to Interstate 35. Purchased for "an amount far below what it would cost the DISD to purchase ... comparable floor space," *Tasby v. Estes*, 572 F.2d at 1016, the district court approval of the site acquisition was questioned by intervenor NAACP before the Fifth Circuit on the ground that "its location in East Oak Cliff, with an attendance zone that encompasses only East Oak Cliff schools, perpetuates school desegregation in Dallas." *Id.* at 1017. Construction of Nolan Estes Plaza raised other questions: (1) placing pre-kindergarten through sixth grade students on the same campus with high school students and students with adjustment problems; (2) the lack of playground and athletic facilities; and (3) the general inferiority of the structure and the site for school purposes. The Fifth Circuit remand directed this Court, as part of the further consideration of the 1976 student assignment plan," to

---

121. The three high schools in East Oak Cliff are A. Maceo Smith, Roosevelt, and South Oak Cliff.

122. South Oak Cliff Annex serves only ninth grade students.

123. The East Oak Cliff alternative school is located at the Nolan Estes Educational Plaza.

124. The middle schools are O. W. Holmes, Boude Storey, Ervin (which also houses grades K–6) and Harry Stone.

125. The elementary schools which combine K–3 with 4–6 grades are John Neely Bryan, Harrell Budd, W. W. Bushman, N. W. Harllee, Albert Johnston, Lisbon, Marsalis, Wm. Brown Miller, Roger Q. Mills and R. L. Thornton. As pointed out above, J. N. Ervin houses a K–3, 4–6 and 7–8 school on the same campus. The K–3 Centers are B. F. Darrell, Elisha Pease, J.

D. Marshall, and Joseph McMillan which is housed at the Nolan Estes Educational Plaza. The 4–6 Centers are Oliver, Russell, Whitney Young, Maynard Jackson and J. Leslie Patton Intermediate, also housed at Nolan Estes. Brashear Early Childhood Education Center for pre-kindergarten students at Nolan Estes and the Beckley Center are not counted in the number of schools because they represent special programs for children not normally enrolled in DISD.

126. The four schools at Estes Plaza are A. Maceo Smith High School, East Oak Cliff Alternative, Patton Intermediate, and McMillan Elementary. Brashear Early Childhood Center is also located at Estes Plaza.

127. *See* note 6, *supra.*

consider assigning anglo students to the new complex", and to determine "the feasibility of transporting anglo students to attend school there." *Id.*

B. *Implementation of the 1976 Court Order*

The district court conclusion in 1976 that East Oak Cliff was beyond the reach of effective desegregation tools did not affect the thrust of the final order to insure that all students were afforded equal educational opportunity. Contending that the subdistrict could develop into "a model for the district and the nation, and attract anglos into it on the basis of its superior programs and facilities", *Tasby v. Estes,* 412 F.Supp. at 1204, the Court required the concentration of resources in this area to meet the documented educational deficiencies flowing from a long-segregated system. In grades K–3, for example, the district was directed to develop "special teaching strategies and enriched program options," *Id.* at 1202, with priority afforded the schools in East Oak Cliff. *Id.* at 1214. At the 4–8 grade level, furthermore, special magnets were to be created with primary attention focused on East Oak Cliff. *Id.* at 1215.

The Supreme Court's decision in *Milliken II* and a long-established line of Fifth Circuit precedents recognize that district courts may properly use educational components to overcome the built-in inadequacies of a segregated educational system. *See, e.g. United States v. Texas,* 447 F.2d 441, 448 (5th Cir. 1971), *cert. denied sub nom. Edgar v. United States,* 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972); *Plaquemines Parish School Bd. v. United States,* 415 F.2d 817, 831 (5th Cir. 1969); *United States v. Jefferson County Bd. of Educ.,* 380 F.2d 385, 394, *cert. denied,* 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967). The inclusion of these specific programs as part of a desegregation remedy is designed

> to restore the victims of discriminatory conduct to the position they would have enjoyed in terms of education had [such

education] been provided in a nondiscriminatory manner in a school system free from pervasive de jure racial segregation.

*Milliken II,* 433 U.S. at 282, 97 S.Ct. at 2758. The need for such educational programs in the Dallas schools flows directly from the constitutional violation—the vestiges of the *de jure* segregated school system reflected in the lower achievement levels of minority students. *Milliken II* stands firmly for the proposition that matters other than pupil assignment must on occasion be addressed by federal courts to eliminate the effects of prior segregation because:

> In a word, discriminatory student assignment policies can themselves manifest and breed other inequalities into a dual system founded on racial discrimination. Federal courts need not, and cannot close their eyes to inequalities, shown by the record, which flow from a longstanding segregated system.

433 U.S. at 283, 97 S.Ct. at 2759.

Since 1976, the Dallas school district has made measurable strides in eliminating the educational inequalities inherent in dual school systems. Under the semi-autonomous direction of Dr. Yvonne Ewell, a noted black educator, and an extensive central office staff, the East Oak Cliff subdistrict has developed a unique educational program for the students within its boundaries designed (1) to ensure mastery of the basic academic and social skills; (2) to develop a multicultural curriculum and school environment; and (3) to encourage parental and community involvement with the schools. Support for the effort to develop a more responsive educational system for black children has been forthcoming from the school district which has allocated an additional $1 million over each of the last several years for East Oak Cliff. In 1976, for example, the budget for the subdistrict was $20 million, rising to $28 million in 1980 and a projected $30 million in 1981. The increases in the budget should be contrasted against the decline in the number of stu-

dents in East Oak Cliff every year since 1976. The 1981 figures include a commitment by the school board of $1.25 million targeted for EOC alone and a minimum guarantee at this level for future appropriations. Additional monies are also funneled into the subdistrict from federal funding sources which are projected to add almost $3.75 million in the 1981 school year.

In large part, the budget for East Oak Cliff reflects personnel costs for a central office staff of 16, 25 instructional experts, and 1054 teachers. The size of the staff allocated to these schools reflects the district's efforts to reduce the teacher-pupil ratio in all EOC grades, which one study concluded makes a great deal of difference in learning outcomes for low academic achievement and for low income children.[128] In 1980, more teacher positions per pupil were allocated to East Oak Cliff for grades K–3, 4–6, and 7–8 than to any other subdistrict in the City. For the 1980–81 school year, in the face of a districtwide decrease in the number of teachers necessitated by a budgetary cutback, this pattern is repeated with additional slots dedicated to high school use bringing that ratio below all other subdistricts.

The model of instruction developed in East Oak Cliff, praised and emulated by leading educational authorities across the country, rests on the basic assumption that minority children have the equal ability to learn and can learn, if necessary, in a predominantly minority setting. The success of these educational components can be traced in the steady and significant upward trend in achievement levels for black students in all basic skills areas since the implementation of the 1976 court order and the creation of the subdistrict. Between 1976 and 1980, for example, the percentile rankings for reading achievement in grade 2 rose from 26 to 52, an increase mirrored in tests of language arts and mathematics.[129]

Similar improvement was documented in grades 4, 6 and 8 although the degree of achievement is generally much lower with each grade above K–3. The improvement in East Oak Cliff schools appears to be occurring more in the lower grades, considered to be the most efficient and lasting method of comprehensive educational change.

Minority achievement in EOC, furthermore, has increased as much or more than minority achievement in the rest of the school district, as outlined in the table below.[130] The success of the EOC programs in meeting the needs of black children is also evidenced by the fact that a significantly smaller percentage of black children were targeted for retention in grades K–3 in East Oak Cliff than in other subdistricts.[131] The only subdistrict that has shown consistently greater achievement gains is in the Southwest, a naturally integrated area in the main, where no desegregative pupil assignment is currently in place.

Grade 4 Black Achievement 1979-1980

Large City Median Percentiles

| | Reading | Language | Math |
|---|---|---|---|
| EOC Black Students | 43 | 53 | 39 |
| Remainder of DISD Black Students | 39 | 46 | 38 |

Academic debate has intensified about the extent of educational benefits realized by children as a result of integrated education. Researchers and writers find it difficult to agree on the effect of desegregation on black student achievement. *See* Coleman, *New Incentives for Desegregation*, 7 Human Rights 10 (1978); Crane and Mahard, *Desegregation and Black Achievement: A Review of the Research*, 42 Law and Contemporary Problems 17 (1978). *See also,* Justice Powell's dissenting opinions in *Austin Independent School District v. United States*, 429 U.S. 990, at 991, 97 S.Ct. 517, at

128. *See* Porwoll, *Class Size* (Educational Testing Service 1978).

129. DISD Exhibit 16A. *See also* DISD Exhibits 49A–E.

130. DISD Exhibit 32.

131. DISD Exhibits 27A–D.

517, 50 L.Ed.2d 603 (1976); and *Columbus Board of Education v. Penick*, 443 U.S. 449, at 479, 99 S.Ct. 2941, 2982, at 2988, 61 L.Ed.2d 666. The Plaintiffs' expert on desegregation techniques, Dr. Gordon Foster, testified that studies indicated that minority children reach higher levels of achievement where enrollment is over 80% minority and highest where the concentration is below 50% minority. The lowest level of achievement was established where the proportion of minority students is between 50% and 75%. While this academic debate has no legal relevance on the choice of a student assignment remedy where one is either practicable or feasible, the Court notes that in an over-70% minority district the opportunities to bring minority enrollment beneath 50% are precious few. The application of compensatory education remedies to schools with predominantly minority enrollments, however, is supported by the greater potential both for achievement in these schools and for elimination of the educational vestiges of the dual system.

The East Oak Cliff subdistrict has accomplished much over the last five years and has in a great many respects become a "model for the district and the nation", 412 F.Supp. at 1204, as envisioned in 1976. It has not, however, and in the Court's opinion, will not in the future, "attract anglos into it" because of the time and distance obstacles amplified in more detail below.

## C. *Feasibility of Transportation to Desegregate East Oak Cliff*

Separated from the district's remaining anglo population clusters by time and geography, the East Oak Cliff subdistrict is beyond the practical reach of the *Swann* transportation tools available to this Court. As discussed earlier, these campuses are great distances from any predominantly anglo school, requiring excessive transportation times in Dallas' heavy traffic.

The logistical problems involved in any attempt to desegregate East Oak Cliff were recognized by the two desegregation plans proposed by the Plaintiffs in 1976 but sub-

sequently abandoned during the course of the appeal. Plan B, which would have required the transportation of 47,000 students, would have left 12 elementary schools, 2 junior high schools and one high school in EOC with almost totally black enrollments due to "[d]istance from the majority white areas, capacity of schools, DISD enrollment patterns and generally good physical facilities ...."[132] The continued upswing in minority enrollment since 1975 makes the task assumed by this Court in 1981 even more discouraging than that faced by the Plaintiffs with such little success. The substantial numbers of black students in the East Oak Cliff schools, furthermore, would require many more anglo students for desegregation than this district can offer, and cause more dislocation than this Court can countenance, only to achieve a negligible and transitory quantum of desegregation. The numbers of students in predominantly anglo schools within acceptable time limits, as pointed out in the K–3 analysis, would be inadequate to implement even a minor desegregative effect on the black schools in EOC without creating additional predominantly minority schools at the same time.

The four schools at Nolan Estes Educational Plaza (the former A. Harris Shopping Center) present the same practical problems to development of a student assignment plan. Situated in the middle of the subdistrict along its western border on Interstate 35, the center is over 15 miles from the major areas with predominantly anglo schools, without consideration of the time required for a neighborhood pick-up route. Time and distance runs from A. Maceo Smith, the high school at Estes Plaza to Seagoville, for example, required travel of over an hour and 26 miles. Similar trips to Hillcrest, White and Bryan Adams high schools entailed bus rides of 60, 70 and 53 minutes. While these times are inordinate for students in high schools, imposition of such transportation burdens on the young children in grades K–3 and 4–6 at Estes

---

132. Plaintiffs' Exhibit 16 in 1975, pp. 34, 36, 38.

Plaza is totally unacceptable. At the same time, however, the Court has reservations regarding the current use of the center in view of the structural and noise problems, the current lack of playgrounds and the combination of the K–6 grades with a high school and an alternative school for students with adjustment problems. Recommendations which address these deficiencies or propose other suggestions for the appropriate use of this facility should be presented to the Court in conjunction with proposed remedial plans.

In addition to constraints which time and distance create in East Oak Cliff and at the Nolan Estes Plaza, the feasibility of transportation is further affected by the significant potential for disruption which a new student assignment plan would create for the compensatory education programs now underway. At a point in time where concrete results are being achieved in overcoming the pervasive effects of *de jure* racial separation, any action to disturb this progress seems unwarranted in view of the lack of meaningful desegregation opportunities in East Oak Cliff. The opposition of many black parents to any transportation out of East Oak Cliff was, in great part, premised on the feared consequences of such action on the education afforded their children, in conjunction with an anticipated loss of parental involvement and community support.

Although the Court has concluded that systemwide transportation is not feasible to desegregate the East Oak Cliff subdistrict, children attending these schools do have opportunities under the 1976 Order to attend a desegregated school during their school career. The majority to minority transfer program is one available option which more than 1200 black students, many from East Oak Cliff schools, use to attend schools in other portions of the system. Six magnet high schools are also available for specialized areas of study in the high school grades with 5 academies for grades 4–6 and 6 vanguard schools in grades 7 and 8.

The prospects for any further desegregation in East Oak Cliff, however, can only be described as grim in this minority dominated school district. Charged with the duty to eliminate from the district's schools all vestiges of state-imposed segregation, however, the Court notes again that pupil reassignment is only one remedy for the "condition that offends the Constitution", *Swann*, 402 U.S. at 16, 91 S.Ct. at 1276,—the former *de jure* segregated school system in Dallas. In the face of practical limitations on the use of transportation to desegregate East Oak Cliff, specific educational remedies should be employed to meet the consequences of "previous, unlawful educational isolation . . . ." *Milliken II*, 433 U.S. at 287, 97 S.Ct. at 2761.

### XI. *Magnet High Schools*

The co-existence in 1978 of anglo and minority one-race high schools within a single subdistrict understandably caused the circuit panel much concern. In the four multi-racial subdistricts, the circuit pointed to four high schools, with between 89% and 96% anglo enrollment, which were in common subdistricts with three 95% to 100% minority high schools. 572 F.2d at 1014, n.14. The Circuit directed this Court (1) to evaluate the feasibility of using the *Swann* techniques to eliminate these one-race schools and (2) to reevaluate the effectiveness of the magnet high school concept. In a preceding section the Court noted that there were no longer any one-race anglo high schools and that within a year or so there would be only one predominantly anglo high school, and concluded that the exigencies of time and distance precluded the adoption of pairing and busing as tools for elimination of the remaining one-race and predominantly minority high schools. The use of such other *Swann* techniques as remedial altering of attendance zones to achieve further desegregation will be addressed by the parties pursuant to the remedy section of this opinion.

The remaining question of the effectiveness of the magnet high school concept as a tool for desegregation is really not one, but two distinct questions. The magnet concept must be examined both for its effectiveness in producing a desegregated envi-

ronment within the individual magnet schools and for its effectiveness in carrying the burden of further desegregating all of the high schools in DISD.

The magnet concept, simply stated, is to design a career, vocational or other special program or curriculum at a school that will attract students of all racial and socio-economic backgrounds on a voluntary basis because of the unique or specialized educational opportunities available there. For years, the career development center at Skyline High School has earned much-deserved national recognition as a model magnet program. The 1976 plan ordered the establishment of four new magnet high schools for the 1976 school year, with at least three additional magnets to be opened by the 1979 school year. The order provided that each magnet would maintain enrollment quotas in proportion to the existing ethnic composition of the 9–12 grades, plus or minus 10%. It was contemplated that the number of magnets would increase in subsequent years, as funding for them became available and as demand for new specialized programs escalated. The Court felt that the creation of this expanding network of magnets was the most realistic, feasible and effective way of eliminating any vestiges of the dual system at the high school level.

At present, there are seven magnet high schools in operation.[133] A new Communications and Journalism magnet adjacent to Lincoln High School, built at a cost of $10,000,000, will open its doors in fall, 1981. Land has been acquired in East Oak Cliff for a new Math and Science magnet, but additional funds must be raised through bond issues before construction may commence. The school district is, however, considering providing a temporary location for the Math/Science magnet at the Nolan Estes Plaza until permanent construction funding becomes available. All of these new magnets are centrally located within a two-mile radius of downtown Dallas. The testimony of Superintendent Wright affirmed the district's commitment to maintain and expand the magnet program notwithstanding the fact that per pupil costs exceed those for ordinary schools.

Since the 1976 plan was implemented, the largest enrollment of students in all the magnets combined was 3,688 in Fall 1976. As of March 9, 1981, enrollment in the seven magnet programs included 2,777 out of 35,526 high school students.[134] The racial composition of all students presently enrolled in magnet high school programs is 23.5% anglo, 61.7% black, and 14.8% hispanic. With one exception, all of the magnets fall approximately within the ±10% guidelines for ethnic composition established by the 1976 order.[135] Only the Business and

**133.** The magnet high schools, in addition to the Skyline Career Development Center, are the Arts Magnet at Booker T. Washington, Business and Management, Health Professions, Human Services, Multiple Careers, Public Services, and Transportation magnets.

**134.** Plaintiffs Exhibit 16; Curry Exhibit 1.

**135.** Ethnic composition of each magnet high school breaks down as follows:

Magnet Schools (Grades 9-12)
Full-time and Part-time Enrollment

(All data are current as of March 9, 1981)

| School | Enrollment | White % | Black % | Hispanic % |
|---|---|---|---|---|
| Arts Magnet at BTW | 566 | 50.2 | 42.2 | 7.6 |
| Business & Management | 926 | 6.5 | 78.1 | 15.4 |
| Health Professions | 581 | 21.8 | 65.1 | 13.1 |
| Human Services | 105 | 26.7 | 51.4 | 21.9 |
| Multiple Careers | 90 | 36.7 | 54.4 | 8.9 |
| Public Services | 200 | 30.5 | 45.0 | 24.5 |
| Transportation | 309 | 19.1 | 58.3 | 22.6 |
| Totals | 2777 | 23.5 | 61.7 | 14.8 |

Source: Cunningham Exhibit 10 at 2 (April 15, 1981 Report to the Court)

Management magnet is substantially disproportionate to the ethnic composition of high school enrollment, with an anglo student body of 6.5%. This imbalance reflects the DISD's policy of reserving spaces for members of each racial or ethnic group per the stated quota, but allowing any student to fill an otherwise vacant space once classes start, in an effort to maximize the opportunities for all students to elect to take advantage of these specialized curricula.

An evaluation of each of the individual schools leads to the conclusion that the magnet high school programs provide useful specialized career training and, in general, attract racially and ethnically diversified student bodies.[136] As such, they fulfill educational as well as desegregative goals of the district. Plaintiffs are critical of the DISD's reluctance to strictly maintain the racial enrollment quotas at the Business and Management magnet (and to a lesser extent, at the Transportation magnet, where racial composition falls just within the nether end of the prescribed tolerances). The DISD responds by suggesting that students at these schools receive a "desegregated experience", despite low anglo enrollment, because of the internship programs involving various businesses and community organizations in which the students participate outside the classroom. While DISD's position is not without merit, the record contains virtually no evidence describing the degree of the students' involvement with such businesses or the racial composition of any such businesses, from which the Court could conclude that these co-curricular activities have any additional desegregative impact. However, racially imbalanced magnets (e. g., Business and Management, Transportation) are simply the result of a greater number of blacks than whites electing to take advantage of certain specialized curricula. It would seem unduly draconian to deny students an available seat in one of these classes on the basis of their race, because their quota had been met.[137] In the absence of evidence that the predominantly minority enrollment at the Business and Management magnet was the result of any discriminatory student assignment practice of the school district, the Court will not presume such activity. Rather than impose strict racial quotas in such a fashion as to prevent eager blacks from taking empty anglo seats, the Court believes the proper approach to alleviate the racial imbalance in the exceptional imbalanced magnet programs is to take appropriate steps to recruit more anglos, by publicizing the programs and revising the curricula to make them more magnetic, if necessary.

From a more macroscopic perspective, the magnet high schools do not appear to have had much impact on the overall student assignment pattern in the DISD high schools. Only 8% of all students in grades 9–12 choose to attend magnets. Although the magnets appear to be attracting students on an appropriately diverse basis, they simply do not attract enough students to have any significant ameliorative effect on enrollment at the remaining predominantly one-race schools. Most of the magnets are operating at about half their student capacities. Even if every magnet seat were filled, the total enrollment would amount to only 5656[138], or around 16% of all high school students. So it appears that, although these magnet programs may provide educational enrichment and valuable learning experiences to those students of all races who avail themselves of the opportunities, the magnets have not fulfilled the role envisioned for them by Judge Taylor in altering the pupil assignment configura-

136. See generally, DISD Exhibits 15–A, 15–B.

137. See June 15, 1981, Report of External Auditor, Donald Hood (E.T.S.); DISD Exhibit 15–A, June 15, 1979, Excerpts from Report of External Auditor.

138. Derived from DISD Exhibit 45 at 2–3. This figure is exclusive of student capacity for the Multiple Careers magnet, which presently enrolls 90 students.

tions that would otherwise obtain, by gradually substituting magnet high schools for local high schools throughout the DISD.

The Court finds that the magnet *concept* can be a useful tool as part of a comprehensive desegregation plan, but that as presently implemented by the DISD, the magnet schools cannot single-handedly carry the burden of further desegregating the high schools. As a consequence of this conclusion, the school district and the other parties will be called on to submit to the Court, as part of their desegregation plans, specific, concrete proposals for the continued use of the magnet schools approach, suggesting steps that can be taken to make the magnets as effective in Dallas as they are reported to be in many urban school districts throughout the country. Specific areas that should be addressed include:

(1) publicizing or advertising the curricula and the availability of free transportation, so that every student and parent in the district can be made aware of these options;

(2) eliminating the "competition" over top students that apparently continues to exist between the magnet schools and the regular high schools;

(3) reevaluation of certain low-drawing programs to determine whether individual course-offerings or the overall orientation of the curriculum could be altered to attract greater numbers of racially diverse students into the magnets. Obviously, the size of a program is not a perfect index to the educational benefits it may provide, and the educational justification for a program must be weighed along with the desegregative goals of the program;

(4) development of extracurricular activities on a par with the regular high schools; and

(5) whether the reinstatement of the part-time attendance option would be

beneficial or detrimental to the desegregative aims of the magnet approach.[139]

The parties are encouraged to give free reign to their imaginations in drawing these plans to increase the effectiveness of the magnets. For example, there was much discussion at trial about the relative merits of a "pure" magnet school vis-a-vis a comprehensive magnet school that combines special magnet programs with regular high school programs. The parties may wish to explore the possibilities of converting the Skyline High School to a "pure" magnet and dividing its current attendance zone between the neighboring Madison, Wilson and Adams High Schools. This could possibly be done in such a way as to further desegregate these latter three schools while at the same time doubling the capacity of the Skyline Career Development Center—a successful magnet program, which every year turns students away for lack of spaces. Additionally or alternatively, the parties might consider the establishment of a "downtown" magnet on a scale similar to the present Skyline Career Center. This idea received considerable attention at trial and has been a goal of the district for quite some time, but has not been implemented because of the prohibitive costs associated with land acquisition and construction in the bullish downtown Dallas real estate market. The parties should consider the possibility of establishing this "downtown" magnet at North Dallas High School, which is the most centrally-located high school in the district and is within the two-mile radius from downtown established in Judge Taylor's guidelines. The current attendance zone for North Dallas High might be shrunk or eliminated altogether to accommodate the magnet program, and apportioned between the attendance zones for Wilson, Hillcrest, Jefferson or other high schools to aid in their further desegregation.

---

**139.** *See* June 15, 1981, Report of External Auditor at 12.

The Court is confident that the magnet concept can be improved upon in this district and that the parties can develop plans for implementation that would increase the effectiveness of this device.

## XII. *Majority-to-Minority Transfers*

Another tool for desegregation employed by the 1976 plan is the majority-to-minority transfer option ("M–M"). Under this provision, any student who attends a school in which the percentage of members of his or her race is greater than the district-wide percentage of that race for that grade level may transfer to any school in the district where the percentage of members of that race is less than the district-wide percentage ratio.

In the fall 1976 semester 1,954 students availed themselves of this option, of whom 93% were black, 5.5% were hispanic, and 1.4% were anglo. The number of M–M transfers dropped to 1,592 in the following semester, and has fluctuated between 1,400 and 1,600 students for each semester since 1977. At present there are 1,392 M–M transfer students, of whom 91.7% are black, 7.2% are hispanic, and 1.1% are anglo.[140]

Superintendent Linus Wright and Deputy Assistant Superintendent Homer Fuller testified concerning the impact that the M–M transfer has had on desegregating the schools. From the perspective of the minority "transferor" attendance areas, the impact can be considerable; out of the 4200 students residing in the South Oak Cliff high school zone, 1400 choose to transfer out on either the M–M option or magnet option. In the predominantly anglo high schools in Northwest and Northeast over the last five years as many as one-half of the minority students attending these schools were there by virtue of the M–M transfer option. For example, at Hillcrest in 1980, minority residents in the attendance zone accounted for slightly over half of the 22.3% minority enrollment—the rest

were M–M transfer students. Similar statistics were developed for Bryan Adams and W. T. White high schools.

Even Plaintiffs support the M–M transfer program to the extent that it is effective.[141] However, it is abundantly clear that the program as implemented by DISD is not accomplishing the degree of desegregation that it potentially can and should. A number of reasons for this were advanced at trial. Assistant Superintendent Fuller suggested that the decline in M–M transfers was tied to the high percentages of minorities and low percentages of anglos in most schools as a result of recent demographic changes; as the percentage of minority enrollment increases at more and more of the schools closest to the one-race or predominantly one-race minority schools, there become fewer schools that can accept transfers under the formula and most minorities would prefer to stay at home than travel to a far distant school that can still accept transfers of minority students. Dr. Gordon Foster testified that the low participation in the M–M option can be ascribed to the variety of transfer programs that virtually compete with it for the same minority students wishing to leave the school to which they are assigned. In particular, Foster believes that the M–M option suffers from its competition with the magnet schools; he notes that about half of the blacks who take the M–M transfer use it to attend Skyline, with its magnet-like career center.

Without passing on either of these hypotheses for the limited nature of the role presently played by M–M transfers, the Court finds that a primary reason why the program fails to place a greater number of minority students in anglo schools is a lack of communication about the option with the minority community. DISD communications director Larry Ascough spoke about the difficulties encountered in relying on

---

**140.** Cunningham Exhibit 11. Dr. Gordon Foster testified that anglo participation in M–M transfers at the rate of 1% was typical of most cities using such programs.

**141.** Along with the other transfer programs (magnets, academies, vanguards and curriculum transfers) this option insures that no student need be "locked in" to a one-race or predominantly one-race school.

the students to carry brochures home to their parents, and testified that the costs involved in using a direct mail scheme are prohibitive. The Court notes that efforts are made by travelling recruitment teams to conduct "sales pitches" in the local schools, but these campaigns do not effectively reach the parents, who ultimately make the decisions on the election of these options.

The Court believes the chief problem in this regard is the lack of information concerning the free transportation that is provided for M–M transfers. In the 1978 remand opinion, the Circuit was concerned that DISD had not provided transportation for students choosing this option. 572 F.2d at 1015. In fact, the district *has* provided transportation for M–M transfers since the inception of the program in 1971, but mention of this policy was omitted from the 1976 district court order and due to its omission was presumed lacking by the reviewing court. Presently, the DISD provides school bus transportation where 20 or more students from the same area are travelling to the same school; when fewer students are involved, transportation is provided at DISD's expense over Dallas Transit System routes. Early and late buses are provided in some instances to permit students to participate in activities before or after regular school hours.

The Court was surprised at the number of parents of minority students, testifying as lay witnesses at trial, who were unaware that DISD provided free transportation for M–M transfers. Most telling of all was the testimony of Mrs. Bobbie Shaw and Mr. Jerry Brown—parents whose children presently choose to take M–M transfers—who transport their children to the transferee schools themselves and who only learned of DISD's policy of providing transportation when they took the witness stand in this case. Other witnesses testified that if information about this policy were effectively spread throughout South Dallas and parts of East Oak Cliff, there would be more transfers to the anglo schools in Northwest and Northeast. As part of the remedy in this case, the Court will direct the parties to submit plans (1) discussing methods whereby information about this program could be more effectively disseminated among the minority community; (2) evaluating the feasibility of reducing the number of students needed for a DISD school bus from twenty to ten; and (3) for improving the transportation of those who wish to participate in extracurricular activities, whether the transportation be by Dallas Transit System or DISD school bus.

## XIII. Remedy

Defendant DISD, Plaintiffs, intervenor NAACP, and intervenor Black Coalition, shall file, and any other party may file, with the Court by October 13, 1981, separate desegregation plans prepared in conformity with this Opinion. These plans should address in detail the following subjects:

1. *Majority-to-minority transfer program.* The Court is of the opinion that information about this program must be more effectively communicated to the minority community and directs DISD to submit proposals to that end. The DISD, in particular, as well as the other parties, should evaluate the feasibility of providing (a) school bus transportation, school-to-school, for a minimum of ten students, instead of the present twenty, and (b) improved transportation for majority-minority transferees who desire to participate in extracurricular activities. This evaluation should also address the possibility of putting more than one sending-school on a single route.

In the same connection, the Court requests the parties to consider and report on feasible improvements in transportation for other transfer programs, e. g., magnet schools, curriculum transfers, etc.

2. *Programmatic remedies.* The Court finds that the educational components established in East Oak Cliff to improve achievement of minority students are meeting with success. Each desegregation plan should discuss the feasibility of establishing similar programs in all predominantly minority schools throughout DISD, and

should, additionally, set forth any other feasible programmatic remedies aimed at eliminating the achievement gap between anglo and minority students. *See, e. g.,* Black Coalition Exhibit 4 and DISD Exhibit 44. *See also, Milliken II.*

The cost and timetable for implementing the program remedies proposed should be realistically assessed. *See, e. g.,* DISD Exhibit 63A.

3. *Nolan Estes Plaza.* The parties should evaluate the feasibility of correcting deficiencies which the Court has noted at the Nolan Estes Plaza or propose alternative uses for this facility.

4. *Magnet Schools.* The parties should propose methods for increasing enrollment at the present magnets—especially, for increasing anglo enrollment at the Business and Management Center and the Transportation Center.

The Court requests a report on the Lincoln magnet and an evaluation of its future as a magnet.

The Court desires a report on the current status of plans for the proposed Science magnet in East Oak Cliff, and an analysis of its prospective usefulness as a desegregation tool or otherwise.

The Court directs the parties to evaluate the feasibility of using Skyline solely as a magnet, assigning students in its attendance zone to high schools in contiguous areas.

The Court is interested in any specific plans which DISD has for another Skyline-type magnet. The parties are directed to evaluate (a) the feasibility of using North Dallas High School as a Skyline-type magnet, in view of its relatively central location, and (b) whether more than one additional Skyline-type magnet should be planned.

5. *Attendance zone changes.* The Court desires to determine if any significant additional desegregation can feasibly be obtained by adjustments in contiguous attendance zones and will consider appropriate suggestions for that purpose. Any proposed attendance zone changes should conform to

the limitations of time and distance imposed by this Opinion, and should not disturb the status of already desegregated schools.

The Court is specifically interested in the practicability of the following:

(a) adjusting the attendance zone of W. T. White, and providing special programs at White, to increase its minority enrollment to more than 25%;

(b) adjusting the attendance zones of Hillcrest and Bryan Adams, and adjacent schools, in order to increase desegregation;

(c) accelerating desegregation at Lagow and Mosely, and other predominantly anglo K–3 schools in the Southeast and Northeast subdistricts, by pairing or clustering with contiguous K–3 schools, or by attendance zone changes; and

(d) closing or consolidating schools with low enrollment and reassigning their students to increase desegregation.

Changes, if any, in high school attendance zones will only apply to students enrolling in high school after the effective date of the zone changes. No attendance zone changes will be effective until the 1982–83 school year.

6. *Grades 4–8.* Counsel should evaluate the feasibility and appropriateness of adjusting the current 4–8 transportation plan to further desegregate the predominantly minority 4–8 schools.

As the Court has noted previously in this opinion, a substantial body of minority parents, represented by the Black Coalition, seeks an end to the desegregative busing in grades 4–8, ordered by Judge Taylor in 1976. The Court directs counsel to analyze the feasibility, and the legality, of giving minority students the option to remain in their neighborhood 4–8 centers and waive their constitutional right to be assigned and transported to a desegregated school—in other words, to "opt out" of busing. *See* Rule 23(b)(2), Federal Rules of Civil Procedure; *Penson v. Terminal Transport,* 634 F.2d 989 (5th Cir. 1981); Bell, *supra* note 11.

This Opinion and Order is interlocutory. The Court will enter a final judgment after a hearing on the proposed desegregation plans. The procedures and date for that hearing will be established in a subsequent order.

SO ORDERED.